Slip Op. No. 22-6

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | **Before: Timothy C. Stanceu, Judge**<br><br>**Consol. Court No. 19-00031** |

### OPINION AND ORDER

[Remanding to the issuing agency final determinations resulting from an antidumping duty investigation of imports of certain truck and bus tires from the People's Republic of China.]

Dated: January 24, 2022

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, N.Y. and Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. With him on the brief were *Jordan C. Kahn*, *Elaine F. Wang*, and *Brandon M. Petelin*.

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle, LLP, of Washington, D.C., for consolidated plaintiffs Shanghai Huayi Grp. Corp. Ltd., formerly known as Double Coin Holdings Ltd., and China Manufacturers Alliance LLC. With him on the brief were *James P. Durling* and *Kimberly Reynolds*.

*L. Misha Preheim*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and *Kara M. Westercamp*, Trial Attorney. Of counsel on the brief was *Elio Gonzalez*, Attorney, Office of the Chief

Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge: Plaintiffs contest a final affirmative less-than-fair-value determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in an antidumping duty investigation of certain truck and bus tires from the People's Republic of China ("China" or the "PRC") and the resulting antidumping duty order. Before the court are plaintiffs' motions for judgment on the agency record. Concluding that the less-than-fair-value determination is contrary to law in certain respects, the court remands this determination to Commerce for reconsideration.

## I. BACKGROUND

### A. The Parties to this Consolidated Case

There are two groups of plaintiffs in this consolidated action. One group, to which the court refers collectively as "Guizhou Tyre," consists of Guizhou Tyre Co., Ltd. ("GTC"), a Chinese producer of truck and bus tires, and its affiliated exporter, Guizhou Tyre Import and Export Co., Ltd. ("GTCIE"), a Chinese exporter of this merchandise. Compl. ¶ 3 (Apr. 15, 2019), ECF No. 7. The other group of plaintiffs consists of a Chinese producer and exporter of truck and bus tires, Shanghai Huayi Group Corporation Ltd., to which its counsel refers by its former name, Double Coin Holdings Ltd., and its affiliated U.S. importer, China Manufacturers Alliance LLC

("CMA").  Compl. ¶ 3 (Mar. 18, 2019), Ct. No. 19-00034, ECF No. 7.  The court refers to these two plaintiffs collectively as "Double Coin."  Defendant is the United States.[1]

### B. The Antidumping Duty Investigation and the Contested Determinations

Two related agency decisions stemming from an antidumping duty investigation are contested in this consolidated action.[2]  They are a Final "Less-Than-Fair Value ('LTFV')" Determination, *Truck and Bus Tires From the People's Republic of China: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 82 Fed. Reg. 8,599 (Int'l Trade Admin. Jan. 27, 2017) (the "*Final LTFV Determination*"), and the subsequently-issued antidumping duty order ("Order"), *Truck and Bus Tires From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 4,436 (Int'l Trade Admin. Feb. 15, 2019) (the "*Order*").  Incorporated by reference in the Final LTFV Determination is an "Issues and Decision Memorandum" containing specific findings and explanatory discussion.  *Truck and Bus Tires from the People's Republic of China: Issues*

---

[1] The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), the petitioner in the antidumping duty investigation, was a defendant-intervenor in this action from May 7, 2019 until its withdrawal from the litigation on August 19, 2019.  *See* The USW's Consent Mot. to Intervene (May 2, 2019), ECF No. 9; Order (May 7, 2019), ECF No. 16; [USW]'s Consent Mot. to Withdraw as Def.-Int. (Aug. 16, 2019), ECF No. 32; Order (Aug. 19, 2019), ECF No. 33.

[2] Consolidated with the lead case, *Guizhou Tyre Co., Ltd. et al. v. United States*, Court No. 19-00031, is *China Mfrs. All. LLC et al. v. United States*, Court No. 19-00034.  *See* Order (June 7, 2019), Ct. No. 19-00031, ECF No. 24.

*and Decision Memorandum for the Final Affirmative Determinations of Sales at Less Than Fair*

*Value and Critical Circumstances* (Int'l Trade Admin. Jan. 19, 2017) (P.R. Doc. 855) ("*Final*

*I&D Mem.*").[3]

Commerce initiated the antidumping duty investigation of certain truck and bus

tires from the PRC (the "subject merchandise") in early 2016, *Truck and Bus Tires From*

*the People's Republic of China: Initiation of Antidumping Duty Investigation*, 81 Fed. Reg.

9,434 (Int'l Trade Admin. Feb. 25, 2016), with a period of investigation ("POI") of July 1,

2015 through December 31, 2015, *id*. at 9,435.  Commerce published a Preliminary

Affirmative LTFV Determination later that year, *Truck and Bus Tires From the People's*

*Republic of China: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and*

*Critical Circumstances, and Postponement of Final Determination*, 81 Fed. Reg. 61,186 (Int'l

Trade Admin. Sept. 6, 2016), which incorporated by reference the "Preliminary Decision

Memorandum."  *Truck and Bus Tires from the People's Republic of China: Decision*

*Memorandum for the Preliminary Affirmative Determinations of Sales at Less Than Fair Value*

*and Critical Circumstances, and Postponement of Final Determination* (Int'l Trade Admin.

Aug. 26, 2016) (P.R. Doc. 716) ("*Prelim. Decision Mem.*").  Commerce also published an

Amended Preliminary LTFV Determination.  *Truck and Bus Tires From the People's*

---

[3] All citations to documents from the administrative record are to public
documents.  These documents are cited as "P.R. Doc. __."

*Republic of China: Amended Preliminary Affirmative Determination of Sales at Less Than Fair*

*Value*, 81 Fed. Reg. 71,051 (Int'l Trade Admin. Oct. 14, 2016).

In the Final LTFV Determination, Commerce calculated an estimated weighted

average dumping margin of 22.57% for what it considered to be a nationwide entity (the

"PRC-wide" or "China-wide" entity) consisting of all exporters of the subject

merchandise that it determined not to have rebutted its presumption of control by the

PRC government.  *Final LTFV Determination*, 82 Fed. Reg. at 8,604.  Commerce included

in the China-wide entity 102 companies that did not respond to the Department's

requests for information during the preliminary phase of the antidumping duty

investigation, *Prelim. Decision Mem.* at 4, and ten other companies that responded but

were determined by Commerce to have failed to rebut its presumption of government

control, *Prelim Decision Mem.* at 16–17; *Final I&D Mem.* at 6–8.  Among the ten

companies were Double Coin, *Prelim. Decision Mem.* at 16; *Final I&D Mem.* at 11–13, and

GTCIE, *Prelim Decision Mem.* at 16; *Final I&D Mem.* at 24–28.  Commerce calculated an

individually determined estimated weighted average dumping margin of 9.00% for

Prinx Chengshan (Shandong) Tire Co., Ltd., the other mandatory respondent, which

Commerce considered to have rebutted its presumption of government control and

thus was a "separate rate" respondent, i.e., a respondent entitled to receive a margin

separate from the rate assigned to the PRC-wide entity.  *Final I&D Mem.* at 6–7.

Commerce assigned the 9.00% rate to the numerous other companies that Commerce

also determined to have rebutted the presumption of government control and therefore

qualified for a separate rate but, not having been individually investigated, did not

receive an individually determined margin. *Final LTFV Determination*, 82 Fed. Reg. at

8,600–04; *Final I&D Mem.* at 6–7.

### C. Proceedings Before the Court

Guizhou Tyre and Double Coin commenced their respective actions on

March 15, 2019.  Summons, Ct. No. 19-00031, ECF No. 1; Compl. (Apr. 15, 2019),

Ct. No. 19-00031, ECF No. 7; Summons, Ct. No. 19-00034, ECF No. 1; Compl. (Mar. 18,

2019), Ct. No. 19-00034, ECF No. 7.  The actions were consolidated on June 7, 2019.

Order, Ct. No. 19-00031, ECF No. 24.

Before the court are the Rule 56.2 motions for judgment on the agency record of

Guizhou Tyre, *see* Mot. for J. on the Agency R. of Pls. [GTC] and [GTCIE] (Oct. 2, 2019),

ECF Nos. 39 (conf.), 40 (public) ("Guizhou Tyre's Br."), and Double Coin, *see*

Consolidated Pls.' Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (Oct. 2, 2019),

ECF No. 41-1 ("Double Coin's Br.").  Defendant opposes both motions in all respects.

Def.'s Resp. to Pls.' Rule 56.2 Mots. for J. on the Admin. R. (Feb. 7, 2020), ECF Nos. 48

(conf.), 49 (public) ("Def.'s Br.").  Plaintiffs filed their replies to defendant's opposition

on March 16, 2020.  Reply of Pls. [GTC] & [GTCIE], ECF Nos. 50 (conf.), 51 (public)

("Guizhou Tyre's Reply"); Consolidated Pls.' Reply Br., ECF No. 52 ("Double Coin's

Reply").

Guizhou Tyre submitted a Notice of Supplemental Authority in April 2021.

Notice of Suppl. Authority (Apr. 30, 2021), ECF No. 61.  Defendant filed a Notice of

Supplemental Authority in June 2021.  Notice of Suppl. Authority (June 28, 2021), ECF

No. 62.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced

under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C.

§ 1516a, including an action contesting a final determination that Commerce issues to

conclude an antidumping duty investigation.[4]

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *SKF USA, Inc. v.*

*United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. Nat'l*

*Labor Relations Bd.*, 305 U.S. 197, 229 (1938)).

---

[4] All citations to the United States Code herein are to the 2012 edition, except
where otherwise indicated.

### B. Plaintiffs' Motions for Judgment on the Agency Record

Guizhou Tyre raises three claims in contesting the Final LTFV Determination.

One of its claims contests the legal basis for the Order: it asserts that the Order was

invalid when issued because no affirmative finding of injury or threat by the U.S.

International Trade Commission ("ITC" or "Commission") was in effect at that time.

Guizhou Tyre's Br. 39–41.  Guizhou Tyre claims, second, that the denial of its separate

rate application was contrary to law because Commerce, abandoning its prior test for

separate rate status without proper notice or explanation, failed to consider whether the

government control it found was, specifically, control over export activities.  *Id.* at 19–

24.  Its remaining claim is that the Department's determination that Guizhou Tyre did

not rebut Commerce's presumption of *de facto* government control is unsupported by

substantial evidence on the record.  *Id.* at 24–30.

Double Coin asserts four claims.  It claims that Commerce lacked statutory

authority to establish a dumping margin for a nationwide entity.  Double Coin's Br. 7–

27.  Its second and third claims, which parallel those of Guizhou Tyre, are that

Commerce failed to apply its established separate rate methodology, *id.* at 27–29, and

that Commerce was unsupported by substantial evidence in deciding that Double Coin

did not rebut Commerce's presumption of *de facto* government control, *id.* at 30–49.

Finally, Double Coin claims that Commerce contravened the antidumping duty statute

when it selected Double Coin for individual investigation and then failed to verify

Double Coin's relevant factual information.  *Id.* at 49–53.

### C. Guizhou Tyre's Claim that the Antidumping Duty Order Was Invalid at the Time of Issuance

Guizhou Tyre claims that the Order was invalid when Commerce issued it on

February 15, 2019, arguing that no affirmative injury or threat determination of the ITC

had gone into effect as of that date.  Guizhou Tyre's Br. 39–41.  According to Guizhou

Tyre, Commerce, before issuing the Order, should have awaited the outcome of

litigation in this Court contesting the initial final determination of the ITC, which

reached a negative finding of injury or threat to the domestic industry.  Guizhou Tyre's

Reply 18; *see United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*

*Workers, Int'l Union, AFL-CIO, CLC v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1328,

1339 (2018) ("*USW I*").  Upon the conclusion of that litigation on February 18, 2020—

approximately a year after Commerce issued the Order—this Court entered a judgment

sustaining an affirmative final injury determination that the ITC submitted on remand.

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers, Int'l*

*Union, AFL-CIO, CLC v. United States*, 44 CIT __, __, 425 F. Supp. 3d 1374, 1381 (2020)

("*USW II*").  The court finds merit in Guizhou Tyre's claim.

Upon issuing the Order on February 15, 2019, Commerce, as background,

referred to the Commission's initial, negative final determination, stating that "[o]n

March 13, 2017, the ITC notified Commerce of its final determination that an industry in

the United States is not materially injured or threatened with material injury within the

meaning of section 735(b)(1)(A) of the Act [19 U.S.C. § 1673d(b)(1)(A)] by reason of

imports of truck and bus tires from China at less than fair value." *Order*, 84 Fed. Reg. at

4,436 (footnote omitted). "Accordingly, Commerce instructed CBP [U.S. Customs and

Border Protection] to liquidate entries of subject merchandise without regard to

antidumping duties." *Id*. (footnote omitted). The Commission published its negative

final determination four days later. *Truck and Bus Tires From China*, 82 Fed. Reg. 14,232

(Int'l Trade Comm'n Mar. 17, 2017).

On April 14, 2017, the petitioner in the antidumping duty investigation

commenced an action in this Court according to section 516A of the Tariff Act, 19 U.S.C.

§ 1516a, to contest the ITC's negative final determination. Summons (Apr. 14, 2017),

Ct. No. 17-00078, ECF No. 1; Compl. (Apr. 14, 2017), Ct. No. 17-00078, ECF No. 6.

Reviewing that determination, this Court held on November 1, 2018, that some, but not

all, of the Commission's material findings of fact in the negative final determination

were supported by substantial record evidence. *USW I*, 42 CIT at__, 348 F. Supp. 3d at

1339–40. On that basis, this Court remanded the negative material injury determination

back to the Commission for reconsideration of various findings. *Id*.

On January 30, 2019, the ITC issued its redetermination in response to this

Court's order of remand in *USW I*. *See Order*, 84 Fed. Reg. at 4,436. This

redetermination concluded that imports of truck and bus tires from China materially

injured the domestic industry.[5]  *See USW II*, 44 CIT at__, 425 F. Supp. 3d at 1377.  On

February 8, 2019, the ITC notified Commerce of its affirmative remand redetermination.

*Order*, 84 Fed. Reg. at 4,436.  Seven days later, on February 15, 2019, Commerce

published the Order.  *Id*.  The ITC published a notice announcing its affirmative remand

redetermination.  *Truck and Bus Tires From China*, 84 Fed. Reg. 4,855 (Int'l Trade

Comm'n Feb. 19, 2019).

On February 18, 2020, more than a year after Commerce issued the Order, the

Court of International Trade sustained the ITC's remand redetermination.  *USW II*,

44 CIT at __, 425 F. Supp. 3d at 1381.  This Court entered judgment the same day.[6]

Judgment (Feb. 18, 2020), Ct. No. 17-00078, ECF No. 120.

Guizhou Tyre argues that the ITC's remand redetermination had no legal effect

at the time it was issued because it was merely a redetermination pending a decision of

this Court.  Guizhou Tyre's Br. 40 ("Just as all other trade redeterminations made on

---

[5] While reaching an affirmative injury determination in its remand
redetermination, "the ITC found that critical circumstances do not exist with respect to
imports of subject merchandise from China that are subject to Commerce's final
affirmative critical circumstances finding."  *Truck and Bus Tires From the People's Republic
of China: Antidumping Duty Order*, 84 Fed. Reg. 4,436, 4,436 (Feb. 15, 2019).

[6] No notice of appeal having been filed in the *USW* litigation, the judgment of the
Court of International Trade sustaining the ITC's affirmative injury determination
became final and conclusive 60 days later, on April 18, 2020.

remand lack legal effect until affirmed by this Court, it is patently unreasonable for the *AD Order* to have issued before such affirmance."). It submits that "Commerce should not have issued the *AD Order* until after this Court affirmed the ITC redetermination." Guizhou Tyre's Reply 18.

Disagreeing with Guizhou's Tyre's argument, defendant responds that Commerce issued the Order in compliance with 19 U.S.C. § 1673e(a) (2018), which, according to defendant, required Commerce to issue an antidumping duty order within seven days of being notified by the Commission, on February 8, 2019, of the affirmative material injury determination. Def.'s Br. 30–31 (citing 19 U.S.C. § 1673e(a) (2018)). The government argues, in addition, that the Department's issuance of the Order following the ITC's notification to Commerce of the affirmative remand redetermination complied with its obligation under the relevant Tariff Act provisions as construed by the Court of Appeals for the Federal Circuit ("Court of Appeals" or "CAFC") in *Diamond Sawblades Mfrs. Coal. v. United States*, 626 F.3d 1374 (Fed. Cir. 2010) ("*Diamond Sawblades IV*"). *Id.* Guizhou Tyre maintains that *Diamond Sawblades IV* does not control the outcome of this case, arguing that certain language in the opinion, which addresses a factual situation other than the one that was before the Court of Appeals, is *dicta*. Guizhou Tyre's Reply 18. For the reasons discussed below, the court agrees with Guizhou Tyre's argument.

*Diamond Sawblades IV*, which affirmed the decision of this Court in *Diamond Sawblades Mfrs. Coal. v. United States*, 33 CIT 1422, 650 F. Supp. 2d 1331 (2009) ("*Diamond Sawblades III*"), arose from facts that were dissimilar, in a critical respect, to those of this case.  As discussed below, the antidumping duty orders involved in the *Diamond Sawblades* litigation were issued after this Court sustained an affirmative ITC determination reached on remand during the litigation.  The pertinent facts in the *Diamond Sawblades* litigation, as presented in the various judicial opinions, are as follows.

Following an affirmative final LTFV determination by Commerce on May 22, 2006, the ITC, on July 11, 2006, published a negative final determination, concluding that the diamond sawblades industry in the United States was neither materially injured, nor threatened with material injury, by the subject imports from Korea and China.  *See Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (Int'l Trade Comm'n May 22, 2006), *as amended by Notice of Amended Final Determination of Sales at Less Than Fair Value: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 35,864 (Int'l Trade Comm'n June 22, 2006); *Diamond Sawblades Mfrs. Coal. v. United States*, 32 CIT 134, 134 (2008) ("*Diamond Sawblades I*").  The petitioner in the antidumping duty investigation, the Diamond Sawblades Manufacturers Coalition, contested the

Commission's negative final determination in an action brought in this Court, *Diamond Sawblades I* at 142, which ruled that the ITC had relied upon an unsupported finding and remanded the case to the Commission for further proceedings, *id*. at 150.  On remand, the Commission, on May 14, 2008, reached a negative determination of injury, but an affirmative determination of threat, to the domestic industry; this Court sustained the ITC's remand redetermination on January 13, 2009.  *Diamond Sawblades Mfrs. Coal. v. United States*, 33 CIT 48 (2009) ("*Diamond Sawblades II*").

On January 22, 2009, the Commission notified Commerce that the Court of International Trade had issued a final decision sustaining the ITC's affirmative remand redetermination, and in response, Commerce published a notice pursuant to 19 U.S.C. § 1516a(c)(1) (a "*Timken*" notice) on February 10, 2009.  *See Diamond Sawblades III*, 33 CIT at 1424, 650 F. Supp. 2d at 1335; *see also Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea: Notice of Court Decision Not in Harmony With Final Determination of the Antidumping Duty Investigations*, 74 Fed. Reg. 6,570 (Int'l Trade Admin. Feb. 10, 2009).[7]  The Department's *Timken* notice on the decision of this

---

[7] Sections 1516a(c)(1) and 1516a(e) of Title 19, United States Code, 19 U.S.C. § 1516a(c)(1), require publication of a notice of a final court decision of the Court of International Trade or the Court of Appeals for the Federal Circuit sustaining, in whole or in part, a cause of action brought under 19 U.S.C. § 1516a to contest a final determination of Commerce or the Commission, within 10 days of that court decision. *Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990), held that the notice of a decision of the Court of International Trade under this provision must be published (continued . . .)

Court in *Diamond Sawblades II* announced that "[i]f the [Court of International Trade's] opinion in this case is not appealed, or is affirmed on appeal, then antidumping duty orders on diamond sawblades from the PRC and Korea will be issued." *Diamond Sawblades and Parts Thereof from the People's Republic of China and the People's Republic of Korea: Notice of Court Decision Not in Harmony With Final Determination of the Antidumping Duty Investigations*, 74 Fed. Reg. at 6,570.  On March 13, 2009, parties who had been defendant-intervenors in the litigation before this Court filed notices of appeal of the judgment sustaining the Commission's affirmative redetermination.  *Diamond Sawblades III*, 33 CIT at 1425, 650 F. Supp. 2d at 1335.

The dispute in *Diamond Sawblades III* arose when the petitioner in the antidumping duty investigation, the Diamond Sawblades Manufacturers Coalition, claimed that Commerce erred in declining to issue antidumping duty orders, and declining to order the collection of cash deposits, until the judgment entered by this Court in *Diamond Sawblades II* became final and conclusive, i.e., when appeals had been exhausted.  The petitioner sought as a remedy a writ of mandamus to compel Commerce to issue antidumping duty orders and order the collection of cash deposits.

---

(. . . continued)
within 10 days of such decision, regardless of whether the decision remains subject to appeal, and that Commerce must order the liquidation of entries of subject merchandise to be suspended until there is a "conclusive" judicial decision in the case, i.e., when the decision can no longer be attacked on appeal.  *Id*. at 341–42.

*Id.*, 33 CIT at 1425, 650 F. Supp. 2d at 1336.  In *Diamond Sawblades III*, this Court issued

the writ of mandamus, and the Court of Appeals affirmed that decision in *Diamond*

*Sawblades IV*, 626 F.3d at 1383.  The Court of Appeals stated that "the statutory scheme

imposes a mandatory duty on Commerce to issue antidumping duty orders covering

the subject entries upon being notified of the Commission's final determination, a

notification that in this case occurred on January 22, 2009," which was the date the ITC

notified Commerce that the Court of International Trade, in *Diamond Sawblades II*, had

sustained its remand redetermination.  *Id.*  The Court of International Trade had entered

a judgment sustaining the Commission's remand redetermination on January 13, 2009,

nine days prior to the ITC's notification.  *Diamond Sawblades II*, 33 CIT at 48–49.

          The issue before the Court of Appeals in *Diamond Sawblades IV* was whether the

Court of International Trade erred in issuing a writ of mandamus to compel the

immediate publication of the antidumping duty orders and order the collection of cash

deposits.  *Diamond Sawblades IV*, 626 F.3d at 1375–76.  At that point in time, the Court of

International Trade already had entered a judgment sustaining the ITC's remand

redetermination, a judgment that was not yet "conclusive" as it still was subject to

appeal.  As the Court of Appeals explained,

> Commerce took the position that under the governing statutes it was not
> required to issue antidumping duty orders or to collect cash deposits until
> the final conclusion of the litigation challenging the predicates for entering
> antidumping duty orders, i.e., until Commerce received notice from the
> Commission that no appeal would be taken to this court or, if an appeal

was taken, until this court issued a "conclusive decision" upholding the
decision of the Court of International Trade.

*Diamond Sawblades IV*, 626 F.3d at 1377.  Rejecting the Department's position, the Court

of Appeals resolved the issue before it by holding that Commerce erred in delaying the

issuance of the antidumping duty orders, and ordering the collection of cash deposits,

as it awaited a final and conclusive judicial determination in the parallel litigation

contesting the ITC's negative final determination.  *Id*. at 1383–84.  The Court of Appeals

ruled, therefore, that this Court had not abused its discretion in issuing the writ of

mandamus to compel Commerce to issue the antidumping duty orders and collect cash

deposits.  *Id*.

The opinion in *Diamond Sawblades IV* contains the following passage:

> To be sure, as we have noted, the Commission in this case issued its
> notification to Commerce at the time of the court decision upholding its
> remand determination, rather than at the time of the remand
> determination itself.  In that respect, the Commission appears to have
> erroneously assumed that its obligation to issue a notice under section
> 1673d(d) was triggered by the court decision upholding its remand
> determination, rather than by the issuance of the remand determination
> itself.  Nonetheless, the Commission's notice, even if late, still constituted
> a valid notification of the Commission's final determination on remand
> for purposes of section 1673d(d), and it therefore triggered Commerce's
> obligation to issue an antidumping duty order under section 1673e(a).
> Nothing in *Timken* [*v. United States*, 893 F.2d 337 (Fed. Cir. 1990)] or any
> other decision of this court is to the contrary.

*Id*. at 1381.  Earlier in the *Diamond Sawblades IV* opinion, in a footnote, the Court of

Appeals stated that:

> The Commission waited until after the Court of International Trade
> sustained its remand determination, even though the governing statute,
> 19 U.S.C. § 1673d(d), requires that notification of a determination be made
> "[w]henever the . . . Commission makes a determination" under section
> 1673d; the statute does not require or contemplate that the notification will
> issue only after court review of the Commission's remand
> redetermination.

*Id*. at 1378 n.1.

Guizhou Tyre argues that the conclusion by the Court of Appeals that the

Commission's obligation to issue the *Timken* notice was triggered by the ITC's remand

redetermination does not state the holding of *Diamond Sawblades IV* and is, instead, *dicta*.

Guizhou Tyre is correct.  The issue on appeal in *Diamond Sawblades IV* was whether

Commerce unlawfully delayed the issuance of antidumping duty orders and cash

deposit collection.  The issue of whether the *Commission* erred in notifying Commerce of

its remand redetermination only after that redetermination had been sustained by the

Court of International Trade was not before, or decided by, the Court of International

Trade in *Diamond Sawblades III* and accordingly was not before the Court of Appeals in

*Diamond Sawblades IV*.  Had that issue actually been before the Court of Appeals, and

fully briefed on that basis, the appellate court may have reached a different conclusion.

Although the opinion in *Diamond Sawblades IV* speculated that "the Commission

appears to have erroneously assumed that its obligation to issue a notice under section

1673d(d) was triggered by the court decision upholding its remand determination,

rather than by the issuance of the remand determination itself," *id*. at 1381, this sentence

does not state a holding of the case and, therefore, is not controlling on the claim Guizhou Tyre raises in this dispute.

Unlike *Diamond Sawblades IV*, this case squarely presents the question of whether Commerce, as Guizhou Tyre claims, erred in issuing the Order, and directing the collection of cash deposits pursuant to that Order, *before* the Court of International Trade had decided whether the ITC's affirmative remand redetermination should be sustained or remanded back to the Commission. The court next turns to this question.

The court considers, first, the immediate effect, and the continuing effect, of the ITC's negative final determination. The Commission notified Commerce of this determination on March 13, 2017.[8]  *See Order*, 84 Fed. Reg. at 4,436. On March 17, 2017, the Commission published this determination in the Federal Register. *Truck and Bus Tires From China*, 82 Fed. Reg. at 14,232. According to the Tariff Act, the immediate effect of publication was to terminate the antidumping duty investigation, both as to the Commission and as to Commerce. *See* 19 U.S.C. § 1673d(c)(2) (directing, in the event of a negative final determination of the ITC under § 1673d(b), that "the investigation shall

---

[8] "Whenever the administering authority or the Commission makes a determination under this section [1673d], it shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based, and it shall publish notice of its determination in the Federal Register." 19 U.S.C. § 1673d(d).

be terminated upon the publication of notice of that negative determination.")[9]  The

statute directed, further, that upon the publication of the Federal Register notice

required by 19 U.S.C. § 1673d(d), Commerce "shall—(A) terminate the suspension of

liquidation under section 1673b(d)(2) of this title, and (B) release any bond or other

security, and refund any cash deposit, required under section 1673b(d)(1)(B) of this

section."[10]  *Id.*

　　　　The continuing effect of the ITC's negative final determination is also defined by

the Tariff Act.  An affirmative final determination of the Commission being essential to

the entry of an antidumping duty order, the effect of the Commission's negative final

determination in this instance was to preclude the issuance of any antidumping duty

order, from the date of publication (March 17, 2017) until invalidation of that negative

final determination.  *See* 19 U.S.C. §§ 1673, 1673d(c)(2) (requiring for the issuance of an

---

[9] The *USW* litigation in this Court continued for approximately the next three years, i.e., from April 14, 2017 to February 18, 2020, the date this Court entered its judgment in *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers, Int'l Union, AFL-CIO, CLC v. United States*, 44 CIT __, 425 F. Supp. 3d 1374 (2020) ("*USW II*").  Therefore, the antidumping duty investigation, having been terminated by operation of 19 U.S.C. § 1673d(c)(2) on March 17, 2017, was not ongoing during the pendency of the *USW* litigation.

[10] Commerce, on April 4, 2017, instructed U.S. Customs and Border Protection to liquidate all affected entries "without regard to antidumping duties."  *Order*, 84 Fed. Reg. at 4,436 ("Accordingly, Commerce instructed CBP to liquidate entries of subject merchandise without regard to antidumping duties.") & 4,436 n.3 (citing CBP Message No. 7094307 dated Apr. 4, 2017).

antidumping duty order an affirmative final less-than-fair value determination by

Commerce and an affirmative final injury or threat determination by the Commission).

The court considers, next, the effect of the Commission's submitting its remand

redetermination for this Court's consideration on January 30, 2019, during the *USW*

litigation, and its notifying Commerce of its remand redetermination on February 8,

2019. The court concludes that neither event invalidated the ITC's negative final

determination, and neither put the ITC's affirmative remand redetermination into

effect.

The negative ITC determination was a *final* determination (as defined in

19 U.S.C. § 1673d(b)). By operation of 19 U.S.C. § 1673d(c)(2), it went into effect and

was not invalidated by the subsequent commencement of the action under 19 U.S.C.

§ 1516a to contest it. After that action was brought, the Court of International Trade, on

November 1, 2018, issued an interlocutory order directing the Commission to

reconsider certain findings (on the nature of export subsidies and on price effects) it had

made in reaching its negative determination and to submit a new decision upon

remand. *USW I*, 42 CIT at __, 348 F. Supp. 3d at 1339–40. This Court ordered

reconsideration of the negative final determination "consistent with this opinion." *Id*. at

1339. The *USW* litigation continued for another year (until the entry of judgment on

February 18, 2020) and entailed this Court's considering comments of the parties on the

ITC's remand redetermination and an oral argument. *See USW II*, 44 CIT at __, 425 F.

Supp. 3d at 1377.  Necessarily, the litigation carried with it the possibility of further

changes to the outcome prior to a final disposition.  *See*, *e.g.*, USCIT R. 54(b) (stating the

general rule that any decision of this Court that does not adjudicate all claims or the

rights and liabilities of all parties "may be revised at any time before the entry of a

judgment").

While it is well established that the Court of International Trade, in conducting

judicial reviews under section 516A of the Tariff Act, has the power to issue

interlocutory orders, including orders for reconsideration of contested determinations

of Commerce or the Commission, section 516A also contemplates that judicial review in

the Court of International Trade will result in an agency "disposition" that is

"consistent with the final disposition of the court."  19 U.S.C. § 1516a(c)(3) (2018) ("If the

final disposition of an action brought under this section is not in harmony with the

published determination of the Secretary, the administering authority, or the

Commission, the matter shall be remanded to the Secretary, the administering

authority, or the Commission, as appropriate, for disposition consistent with the final

disposition of the court.").  As of January 30, 2019, the date the ITC submitted its

remand redetermination, as of February 8, 2019, the date the ITC notified Commerce of

that redetermination, and as of February 15, 2019, the date Commerce published the

Order, the Court of International Trade was far from reaching a final disposition, for it

had yet even to decide whether the ITC's remand redetermination complied with the

interlocutory order it had issued on November 1, 2018. Were that redetermination

ultimately held by this Court not to so comply, it could not have been put into effect in

any respect, including by the collection of cash deposits upon publication of an

antidumping duty order. Nevertheless, Commerce took steps to effectuate the ITC's

remand redetermination by issuing the Order and directing U.S. Customs and Border

Protection ("Customs") to collect cash deposits thereunder. Those steps were

authorized neither by the Tariff Act nor by the Court of International Trade, and in

effect they usurped this Court's authority over the conduct of the judicial review

proceeding.

      In addition to arguing that the Department's action was in accord with the

decision of the Court of Appeals in *Diamond Sawblades IV*, defendant also argues that

Commerce was required to issue the Order when it did to comply with the directive in

19 U.S.C. § 1673e(a) (2018). Def.'s Br. 30–31. The court rejects this argument. The cited

provision states that "[w]ithin 7 days after being notified by the Commission of an

affirmative determination under section 1673d(b) of this title, the administering

authority [i.e., Commerce] shall publish an antidumping duty order." 19 U.S.C.

§ 1673e(a) (2018). The "affirmative determination under section 1673d(b)" mentioned in

this provision is a "final determination" of material injury or threat by the Commission,

made in the ordinary course during an antidumping duty investigation, and following

a final LTFV determination by Commerce. *See id.* § 1673d(b) (2018). That was not the

situation at the time Commerce erroneously entered the Order.  For the reasons the

court discussed previously, the antidumping duty investigation, having been

terminated upon the ITC's earlier negative final determination, was not ongoing at that

time.  Because finality—in any sense of the word—had not yet attached to the ITC's

remand redetermination as of February 8, 2019, the date the ITC notified Commerce of

it, Commerce did not have before it a notification by the Commission of a decision that

was described by 19 U.S.C. § 1673e(a) (2018), and the Department's authority or duty to

issue an antidumping duty order had not yet arisen.[11]

The court's conclusion is further illustrated by an example.  If, for instance, a

contested final determination of the ITC were an affirmative one instead of a negative

one (followed, necessarily, by the publication of an antidumping duty order), and were

the ITC's affirmative final determination contested in this Court with the result that the

Commission submitted a negative determination on remand, it could not correctly be

argued that the ITC's mere notification to Commerce of that negative remand

redetermination, or the submission of that decision for the consideration of this Court,

would have been sufficient to revoke the antidumping duty order.  The ITC's negative

---

[11] In the *Diamond Sawblades* litigation, the Commission described its affirmative remand redetermination as "final" in the notification it submitted to Commerce.  *See Diamond Sawblades IV*, 626 F.3d at 1379.  As mentioned *supra*, this notification followed the entry of judgment by this Court sustaining the remand redetermination, an event that had not occurred as of the time the ITC notified Commerce of its remand redetermination in the *USW* litigation.

determination on remand would not have been the equivalent of a negative

determination under 19 U.S.C. § 1673d(b)(1) (2018), which, in order to effect a

termination of an antidumping duty investigation by operation of 19 U.S.C.

§ 1673d(c)(2) (2018), must be one to which finality has attached.  Under neither that

factual scenario, nor the one presented by this case, does any provision in the Tariff Act

attach finality to a redetermination by an administrative agency that is submitted for

this Court's consideration in remand proceedings this Court conducts to adjudicate a

challenge to a final agency determination brought under 19 U.S.C. § 1516a (2018).

In summary, the ITC's remand redetermination was not a determination

described by 19 U.S.C. § 1673e(a) (2018) as of February 8, 2019, the date the ITC notified

Commerce of this decision.  Therefore, the Department's issuance of the Order on

February 15, 2019, *Order*, 84 Fed. Reg. at 4,436, was premature.

The court next addresses the issue of the procedure Commerce should have

followed with respect to issuance of an antidumping duty order.  In provisions that do

not refer specifically to judicial review, the Tariff Act specifies the normal procedures

for issuance of an antidumping duty order when Commerce and the ITC have issued

affirmative final determinations: "If the determinations of the administering authority

and the Commission under subsections (a)(1) [19 U.S.C. § 1673d(a)(1) (2018), the final

less-than-fair value determination by Commerce] and (b)(1) [19 U.S.C. § 1673d(b)(1)

(2018), the final determination of the Commission] are affirmative, then the

administering authority shall issue an antidumping duty order under section 1673e(a)

of this title." 19 U.S.C. § 1673d(c)(2) (2018). The Commission's affirmative remand

redetermination was sustained in a judgment of this Court entered on February 18,

2020. Judgment, Ct. No. 17-00078, ECF No. 120. In accordance with the holding of

*Diamond Sawblades IV*, Commerce was required to take steps to publish an antidumping

duty order at that time rather than after any appeal of the judgment entered in *USW II*

had been exhausted.[12] Because the earliest date Commerce could have published an

antidumping duty order in the Federal Register was February 21, 2020, the court,

consistent with the holding in *Diamond Sawblades IV*, intends to adopt this date in

fashioning a remedy for Guizhou Tyre's successful claim that the Order was issued

prematurely.[13]

---

[12] Under 19 U.S.C. § 1516a(c)(1) (2018) and the companion provision, 19 U.S.C. § 1516a(e) (2018), as interpreted by *Timken Co.*, 893 F.2d at 337, Commerce should have arranged for Federal Register publication of a *Timken* notice. The court is unable to find a *Timken* notice for the *USW II* decision of this Court in the Federal Register issues published for the ten-day period following February 18, 2020.

[13] The court recognizes that as a practical matter, it would have been unlikely (but not impossible) that Commerce could have published an antidumping duty order on Friday, February 21, 2020. Under "regular schedule" procedures for Federal Register publication, doing so would have required Commerce to submit the document to the Federal Register by 2:00 p.m. on Tuesday, February 18, 2020, the same day this Court issued its judgment in *USW II*. *See* 1 C.F.R. § 17.2 (2019) (under which submission before 2:00 p.m. results in publication on the third day after submission). It would not appear that the publication under the "Criteria for emergency publication," *id.* § 17.3 ("prevention, alleviation, control, or relief of an emergency situation") would have been (continued . . .)

In issuing the Order on February 15, 2019, Commerce announced a series of implementing steps.  It stated, first, that "Commerce will direct CBP to assess, upon further instruction by Commerce, antidumping duties equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of truck and bus tires from China." *Order*, 84 Fed. Reg. at 4,436.  "These antidumping duties will be assessed on unliquidated entries of truck and bus tires from China entered, or withdrawn from warehouse, for consumption on or after the effective date of this antidumping duty order."  *Id*.  Second, Commerce announced that "effective the publication date of this order, we will instruct CBP to suspend liquidation on all entries of truck and bus tires from China" and that "[t]hese instructions suspending liquidation will remain in effect until further notice."  *Id*. at 4,437.  Third, Commerce announced that "[w]e will also instruct CBP to require cash deposits at rates equal to the estimated weighted-average dumping margins indicated below."  *Id*.  The notice specified the rate of 22.57% for the "China-Wide Entity" (which included GTCIE), *id*. at 4,440, and which cash deposit rate would be adjusted downward to 2.83% upon deducting the amended countervailing

---

(. . . continued)

available, and even if it had been, publication earlier than February 21, 2020 would have been extremely unlikely.  Based on the circumstances, court intends to adopt February 21, 2020 as the earliest date Commerce possibly could have published an antidumping duty order.

duty rate of 19.74% attributable to domestic pass-through subsidies and export

subsidies, as determined in "the concurrent countervailing duty investigation," *id*. at

4,437 n.9.

     As the court noted previously, the effect of the publication of the ITC's initial,

negative determination on March 17, 2017, as provided by 19 U.S.C. § 1673d(c)(2), was

termination of the investigation, termination of the suspension of liquidation that

previously had been imposed under 19 U.S.C. § 1673b(d)(2), the release of any security,

and the refund of any cash deposits.  By operation of that statutory provision, the

investigation remained terminated until the first possible effective date of an

antidumping duty order, which in this instance appears to have been February 21, 2020.

In this situation, the Tariff Act requires that entries made prior to that date not be

assessed antidumping duties.  The court intends to order Commerce to direct Customs

to liquidate these entries without regard to antidumping duties and to refund all cash

deposits collected on these entries, with interest as provided by law, when it enters a

judgment to conclude this judicial review proceeding.  In the remand redetermination

that Commerce will file in response to this Opinion and Order, Commerce may

comment on the remedy the court intends to order, including in particular the court's

choice of February 21, 2020 as the earliest possible date the Order could have been

entered.  The parties may address that remedy also, in their comment submissions on

the Department's remand redetermination.

### D. The Department's Denial of Separate Rate Status for GTCIE

In antidumping duty investigations of imports from nonmarket economy ("NME") countries, including the PRC, the Department's practice is to begin "with a rebuttable presumption that all companies within the country are subject to government control." *Final I&D Mem.* at 6. Under this practice, Commerce assigns all exporters and producers of investigated merchandise a single rate unless "an exporter can demonstrate that it is sufficiently independent to be entitled to a separate rate." *Id.* (footnote omitted). To rebut the presumption, an exporter or producer must demonstrate "*de jure*" and "*de facto*" independence from government control. *See id.* Commerce concluded that GTCIE had not rebutted its presumption of *de facto* control by the PRC government. *Id.* at 27.

Commerce noted, and it is not contested, that during the period of investigation the Guiyang Industry Investment Group Co., Ltd. ("GIIC") held a 25.20% ownership stake in GTC (which owned 100% of GTCIE), and that GIIC was 100% owned by a government entity, the Guiyang State-owned Assets Supervision and Administration Commission (the "Guiyang SASAC"). *See id.* at 24. In the Preliminary Decision Memorandum, Commerce preliminarily determined "that Guizhou Tyre Import & Export Co., Ltd. [GTCIE] did not rebut the presumption of the *de facto* control over the company's selection of the board and management and profit distribution." *Prelim. Decision Mem.* at 16 (footnote omitted). In the Issues and Decision Memorandum,

Commerce stated that "[f]or the final determination, we continue to deny separate rate

eligibility for GTCIE." *Final I&D Mem*. at 27.  Commerce again concluded that GTCIE

failed to rebut the Department's presumption of *de facto* government control over GTC's

selection of members of the board of directors, its selection of management, and its

profit distribution.  *Id*.  As to selection of board members, Commerce referred to a

shareholders' meeting held in May 2015, and another held in July 2015, concluding that

"[r]ecord evidence does not support a finding that GTC's selection of the board took

place in shareholders meetings available to all shareholders."  *Final I&D Mem*. at 27;

Guizhou Tyre's Br. 24–25.  On profit distribution, Commerce referred to a 2014

preliminary profit distribution plan that was voted down at the May 2015 shareholders

meeting and "passed in a shareholders meeting on July 16, 2015, in which the minority

shareholders' rights were not protected, contrary to GTCIE's assertion."  *Final I&D

Mem*. at 28; Guizhou Tyre's Br. 25.

     Guizhou Tyre argues that "Commerce's analysis is directly contrary to the

record, which establishes that GTC's shareholders' meetings, in fact, were available to

all shareholders."  Guizhou Tyre's Br. 24.  Guizhou Tyre identifies record evidence in

support of its contention that the two shareholders' meetings that took place in May

2015 and July 2015, to each of which Commerce alluded in the Issues and Decision

Memorandum, were announced to, and made available to, all shareholders.  *Id*. at 25

(citing *GTCIE Second SRA Suppl*. Ex. 3D at "Resolution of the 2014 Annual Shareholders'

General Meeting" ¶ I.1.6.).  Commerce appears to have disregarded this evidence

detracting from its conclusion.

Alluding to the July 2015 meeting, at which, as Guizhou Tyre acknowledges,

"proposals favored by GIIC passed," *id.* at 24, defendant argues that "Commerce did

not conclusively state and find that the shareholder meeting was not available to all

shareholders."  Def.'s Br. 14.  This argument is unconvincing.  Unquestionably,

Commerce reached its decision after assuming that the meetings were not open to all

shareholders.  Defendant's assertion to the contrary impliedly acknowledges that this

assumption might well have been false.

Under the standard of review it must apply, the court cannot sustain an agency

determination that relies, in whole or in part, upon an invalid finding of material fact.

Commerce built upon its invalid factual finding in stating that "[b]ecause of the type of

shareholders meetings in which GIIC elected GTC's board members, we do not find any

practical difference between electing board members or appointing board members"

and that "GIIC's election of GTC's board members was like an appointment of board

members."  *Final I&D Mem.* at 27.  The evidence upon which Commerce relied, which is

that GIIC's shareholders succeeded in electing board members at the July 2015 meeting

after being unsuccessful in attempting to do so at the May 2015 meeting, is less than

substantial evidence for the Department's conclusion that GIIC effectively "appointed"

board members at the July 2015 meeting.  Because Commerce had no basis for a finding

that the meetings were not open to all shareholders the court also must reject the

derivative finding, that "record evidence demonstrates that GIIC intentionally selected

a shareholders meeting that is most favorable to it to elect members of GTC's board."

*Id*.

Commerce did not attempt to refute, and appears to have accepted, contentions

by Guizhou Tyre that GIIC did not nominate board members during the period of

investigation, and that the July 2015 shareholders meeting conformed to all applicable

requirements for an election of board members, not an appointment process.

Commerce itself acknowledges that "GIIC did not nominate any of the directors by

itself under Article 82 of the articles of association." *Id*.  But according to Commerce,

"the process of nomination for GTC's board members was under the influence of GIIC."

*Id*.  Commerce added, but failed to support or justify, a conclusion that "[w]hether those

shareholders meetings complied with the relevant laws and the articles of association is

irrelevant in the selection of a particular type of shareholders meetings to elect GTC's

board members." *Id*.  While attaching significance to the *result* of the nomination and

election process, Commerce does not cite any evidence that GIIC's shareholders exerted

any irregular or improper influence over that process or did anything other than vote

their shares, which, according to the evidence Commerce does not dispute, they were

entitled to do.  Commerce found that "GIIC's shares that elected the board members of

its preference were present in shareholders' meetings," *id*., but missing from the Issues

and Decision Memorandum is discussion of evidence as to whether, or how, GIIC acted

to prevent other shareholders from exercising their voting rights at the July 2015

meeting, either as to the election of board members or as to the approval of a profit

distribution plan.

Having begun its analysis with an unwarranted assumption that shareholder

meetings, including in particular the July 2015 meeting, were not open to all

shareholders, Commerce proceeded to conclude that:

> Although the articles of association: (1) require the election of senior
> managers by the board members and (2) prevents [*sic*] a person who is in
> a position other than a board of the controlling shareholders or the actual
> controllers of GTC from serving as a senior manager of GTC, we find that,
> given the specific nature of the election of the board members and the
> appointment of senior managers by the board, these provisions do not
> ensure the absence of the *de facto* control from the selection of
> management.

*Id*.  The Department's invalid assumption concerning the unavailability of the meetings

to all shareholders necessarily invalidates the Department's assumption about "the

specific nature of the election of the board members."  *Id.*  As a result of these errors,

Commerce proceeded to deny GTCIE a separate rate without a basis in substantial

evidence for its finding that GIIC controlled the selection of board members and

management of GTC and GTCIE.

The deficiency in the Department's analysis with respect to the findings on board

member and manager selection, and on profit distribution, is not the only reason the

court must remand to Commerce the decision to deny separate rate status to GTCIE.

The court concludes, further, that the Department's reasoning is flawed, being vague

and ambiguous as to whether its inquiry is focused on government control of export

activities.[14]

      In its Preliminary Decision Memorandum, Commerce stated that "[a]ccording to

this separate rate test, the Department will assign a separate rate in NME proceedings if

a respondent can demonstrate the absence of both *de jure* and *de facto* government

control over its *export activities*."  *Prelim. Decision Mem.* at 13 (emphasis added).

Commerce identified criteria it considers when determining whether a company is free

from "*de facto* government control of its *export functions*."  *Id*. at 15 (emphasis added)

(footnote omitted).  Commerce stated the criteria as follows:

> (1) whether the prices are set by, or are subject to the approval of, a
> government agency; (2) whether the respondent has authority to negotiate
> and sign contracts and other agreements; (3) whether the respondent has
> autonomy from the government in making decisions regarding the
> selection of management; and (4) whether the respondent retains the
> proceeds of its export sales and makes independent decisions regarding
> the disposition of profits or financing of losses.

---

[14] As the court discusses later in this Opinion and Order, this flaw also affected
the separate rate analysis Commerce applied to the issue of whether Double Coin
rebutted its presumption of government control.

*Id.* Commerce explained that in instances of minority government ownership, "we will analyze the impact of government ownership within the context of the *de facto* criteria." *Id.* at 13.

Commerce did not indicate in the Issues and Decision Memorandum that it intended to make a change to the methodology Commerce described in the preliminary phase of the investigation. Nevertheless, the analysis as to GTCIE in that document does not focus specifically on export activities or functions in addressing government control. As a result, the separate rate analysis Commerce applied to GTCIE failed to show a factual relationship between the findings it made as to selection of board members and distribution of profits and the purpose it identified for applying its *de facto* separate rate criteria in the preliminary phase, which was to determine whether the government of the PRC exercised control of GTCIE's "export activities" or "export functions."

In its brief, defendant argues that Commerce "may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria." Def.'s Br. 9 (citing *Yantai CMC Bearing Co. v. United States*, 41 CIT __, __, 203 F. Supp. 3d 1317, 1326 (2017) ("*Yantai*"); *Advanced Tech. & Materials Co. v. United States*, 37 CIT 1487, 1490, 938 F. Supp. 2d 1342, 1345 (2013) ("*Advanced Tech. III*"), *aff'd*, 581 Fed. App'x 900 (Fed. Cir. 2014)). Defendant further elaborates that, "if an applicant fails to establish any one of the *de jure* or *de facto* criteria,

Commerce is not required to continue its analysis and determine whether the applicant

has, or has not, established the other applicable criteria." *Id.* (citing *Yantai*, 203 F. Supp.

3d at 1326).  For this argument, defendant relies on *Yantai* and *Advanced Tech. III*, but

neither decision was based on facts analogous to those in this investigation, in which

ownership by government-controlled entities was only 25.20%, with 74.80% owned by

public shareholders.  *Final I&D Mem.* at 24; Guizhou Tyre's Br. 5; Def.'s Br. 10.  In

*Yantai*, the respondent had a "chain of ownership" that "extended to the Chinese

government because Yantai CMC is more than majority owned by CMC, which is, in

turn, more than majority owned by Genertec, and Genertec is wholly-owned by the

State-owned Assets Supervision and Administration of the State Council ('SASAC')."

41 CIT at __, 203 F. Supp. 3d at 1323 (footnote omitted) (citation omitted).  In *Advanced*

*Tech. III*, the respondent was similarly majority owned by a company that was wholly-

owned by the SASAC.  37 CIT at 1494, 938 F. Supp. 2d at 1348.[15]

        The question of majority or minority government ownership aside, the

Department's analysis fails to clarify or explain whether its finding of government

control extended, specifically, to GTCIE's export activities during the period of

investigation.  The Tariff Act contemplates a retrospective approach to the

---

        [15] *Advanced Tech. & Materials Co. v. United States*, 581 Fed. App'x 900 (Fed. Cir.
2014) was issued as a summary affirmance according to U.S. Court of Appeals for the
Federal Circuit Rule 36 and therefore is not a precedential decision.

determination of antidumping duties under 19 U.S.C. §§ 1673a et seq. *See Thyssenkrupp*

*Steel North Am., Inc. v. United States*, 886 F.3d 1215, 1218 (Fed. Cir. 2018) ("[T]he United

States uses a 'retrospective' assessment system to determine the 'final liability' for

antidumping duties." (quoting 19 C.F.R. § 351.212(a) (2014)).  The Department's

rationale for placing GTCIE within the PRC-wide entity was that Commerce considered

GTCIE, which Commerce determined not to have rebutted its presumption of *de facto*

control, to be part of a single exporting entity consisting of all Chinese exporters of the

subject merchandise that are under government control.  *See Final I&D Mem.* at 27.

Even if the court were to presume Commerce to be correct in its findings that GIIC

controlled the selection of board members and the distribution of profits (and, as

discussed above, the analysis Commerce has put forth does not allow it to so presume),

the court could not conclude solely from those findings that the government of China

exercised control of export "functions" or, specifically, the prices at which subject

merchandise exported by GTCIE was sold during the period of investigation.  Because

the pricing decisions were already made by the time Commerce made its separate rate

decision for GTCIE, a vague presumption that the government had the potential to

control GTCIE's export activities and prices during the period of investigation is

unconvincing and does not suffice for the purposes Commerce itself stated for its

separate rate analysis.

Guizhou Tyre introduced evidence to support its contention that the Chinese

government did not control GTCIE's export activities and in particular its export prices.

*See* Guizhou Tyre's Br. 6–15, 24–30.  Under the "rebuttable presumption" method of the

Department's separate rate analysis, the information Guizhou Tyre put forward was

sufficient to require Commerce to consider the record as a whole and make a factual

determination on whether the Chinese government actually controlled Guizhou Tyre's

export functions and export pricing decisions during the period of investigation.

Having failed to address this pivotal inquiry, Commerce must do so on remand and

reach a result supported by the record evidence.

### E. Double Coin's Challenge to the Establishment of a Rate for the PRC-Wide Entity and the Assignment of that Rate to Double Coin

Double Coin claims that, on the facts shown by the record of the subject

investigation, Commerce acted without statutory authority in establishing an estimated

dumping duty rate for the PRC-wide entity (specifically, 22.57%) and assigning that rate

to Double Coin.  Double Coin's Br. 7–27.  Directing the court's attention to section

735(c)(1)(B)(i) of the Tariff Act, 19 U.S.C. § 1673d(c)(1)(B)(i), Double Coin argues that the

PRC-wide rate was invalid because it was neither an estimated weighted-average

dumping margin for an individually-investigated exporter or producer, as required by

§ 1673d(c)(1)(B)(i)(I), nor an "all-others rate" of the type the Tariff Act, in

§ 1673d(c)(1)(B)(i)(II), requires Commerce to assign to "all exporters and producers not

individually investigated." *Id.* at 8, 10–16.  According to Double Coin, the "clear

identification of these two options for antidumping rates necessarily forecloses

Commerce from adopting and imposing a different kind of antidumping rate; one

applying a country-wide [rate] *regardless* of whether a company has been 'individually

investigated.'" *Id.* at 8 (emphasis in original).  For comparison, Double Coin points to

countervailing duty provisions in the Tariff Act, 19 U.S.C. § 1671d, which specify three

types of rates: (a) an "individual countervailable subsidy rate for each exporter and

producer individually investigated," (b) "an estimated all-others rate," and (c) "a single

estimated country-wide subsidy rate."  19 U.S.C. § 1671d(c)(1)(B)(i).  Noting that the

first and second rates parallel those found in section 1673d(c) while the third is not

explicitly included in the antidumping duty provisions, Double Coin argues that "when

Congress explicitly grants some authority in one part of a statute, that is a clear

indication Congress knows how to grant that authority and its failure to provide that

authority elsewhere in the same statute is deliberate."  Double Coin's Br. 8–9 (citing

*Loughrin v. United States*, 573 U.S. 351, 358 (2014)).  Double Coin maintains that

Congress, having expressly provided for a country-wide rate in the countervailing duty

provisions but having declined to do so in the antidumping duty provisions, did not

intend for Commerce to establish a country-wide rate in an antidumping duty

investigation.  Double Coin's Br. 8–9.  For the reasons stated below, the court denies

relief on Double Coin's claim.

The Tariff Act requires that Commerce, when making its final determination of

whether the subject merchandise is being, or is likely to be, sold at less than fair value in

the United States, "determine the estimated weighted average dumping *margin* for each

exporter and producer *individually investigated*, and . . . determine . . . the estimated all-

others *rate* for all exporters and producers *not individually investigated*."  19 U.S.C.

§ 1673d(c)(1)(B)(i) (emphasis added).  In this language, the statute draws a distinction

between an estimated weighted average dumping duty "margin," which Commerce is

to assign to each exporter or producer that it investigates individually, and a "rate" that

Commerce is to assign to "all exporters and producers not individually investigated."

*Id.*

A related provision, 19 U.S.C. § 1677f-1(c), states that in determining the

weighted average dumping margin under section 1673d(c), Commerce "shall determine

the individual weighted average dumping margin *for each known exporter and producer* of

the subject merchandise."  *Id.* § 1677f-1(c)(1) (emphasis added).  The only exception the

statute provides to this "[g]eneral rule," stated in the next paragraph, applies when "it

is not practicable to make individual weighted average dumping margin

determinations . . . because of the large number of exporters or producers involved in

the investigation."  *Id.* § 1677f-1(c)(2).  In this instance, Commerce may "determine the

weighted average dumping margins for a reasonable number of exporters or producers

by limiting its examination to . . . [a] statistically valid [sample] . . . [of] exporters and

producers accounting for the largest volume of the subject merchandise from the

exporting country that can be reasonably examined." *Id.*  Commerce did not invoke this

exception, either as to an individual investigation of Double Coin (which, to the

contrary, it selected for individual investigation) or as to the PRC-wide entity, which

Commerce did not identify as an entity that it was declining to investigate because of

the large number of exporters or producers involved in the investigation.[16]  Moreover,

Commerce did not state that it determined the 22.57% rate Commerce assigned to the

PRC-wide entity according to the "[m]ethod for determining the all-others rate" that the

statute specifies in 19 U.S.C. § 1673d(c)(5) (under which Commerce determined the

9.00% rate for the separate rate respondents).  Instead, Commerce stated in the Issues

and Decision Memorandum that "[f]or the final determination, we continue to base the

PRC-wide rate on AFA" and that "we have selected the highest petition rate[] to

---

[16] In the investigation, Commerce invoked the exception in section 1677f-1(c), but
not to avoid an individual investigation of Double Coin, which was one of the two
companies Commerce selected for individual investigation due to their accounting for
the largest volume of the subject merchandise during the period of investigation.  *See
Truck and Bus Tires from the People's Republic of China: Decision Memorandum for the
Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical
Circumstances, and Postponement of Final Determination* 1–2 (Int'l Trade Admin. Aug. 26,
2016) (P.R. Doc. 716).  Instead, Commerce followed its practice of presuming that all
exporters and producers of subject merchandise in the nonmarket economy ("NME")
country that it considered not to have rebutted its presumption of government control,
are to receive a single estimated weighted-average dumping margin.  *Id.* at 12.
Commerce concluded that the statute did not require it to assign Double Coin an
individual margin because it found that Double Coin was part of the government-
controlled PRC-wide entity.  *See id.* at 3, 16.

determine the AFA rate for the PRC-wide entity." *Final I&D Mem.* at 7.  In using the

term "AFA," Commerce used its acronym for "adverse facts available," by which it

meant a combination of the use of "facts otherwise available" under 19 U.S.C. § 1677e(a)

and an "adverse inference" under 19 U.S.C. § 1677e(b).  A "margin" can be based in part

or entirely on § 1677e(a) and (b), *see, e.g.,* 19 U.S.C. § 1673d(c)(5), but only if the

respective requirements of § 1677e(a) and (b) are met, which include, *inter alia*, a finding

that an interested party has failed to cooperate by not acting to the best of its ability to

comply with a request for information from Commerce.  *See id.* § 1677e(b).

In its response to Double Coin's Rule 56.2 motion, defendant argues that

"Commerce's PRC-wide rate is an individually investigated rate pursuant to 19 U.S.C.

§ 1673d(c)(1)(B)(i)(I)."  Def.'s Br. 29.  Addressing Double Coin's argument, Double

Coin's Br. at 20–27, that the Department's interpretation of the Tariff Act is

unreasonable and therefore does not qualify for deference under *Chevron U.S.A., Inc. v.

Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), defendant maintains that

"Commerce's PRC-wide rate is one of the two statutorily authorized rates under

19 U.S.C. § 1677d(c)(1)(B)(i), and thus, it is unnecessary to conduct a *Chevron* step two

analysis."  Def.'s Br. 30.  Because the PRC-wide rate was not determined according to

19 U.S.C. § 1673d(c)(1)(B)(i)(II), the court next considers whether the PRC-wide rate

Commerce assigned to the PRC-wide entity conforms to the requirements of 19 U.S.C.

§ 1673d(c)(1)(B)(i)(I).

The provision at issue contains two specific requirements.  In taking an action under this provision, Commerce must determine an "estimated weighted average dumping *margin*," and it must assign that margin to "*each* exporter and producer" that is "individually investigated," 19 U.S.C. § 1673d(c)(1)(B)(i)(I) (emphasis added), and as to the latter the statute provides, further, that in this circumstance Commerce "shall determine the individual weighted average dumping margin for each *known* exporter and producer of the subject merchandise."[17]  *Id.* § 1677f-1(c)(1) (emphasis added). Adjudicating Double Coin's claim, therefore, requires the court to answer two questions: was the 22.57% rate Commerce assigned to the PRC-wide entity an estimated "weighted average dumping margin," and was the entity to which Commerce assigned it a "known" exporter or producer of the subject merchandise that was "individually investigated"?

The Court of Appeals provided the answers to both questions in *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021), a precedential decision on material facts analogous to those of this case (and in which the plaintiff-appellee was Double Coin).  Upon applying the facts of this investigation to the holding in *China*

---

[17] The Tariff Act specifies that "[t]he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise," 19 U.S.C. § 1677(35)(A), and that "[t]he term 'weighted average dumping margin' is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer," *id*. § 1677(35)(B).

*Mfrs. Alliance*, which the court considers controlling on the claim Double Coin raises in

this proceeding, the court concludes that the rate Commerce assigned to the PRC-wide

entity qualifies as an "estimated weighted average dumping margin" within the

meaning of that term as used in 19 U.S.C. § 1673d(c)(1)(B)(i)(I).  Also based on the

holding in *China Mfrs. Alliance*, the court concludes that the PRC-wide rate must be

deemed to have been assigned to a known, "individually-investigated" exporter and

producer consisting of the PRC-wide entity.

   *China Mfrs. Alliance* involved the fifth administrative review of an antidumping

duty order on certain off-the-road tires from China.  In the investigation resulting in the

antidumping duty order, "Commerce sent quantity and value questionnaires to ninety-

four identified Chinese exporters, and received responses from only thirty."  *China Mfrs.

Alliance*, 1 F.4th at 1037.  The Court of Appeals noted that "[b]ased on that information,

Commerce identified an entity composed of uncooperative exporters, who had failed to

rebut the presumption of government control and for whom Commerce had no

individual data" and that "[a]ccordingly, Commerce calculated an AFA rate for this

PRC-wide entity."  *Id.*  The Court of Appeals concluded from these facts that "[t]he

PRC-wide entity rate resulting from Commerce's initial investigation constitutes an

'individually investigated' weighted average dumping margin within the meaning of

19 U.S.C. § 1673d(c)(1)(B)(i)(I) because 'Commerce treats the companies comprising the

China-wide entity as a single entity and investigated them as such in the original

investigation.'" *Id*. (citation omitted).  The Court of Appeals held, further, that on the facts presented, Commerce may recognize a single NME-wide entity to include all exporters that fail to rebut the presumption of government control.  *Id*.

In the investigation at issue, Commerce stated that "the Department did not receive responses to its Q&V [quantity and value] questionnaire from certain PRC exporters and/or producers of the merchandise under consideration that were named in the Petition and received the Q&V questionnaires the Department issued." *Prelim. Decision Mem.* at 17.  "Because non-responsive PRC companies have not demonstrated that they are eligible for separate rate status, the Department finds that they have not rebutted the presumption of government control and, therefore, considers them to be part of the PRC-wide entity" and "preliminarily [is] determining the PRC-wide rate on the basis of AFA." *Id.*  In the final phase of the investigation, Commerce made no change to this methodology in determining "the AFA rate for the PRC-wide entity" by selecting "the highest petition rate," *Final I&D Mem.* at 7, which was 22.57%, *Final LTFV Determination*, 82 Fed. Reg. at 8,604.

The material facts concerning the PRC-wide entity in the investigation at issue do not differ materially from the facts pertaining to the investigation that resulted in the antidumping duty order, and the establishment of a single, PRC-wide rate, upon which the Court of Appeals based its holdings in *China Mfrs. Alliance*.  Because those holdings are controlling on the claim Double Coin directs to the Department's authority to

establish a rate for a PRC-wide entity and assign that rate to Double Coin, the court may

not grant a remedy on this claim.  Accordingly, the court next considers Double Coin's

claim that Commerce erred in denying separate rate status to Double Coin on a factual

determination that Double Coin had failed to rebut the Department's presumption of *de*

*facto* control by the government of the PRC.

### F. The Department's Denial of Separate Rate Status for Double Coin

In the Issues and Decision Memorandum, Commerce noted, as stated in Double

Coin's response to Section A of the Department's questionnaire, that "Double Coin is

72.15 percent owned by Shanghai Huayi, which is 100 percent owned by Shanghai

SASAC."  *Final I&D Mem.* at 12.  Here also, the Department's reference to a "SASAC"

was to a "State-owned Assets Supervision and Administration Commission."  *Id*. at 3.

In the Preliminary Determination, *Prelim. Decision Mem.* at 16, and again in the Final

LTFV Determination, Commerce found that "Shanghai SASAC controls Double Coin

through Shanghai Huayi."  *Final I&D Mem.* at 22.  Moreover, Commerce found that:

> As the majority shareholder, Shanghai Huayi has rights to elect directors
> at the shareholders' general meetings in accordance with the number of
> shares it owns, *i.e.*, 72.15 percent.  Double Coin's board appoints its
> general manager and the general manager appoints other managers,
> including deputy general managers.  Three of four directors are general
> manager and deputy general managers.

*Id*. at 12  Commerce concluded from these facts that "[t]herefore, Shanghai SASAC

controls the selection of Double Coin's management and the *de facto* control over

Double Coin exists."  *Id*. (citing *Double Coin's Section A Response* 11–19 (May 23, 2016)).

While not contesting these factual findings, Double Coin argues, *inter alia*, that the

record evidence does not establish "Chinese Government control over Double Coin's

export activities."  Double Coin's Br. 31.  Double Coin argued that it placed evidence on

the record, which included excerpts from Double Coin's Articles of Association,

demonstrating, for example, that Double Coin, as a publicly listed company subject to

China's "Company Law," was not under the control of its majority shareholder as to its

"business" or its "financial and accounting activities."  *Id*. at 34 (quoting, *inter alia*,

Article 25 (". . . Controlling shareholders shall respect the financial independence of the

company and shall not interfere with the financial and accounting activities of the

company.") & Article 27 ("A listed company's business shall be completely independent

from that of its controlling shareholders.")).

        The court concludes that it must remand to Commerce the decision to deny

separate rate status to Double Coin.  A court is obligated to review a decision of an

administrative agency according to the reasoning the agency puts forth.  *See Burlington*

*Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).  To do that, a court must be

able to discern and evaluate that reasoning according to the applicable standard of

review.  Because, as discussed below, the reasoning underlying the Department's

decision, as stated in the Issues and Decision Memorandum, is unclear and ambiguous,

the court is unable to proceed further in adjudicating Double Coin's claim and instead

must issue an order of remand with respect to the denial of separate rate status for

Double Coin.

It is not clear to the court whether, or to what extent, the Department's separate

rate inquiry was focused on Double Coin's *export* activities, as opposed to control of the

selection of board members and management, and the Department's statements on this

question are internally inconsistent.  As discussed earlier in this Opinion and Order,

Commerce described its four-part test for *de facto* independence as one according to

which a respondent "can demonstrate the absence of both *de jure* and *de facto*

government control over its *export activities*."  *Prelim. Decision Mem.* at 13 (emphasis

added).  But at the same time, the Department's depiction of its methodology indicates

that a respondent situated as was Double Coin in the instant investigation may lack a

meaningful opportunity to make such a demonstration.  The court notes, for example,

that an analysis of the presence of, or extent of, government control over Double Coin's

export activities—as opposed to the selection of board members and management—

played no part in the explanation Commerce put forth, *Final I&D Mem.* at 22–24, to

support its denial of separate rate status to Double Coin.  To the contrary, Commerce

went so far as to explain that control of any "daily operations"—including, impliedly,

control of daily operations involving export sales—was not the issue with which it was

concerned.  *See id.* at 23 ("Whether or not Shanghai Huayi, which is Double Coin's

majority owner, demonstrably exercised control over Double Coin's daily operations

does not refute the fact that a government-owned entity appears to have near complete control of shareholder decisions of Double Coin." (footnote omitted)).

As to "shareholder decisions," Commerce explained that "[r]egardless of the restrictions of the PRC laws and the protection afforded to minority shareholders, Double Coin's articles of association demonstrate that a majority shareholder—and particularly one with 72.15 percent ownership—would be expected to have near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company." *Id.* (footnote omitted). Despite the evidence Double Coin placed on the record, including that pertaining to Articles 25 and 27 of the Articles of Association, which place restrictions on the authority of controlling shareholders, the court is asked to speculate that "shareholder" decisions "*may* affect" the management and operations of Double Coin. *Id.* (emphasis added). Even were the court to do so, it would require further speculation to conclude that the affected operations were equivalent to government control over Double Coin's export activities during the period of investigation.

The Department's analysis calls for other speculation as well. Addressing Double Coin's contention that "the price negotiations with unaffiliated U.S. customers for sales of subject merchandise were conducted by Double Coin's U.S. subsidiary, which is far removed from the PRC government," *id*. at 22, Commerce responded that "the price negotiations between Double Coin's U.S. subsidiary and the unaffiliated U.S.

customers do not rebut the presumption of the PRC government control." *Id.* at 23.

Commerce reasoned that "[t]he actual setting of price is only one of the four *de facto*

criteria, 'whereas government manipulation of the cost of inputs, . . . or rationalization

of industry or output are among numerous other scenarios of concern that can affect

seller pricing.'" *Id.* at 23–25 (quoting *Advanced Tech. & Materials Co., Ltd., et. al. v. United*

*States*, 36 CIT __, ___, 885 F. Supp. 2d 1343, 1359–60 (2012)).  Commerce would infer that

majority ownership of Double Coin by a government-owned entity affected export

pricing in these ways without pointing to record evidence or explaining the significance

of these "concerns."  Commerce did not explain, for example, why government

manipulation of input costs was "of concern" when input pricing in China is

disregarded in the determination of normal value under the Department's long-

established NME country methodology as applied under the "surrogate value"

provisions of 19 U.S.C. § 1677b(c).  Nor did it shed any light on how the issue of

"rationalization of industry or output" was pertinent to this investigation as it related to

Double Coin.

Overall, the Department's analysis is unclear and ambiguous as to whether,

upon a finding by Commerce of majority ownership by a government entity allowing

control of the selection of board and management, the Department's presumption of

control of export activities by the PRC government remains rebuttable or, in effect,

becomes irrebuttable.  Despite some indications to the contrary in the Issues and

Decision Memorandum, the latter would appear to be the case, although the Department's explanation of its decision, considered on the whole, is ambiguous on this point.  While Commerce described the presumption as a rebuttable one, the Issues and Decision Memorandum appears to conclude that a majority shareholder would be "expected to" have control of the company through its "near complete control of any shareholder decisions," *Final I&D Mem.* at 23, regardless of the absence of evidence to support a factual finding that a majority shareholder actually exercised control of business decisions, including, in particular, those involving export activities, during the period of investigation and regardless of evidence, such as, in this instance, evidence in the company's Articles of Association, that would detract from any such finding.

Commerce has not promulgated a rule of general applicability for NME country investigations or reviews that addresses the question of whether government control of selection of board and management is either a rebuttable or irrebuttable presumption of government control over export activities.[18]  In the absence of such a rule, it is possible to construe some, but not all, of the relevant discussion in the Issues and Decision

---

[18] A rulemaking process with notice and comment procedures might provide much-needed clarity that could resolve the ambiguities the court has identified as well as allow comment on the validity and implementation of any such rule.  As this Court has observed, Commerce has not developed its larger, and evolving, NME country policy through a rulemaking process.  *See Jilin Forest Indus. Grp. Jinqiao Flooring Grp. Co., Ltd. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1240 (2021) ("The NME policy has not been codified by regulation and remains policy.").

Memorandum to mean that the Department's current practice, as applied to Double

Coin in the investigation under review, is that government control of selection of board

and management is, in effect, an irrebuttable presumption of control of export activities.

But if that is the current Commerce position, the discussion Commerce put forth in the

Issues and Decision Memorandum cannot suffice as an explanation for adoption of such

a rule or policy.

       In light of the unclear and ambiguous reasoning the court has identified, the

court is unable to sustain the Department's decision to deny Double Coin separate rate

status.  In its redetermination upon remand, Commerce must address the court's

concerns by presenting a statement of the reasoning underlying any decision it reaches.

### G. The Department's Decision Not to Conduct a Verification of Double Coin's Information

       Double Coin claims that Commerce unlawfully denied it separate rate status

without verifying the factual information upon which Commerce based its decision.

Double Coin's Br. 49–53.  Because the court is remanding to Commerce the decision

denying Double Coin separate rate status, it is not known at this time what record

information will form the basis for the Department's new decision, as set forth in a

redetermination submitted upon remand, and whether any factual determinations

underlying that redetermination will be in dispute.  Therefore, the court defers any

consideration of this claim.

III. Conclusion and Order

Upon consideration of plaintiffs' motions for judgment on the agency record, all

papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce shall submit a redetermination upon remand ("Remand Redetermination") that complies with this Opinion and Order, in which it reconsiders its decisions not to accord separate rate status to GTCIE and to Double Coin; it is further

**ORDERED** that Commerce shall submit its Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that comments of plaintiffs on the Remand Redetermination must be filed with the court no later than 30 days after the filing of the Remand Redetermination; it is further

**ORDERED** that the response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed; and it is further

**ORDERED** that the joint request for oral argument of plaintiffs Guizhou Tyre and Double Coin, Joint Mot. for Oral Arg. (Mar. 30, 2020), ECF No. 53, is denied.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: January 24, 2022
        New York, New York