A-570-040
Remand
Slip Op. 22-6
POI:  7/1/2015 – 12/31/2015
~~Proprietary Document~~
E&C/OI:  TES
**PUBLIC VERSION**

***Guizhou Tyre Co., Ltd., et al., v. United States*,
Consol. Court No. 19-00031, Slip Op. 22-6 (CIT January 24, 2022)
Truck and Bus Tires from the People's Republic of China**

**Final Results of Redetermination
Pursuant to Court Remand**

## I.   SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the Court) in *Guizhou Tyre Co., Ltd., et al., v. United States*, Court No. 19-00031, Slip Op. 22-6 (CIT January 24, 2022) (*Remand Order*).  These final results of redetermination concern *Truck and Bus Tires from the People's Republic of China: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 82 FR 8599 (January 27, 2017) (*Final Determination*), the accompanying Issues and Decision Memorandum (IDM), and *Truck and Bus Tires from the People's Republic of China: Antidumping Duty Order*, 84 FR 4436 (February 15, 2019) (*Order*).

In the *Remand Order*, the Court invited Commerce to comment on:  (a) the Court's stated intention of ordering Commerce to direct U.S. Customs and Border Protection (CBP) to liquidate entries made prior to February 21, 2020, without regard to antidumping duties and to refund all cash deposits collected on these entries, with interest as provided by law, when it enters a judgment to conclude the judicial proceeding, as well as; (b) the Court's selection of February 21, 2020, as the earliest possible date the antidumping duty (AD) order could have been

published.[1]  The Court also ordered Commerce to reconsider its denial of a separate rate for

Guizhou Tyre Import and Export Co., Ltd. (GTCIE)[2] and Shanghai Huayi Group Corporation

Limited (formerly Double Coin Holdings Ltd.) (Double Coin).[3]  In addition, the Court concluded

that the rate Commerce assigned to the China-wide entity qualifies as an estimated weighted-

average dumping margin and that this rate must be deemed to have been assigned to a known,

individually-investigated exporter and producer consisting of the China-wide entity.[4]  Finally,

the Court deferred consideration of Double Coin's claim that Commerce unlawfully denied it

separate rate status without verifying the factual information upon which Commerce based its

decision.[5]

## II.    BACKGROUND

On January 27, 2017, Commerce published an affirmative final determination of sales at

less than fair value and critical circumstances in the investigation of truck and bus tires from the

People's Republic of China (China).[6]  In the *Final Determination*, Commerce determined that

GTCIE and Double Coin were not eligible for separate rates because each company failed to

rebut the presumption of *de facto* government control.[7]

On March 13, 2017, the International Trade Commission (ITC) notified Commerce of its

final determination that an industry in the United States is not materially injured or threatened

with material injury within the meaning of section 735(b)(1)(A) of the Tariff Act of 1930, as

---

[1] *See Remand Order* at 28.
[2] *Id.* at 38.
[3] *Id.* at 52.
[4] *Id.* at 44-46.
[5] *Id.* at 52.
[6] *See Final Determination*.
[7] *See Final Determination* at Comments 2 through 8.

amended (the Act) by reason of imports of truck and bus tires from China at less than fair value.[8]
Accordingly, Commerce instructed CBP to liquidate entries of subject merchandise without
regard to antidumping duties.[9]  On November 1, 2018, the CIT remanded the ITC's final
negative determination.[10]  On January 30, 2019, upon remand, the ITC issued its final
determination, in which the ITC found that an industry in the United States is materially injured
by reason of imports of truck and bus tires from China.

On February 8, 2019, pursuant to the U.S. Court of Appeals for the Federal Circuit's
(CAFC) opinion in *Diamond Sawblades*, the ITC notified Commerce of this determination upon
remand.[11]  On February 15, 2019, Commerce published the *Order*, in accordance with section
736(a) of the Act.

On March 11, 2022, we released the Draft Results to interested parties for comment.[12]
On March 18, 2022, we received comments from Double Coin and its affiliate China
Manufacturers Alliance LLC (CMA)[13] and from Guizhou Tyre Co., Ltd. (GTC) and GTCIE
(collectively, Guizhou Tyre).[14]

---

[8] *See* ITC's Letter, dated March 13, 2017; *see also Truck and Bus Tires from China*, 82 FR 14232 (March 17, 2017);
*see also Truck and Bus Tires from the People's Republic of China*, Investigation No. 701-TA-556 and 508 and 731-
TA-1311, USITC Pub. 4673 (March 2017) (Final).
[9] *See* CBP Message No. 7094307, dated April 4, 2017.
[10] *See United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
International Union, AFL-CIO, CLC, v. United States*, 348 F. Supp. 3d 1328 (CIT 2018).
[11] *See ITC's* Letter, "Truck and Bus Tires from China, Inv. Nos. 701-TA-556 & 731-TA-1311 (Final) (Remand):
Notice of Remand Determinations," dated February 8, 2019 (ITC Remand Notification) (citing *Diamond Sawblades
Mfrs. Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010) (*Diamond Sawblades*)).
[12] See Draft Results of Remand Redetermination, *Guizhou Tyre Co., Ltd., et al., v. United States*, Consolidated
Court No. 19-00031, dated March 11, 2022 (Draft Results).
[13] *See* Double Coin's Letter, "Double Coin and CMA's Comments on Draft Remand Redetermination Truck and
Bus Tires from the People's Republic of China," dated March 18, 2022 (Double Coin's Comments).
[14] *See* Guizhou Tyre's Letter, "Guizhou Tyre's Comments on the Department's Draft Remand Redetermination –
Remand Redetermination Pursuant to *Guizhou Tyre Co. v. United States,* Consol. Court No. 19-00031," dated
March 18, 2022 (Guizhou Tyre's Comments).

### III.    ANALYSIS

#### 1.  Issuance of the AD Order

In the *Remand Order*, the Court concluded that Commerce's issuance of the *Order* on February 15, 2019, following the ITC's notification of its affirmative remand redetermination, was premature.[15]  The Court held that Commerce, instead, should have taken steps to publish an AD order after the CIT sustained the ITC's affirmative remand redetermination on February 18, 2020, and estimated that the earliest date Commerce could have published an order in the *Federal Register* was February 21, 2020.[16]  The Court invited Commerce to comment on the Court's stated intention of ordering Commerce to direct CBP to liquidate entries made prior to February 21, 2020, without regard to antidumping duties and to refund all cash deposits collected on these entries, with interest as provided by law, when it enters a judgment to conclude the judicial review proceeding, as well as the Court's selection of February 21, 2020, as the earliest possible date the *Order* could have published.[17]  The Court arrived at this date because the ITC's remand redetermination was sustained by the Court on February 18, 2020, and thus, according to the Court, the earliest date Commerce could have published the *Order* under regular schedule procedures for *Federal Register* publication is three days later on February 21, 2020.[18]  Should the Court proceed with its intended remedy and it is necessary to identify the earliest date that Commerce hypothetically could have published the *Order* following the CIT's February 18, 2020 decision sustaining the ITC's affirmative redetermination, Commerce believes the Court's choice of February 21, 2020, is reasonable.

---

[15] *See Remand Order* at 25.
[16] *Id.* at 26.
[17] *Id.* at 28.
[18] *Id.* at fn. 13.

We observe that the Court's intention to liquidate entries made prior to February 21, 2020, without regard to antidumping duties, and to refund all cash deposits collected on these entries, will necessarily only apply to entries of subject merchandise exported by GTCIE. The reviews covering the period from the date of the *Order* through February 21, 2020, have both been rescinded.[19] Because only GTCIE's entries during the periods covered by those reviews have been enjoined from liquidation, all other entries of subject merchandise from the date of the *Order* through February 21, 2020, have been liquidated. Thus, should the Court order Commerce to direct CBP to liquidate entries prior to February 21, 2020, without regard to antidumping duties, Commerce intends to do so for GTCIE's entries that remain suspended pursuant to statutory injunction upon a final and conclusive decision, in accordance with *Timken*,[20] as clarified by *Diamond Sawblades*.[21] With regard to refunding cash deposits with interest as provided by law, the assessment of antidumping duties by CBP on shipments or entries of this merchandise is subject to the provisions of section 778 of the Act. This provision states that interest shall be payable on overpayments and underpayments of amounts deposited on merchandise entered, or withdrawn from warehouse, for consumption on and after "the date of publication" of an AD or countervailing duty order.[22] One approach is to treat February 15, 2019 as the "date of publication" of the *Order* (as it is currently in effect and resulted in suspension of liquidation and collection of cash deposits) and refund, with interest, cash deposits for merchandise that entered between February 15, 2019, and February 21, 2020.[23]

---

[19] *See Truck and Bus Tires from the People's Republic of China:  Rescission of Antidumping Duty Administrative Review; 2019–2020*, 85 FR 39530 (July 1, 2020); *see also Truck and Bus Tires from the People's Republic of China:  Rescission of Antidumping Duty Administrative Review; 2020–2021*, 86 FR 31697 (June 15, 2021).

[20] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).

[21] *See Diamond Sawblades*, 626 F.3d 1381-82.

[22] *See* section 778(a)(1) of the Act.

[23] In the Draft Results, we erroneously referred to February 18, 2020 (the date the CIT affirmed the ITC's remand redetermination) rather than February 21, 2020 (the date the CIT found would be the earliest an order could have

Alternatively, we can treat February 21, 2020, the date the Court intends to adopt in fashioning a remedy for Guizhou Tyre, as the "date of publication" of the *Order*, and merely refund the cash deposits for merchandise that entered prior to that date. Considering the Court's holding that Commerce's issuance of the *Order* was premature, we understand the Court's intent to be in line with the former approach. Should the Court hold that the *Order* was prematurely issued and order its intended remedy when it enters a final judgment in this case, Commerce intends to publish a notice of amended order in the *Federal Register* and issue appropriate customs instructions to CBP.

### 2. GTCIE's Separate Rate

In the underlying investigation, we determined that GTCIE was not eligible for a separate rate because it did not establish *de facto* independence from the Government of China (GOC). We found that the Guiyang State-owned Assets Supervision and Administration Commission (Guiyang SASAC), through its 100 percent-owned affiliate Guiyang Industry Investment Group Co., Ltd. (GIIG), a state-owned enterprise (SOE) that owned 25.20 percent of GTC, was the single largest and controlling shareholder of GTC, and that GTC owned 100 percent of GTCIE.[24] Furthermore, we found that, even with less than a majority number of shares in GTC, Guiyang SASAC, through its 100 percent-owned affiliate GIIG, remained in a position to control the export activities of GTCIE through its control of GTC.[25] We found that "{record} evidence does not support a finding that GTC's selection of the board took place in shareholders meetings

---

been published), both in this sentence and the next. We have corrected this error in this final results of redetermination.

[24] *See* Memorandum, "Truck and Bus Tires from the People's Republic of China: Preliminary Denial of Separate Rate," dated August 26, 2016 (Preliminary SRA Denial Memorandum) at 4.

[25] *See Final Determination* IDM at 27-28.

available to all shareholders" and that "record evidence demonstrates that {GIIG} intentionally selected a shareholders meeting that is most favorable to it to elect members of GTC's board."[26]

Observing that plaintiff GTC identified "record evidence in support of its contention that the two shareholders' meetings that took place in May 2015 and July 2015 … were announced to, and made available to, all shareholders," the Court reasoned that "Commerce appears to have disregarded this evidence detracting from its conclusion."[27]  The Court stated that Commerce did not cite any evidence that GIIG's shareholders exerted any irregular or improper influence over the nomination and election process, or how they prevented other shareholders from exercising their voting rights.[28]

In addition, the Court concluded that Commerce's "reasoning is flawed, being vague and ambiguous as to whether its inquiry focused on government control of export activities."[29]  Specifically, the Court stated that Commerce's analysis did not clarify or explain whether its finding of government control extended to GTCIE's export activities during the period of investigation (POI).[30]  According to the Court, in light of the retrospective approach to the determination of antidumping duties, the pricing decisions were already made by the time Commerce made its separate rate decision for GTCIE, and thus, a vague presumption that the government had the potential to control GTCIE's export activities is not sufficient.[31]  The Court stated that the information GTCIE introduced to support its contention that the GOC did not control GTCIE's export activities and export prices was sufficient to require Commerce to "consider the record as a whole and make a factual determination on whether the Chinese

---

[26] *Id.* at 27.
[27] *See Remand Order* at 34-37.
[28] *Id.* at 31-33.
[29] *Id.* at 33-34.
[30] *Id.* at 34-37.
[31] *Id.* at 37-38.

government actually controlled Guizhou Tyre's export functions and export pricing decisions during the {POI}."[32]  Therefore, the Court remanded the *Final Determination* for Commerce to reconsider its denial of a separate rate for GTCIE.[33]

*Analysis*

We are reconsidering and further explaining GTCIE's separate rate status in light of the record evidence as a whole.  We acknowledge that details of the May 2015 and July 2015 meetings indicate that public notices were available to all shareholders.  However, as we explain below, other record evidence demonstrates that GTCIE did not operate independent of government control.

Under the broad authority delegated to it by Congress, Commerce employs a presumption of state control for exporters in a non-market economy (NME) country.[34]  It is Commerce's policy to assign exporters of the subject merchandise from an NME country a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities.[35]  To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers*,[36] as amplified by *Silicon Carbide,*[37] and further clarified by *Diamond Sawblades.*[38]

---

[32] *Id.* at 38.

[33] *Id.*

[34] *See Sigma Corp. v. United States*, 117 F. 3d 1401, 1405 (Fed. Cir. 1997) (*Sigma*).

[35] *See, e.g.*, Policy Bulletin 05.1 dated April 5, 2005.

[36] *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers*).

[37] *See Final Determination of Sales at Less than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585, 22586-89 (May 2, 1994) (*Silicon Carbide*).

[38] *See Final Results of Redetermination Pursuant to Remand Order for Diamond Sawblades and Parts Thereof from the People's Republic of China*, dated May 6, 2013, available at https://access.trade.gov/resources/remands/12-147.pdf, in *Advanced Technology & Materials Co., Ltd. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012) (*Advanced Tech*), sustained, *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013) (*Advanced Tech II*), aff'd, *Advanced Technology & Materials Co., Ltd. v. United States*, Case No. 2014-1154

Commerce typically considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and, (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.[39]  As established in numerous proceedings, if a respondent is unable to establish autonomy from the government under one of the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate.  In other words, Commerce's practice is to deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the factors (the aforementioned *de facto* factors) and that if an applicant fails to establish any one of the criteria, Commerce is not required to continue its analysis with respect to the remainder of the criteria.[40]

Further, Commerce considers that the four *de facto* criteria and the related questions that appear in the separate rate application constitute Commerce's analysis of "export functions," which is a required part of Commerce's *de facto* control analysis.  Further, in the context of examining separate rate eligibility in an NME proceeding, Commerce may use the terms "export

---

(Fed. Cir. Oct. 24, 2014) (*Advanced Tech III*). This remand redetermination is on the Enforcement and Compliance website at http://enforcement.trade.gov/remands/12-147.pdf; *see also Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 77098 (December 20, 2013), and accompanying Preliminary Decision Memorandum (PDM) at 7, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014), and accompanying IDM at Comment 1.

[39] *Id.*; *see also Notice of Final Determination of Sales at Less Than Fair Value:  Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544, 22545 (May 8, 1995) (*Furfuryl Alcohol*).

[40] *See Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,* 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*); *see also Yantai CMC Bearing Co. Ltd. v. United States,* 203 F. Supp. 3d 1317, 1326 (CIT 2017) (*Yantai CMC*); and *Advanced Tech II,* 938 F. Supp. 2d 1342.

functions" and "export activities" interchangeably to denote the tasks undertaken by a company in selling its merchandise outside its own country.  In addition, the term "company operations" generally refers to the general operations of a company and encompasses a broad range of business activities, inclusive of export functions/activities, as well as management, board meetings, manufacturing, sales, advertising, and marketing.

In the instant case, we find that GTCIE is not free from government control in making decisions regarding the selection of its management and, thus, is subject to *de facto* government control of its export functions.[41]  Notably, we continue to determine, and the record supports, that an SOE, GIIG, is GTC's single largest, and thus controlling, shareholder with 25.20 percent ownership.[42]  Generally, we would expect any large shareholder, including a government entity, to control the operations of the company in which it holds the largest number of shares, if its shareholder rights afford it that ability.[43]  In the instant case, GTC's single largest shareholder – with the opportunity and ability to exert influence over GTC and GTCIE[44] – is GIIG, an SOE.  Specifically, GIIG is 100 percent owned and supervised by Guiyang SASAC, and through its large ownership stake, GIIG can control, and has an interest in controlling, the operations of GTC, and ultimately GTCIE, including the selection of management and the profitability of the companies.[45]  In this case, the record evidence indicates that GIIG has the ability to control the

---

[41] *See Yantai CMC*, 203 F. Supp. 3dat 1326 (recognizing that "Commerce requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate status" and sustaining Commerce's decision not to continue with the separate rate analysis where one of the factors is not met).

[42] *See* Guizhou Tyre's Letter, "Separate Rate Application for GTCIE in the Antidumping Duty Investigation of Truck and Bus Tires from the People's Republic of China," dated April 8, 2016 (Guizhou Tyre SRA) at 12-13; *see also* Guizhou Tyre's Letter, "GTCIE SRA Supplemental Questionnaire Response in the Antidumping Duty Investigation of Truck and Bus Tires from the People's Republic of China," dated July 8, 2016 (Guizhou Tyre SQR1) at 1 and Exhibit 1.

[43] *See, e.g., Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 79 FR 68860 (November 19, 2014), and accompanying IDM (*Steel Wire Rod*).

[44] GTC wholly owns GTCIE.  *See* Final Determination IDM at 27-28; *see also* Preliminary SRA Denial Memorandum at 4.

[45] *See* Guizhou Tyre SRA at 12 and Exhibit 6A.

operations of GTC using its status as GTC's single largest, and controlling, shareholder, as we further explain below.[46]

We continue to find that Chinese law and the shareholders' safeguards in GTC's Articles of Association (AoAs) in place during the POI were ineffective at preventing influence by an SOE that is a controlling shareholder. GTC's nomination and voting processes for directors and management under Articles 40, 43, 83, and 117 of its AoAs allowed the Guiyang SASAC, through GIIG, to influence the board selection process during the POI. Specifically, Article 40 states that the shareholders' general meeting is an "organ of power of the Company" and outlines its broad set of functions and powers.[47] Article 43 outlines the circumstances under which an interim shareholders' meeting is convened, and states that shareholders individually or jointly holding ten percent or more of shares can request an interim shareholders' meeting.[48] Article 83 states that the list of candidates for directors and supervisors shall be based upon proposal/motion at the shareholders' general meeting.[49] Under Article 83, non-independent directors are nominated by the board of directors or shareholders holding individually or jointly more than ten percent of the company shares.[50] Additionally, independent directors are nominated by the board of directors, board of supervisors, or shareholders individually or jointly holding more than one percent of company shares.[51] Lastly, Article 117 states that the chairperson and vice chairperson shall be elected and dismissed by the votes of more than half of

---

[46] See Guizhou Tyre SQR1 at Exhibit 2B; see also Guizhou Tyre's Letter, "GTCIE SRA Supplemental Questionnaire Response in the Antidumping Duty Investigation of Truck and Bus Tires from the People's Republic of China," dated July 22, 2016 (Guizhou Tyre SQR2) at Exhibit 3D.

[47] See Guizhou Tyre's Letter, "GTC and GTCIE Rebuttal Factual Information Submission: Antidumping Duty Investigation of Truck and Bus Tires from the People's Republic of China," dated May 6, 2016 (Guizhou Tyre RFI) at Exhibit 4.

[48] Id.

[49] Id.

[50] Id.

[51] Id.

all directors.[52]  With its 25.20 percent ownership share, GIIG is the only individual shareholder with more than ten percent or even one percent of shares.[53]  Therefore, GIIG is able to exert control through shareholders' meetings, the selection of directors, and, in turn, the selection of the chairperson.  Furthermore, because GIIG is the only shareholder with more than three percent of shares, GIIG is the only shareholder with the requisite shares to individually put forward proposals for consideration at shareholders' meetings, pursuant to Article 54 of GTC's AoAs.[54]

Certain articles in GTC's AoAs also allow GIIG to remain in a supervisory position over GTC despite its less-than-majority ownership.  Specifically, Article 32(3) of GTC's AoAs gives shareholders, including GIIG, the right to supervise the operations of the Company, put forward suggestions, and raise inquiries.[55]  Article 49 of GTC's AoAs allows "shareholders individually or jointly holding ten percent (10%) of the shares of the company . . . to propose to the Board of Directors to convene an interim shareholders' meeting."[56]  In the instant case, only GIIG individually has the requisite number of shares to convene an interim shareholders meeting.[57]

Moreover, though the AoAs appear on their face to place safeguards against undue influence by large shareholders in the selection of GTC's senior managers, the record demonstrates that those safeguards were unsuccessful in the instant case.  GIIG was ultimately able to dominate GTC's decision-making process, despite such safeguards, and appoint its preferred members to GTC's board.[58]  Specifically, [

].[59]

---

[52] *Id.*
[53] *See* Guizhou Tyre SRA at Exhibit 6A.
[54] *See* Guizhou Tyre RFI at Exhibit 4.
[55] *Id.*
[56] *Id.*
[57] *See* Guizhou Tyre SRA at Exhibit 6A.
[58] *See* Guizhou Tyre SQR1 at Exhibit 2B; *see also* GTCIE SQR2 at Exhibit 3D.
[59] *See* Guizhou Tyre's SQR2 at Exhibit 1A.

Additionally, records for the July 2015 shareholders' meeting [

].[60]  Items voted on

included matters such as [                          ], which we consider relevant to the company's

operations, including its export functions.[61]  Furthermore, Article 130 of GTC's AoAs states that

the board of directors shall appoint or remove GTC's general manager and four deputy general

managers.[62]  Accordingly, because of GIIG's level of control in GTC's board selection process,

we find that GTC and GTCIE do not have autonomy from the government in making decisions

regarding the selection of management.

In addition, Article 161 (IV) of GTC's AoAs states, "The Board of Director shall put

forward {an} annual profit distribution proposal…."[63]  Therefore, GIIG's role in the board

selection process also impacts the profit distributions of the company.  This is further supported

by the records for the shareholders' meetings during the POI, which demonstrate that [

].[64]

We further continue to find that the relationship between GIIG and the Chair of GTC's

Board of Directors supports our finding of government control over GTC.  Specifically, GTC's

Chairman is [

].[65]  Moreover, the Chairman was voted [

---

[60] *See* Guizhou Tyre SQR1 at Exhibit 2B.
[61] *Id.*
[62] *See* Guizhou Tyre RFI at Exhibit 4.
[63] *Id.*
[64] *See* Guizhou Tyre SQR1 at Exhibit 2B.
[65] *See* Guizhou Tyre's SQR2 at Exhibits 1A, 3A, and 3D.

].[66]  Additionally, Article 118 of GTC's AoAs allows the Chairman to exercise special powers in the event of emergency and to exercise other functions and powers as authorized by the Board of Directors.[67]

Thus, we continue to find that GIIG [                                    ], and through its 25.20 percent ownership stake during the POI, exerted control over GTC's shareholders meetings by virtue of the operational structure established in its AoAs.  Moreover, [

                                    ],[68] and [

                        ],[69] who control the operations of the company including GTCIE's export activity.  Although GTC has cited the Company Law of China,[70] the China Code of Corporate Governance,[71] and its AoAs[72] in support of its claim that GIIG cannot exercise control over GTC and that there are restrictions in place on GIIG, as explained above, the record evidence indicates that GIIG exerted control over [                                    ].  Hence, we continue to find that Chinese law (including the Company Law of China and the China Code of Corporate Governance) and the shareholders' safeguards in GTC's AoAs in place during the POI were ineffective at preventing control by an SOE that is a controlling shareholder, i.e., GIIG.

Regarding the statements GTC highlights from its annual report about minority shareholders expressing their opinion and claims and abiding by laws and regulations,[73] Commerce never found that minority shareholders were silenced, or that GTC failed to abide by

---

[66] See Guizhou Tyre SQR1 at Exhibit 2B.
[67] See Guizhou Tyre RFI at Exhibit 4.
[68] See Guizhou Tyre SQR1 2016 at Exhibit 2B.
[69] Id. at Exhibit 2B.
[70] See Guizhou Tyre's Letter, "GTC and GTCIE Direct Case Brief in the Antidumping Duty Investigation of Truck and Bus Tires from the People's Republic of China," dated December 6, 2016 at 8-9, 18-20 (citing Guizhou Tyre RFI at Exhibit 2).
[71] Id. at 8-11, 18-20 (citing Guizhou Tyre RFI at Exhibit 3).
[72] Id. at 19-22 (citing Guizhou Tyre RFI at Exhibit 4).
[73] Id. at 26-29 (citing Guizhou Tyre SQR1 at Exhibit 4).

relevant laws.  Rather, Commerce found these protections were ineffective at preventing GIIG's

control.  Similarly, although GTC cites a letter from Guiyang SASAC representing that decisions

on selection of board members, appointment of management, and general business operation

decisions shall be made by GTC in accordance with relevant laws, regulations, and GTC's AoAs

without approval from Guiyang SASAC,[74] Commerce did not find that GTC failed to abide by

relevant laws, regulations, or its AoAs but, rather, that these protections were ineffective at

preventing GIIG from exercising control over GTC in the selection of board members and

distribution of profits.

Guizhou Tyre further argues that the case for independence would seem to be stronger in

this investigation than in *OTR Tires AR5*,[75] considering that GIIG's ownership percentage was

reduced and that certain performance reviews are no longer performed.  That GTC may have

been eligible for a separate rate during an earlier period in another proceeding is not dispositive

here.  As described above, Commerce analyzed the record evidence in this investigation and

reasonably concluded that GTC failed to rebut the presumption of control.  Moreover, GTC's

arguments ignore the fact that in *OTR Tires AR5*, Commerce subsequently found that GTC is not

eligible for a separate rate based on a factual situation that is essentially identical to the factual

situation in this investigation.[76]  Thus, Commerce's differing conclusions between the 2012-13

administrative review of *OTR Tires AR5* and this investigation are not unexplained and, instead,

reflect the reasonable evolution of Commerce's analysis considering the evidence on this record.

---

[74] *Id*. at 25-36 (citing Guizhou Tyre RFI at Exhibit 1).
[75] *Id*. at 30-32 (citing *e.g.*, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 20197 (April 15, 2015) (*OTR Tires AR5*).
[76] *See, e.g.*, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18733 (April 21, 2017), and accompanying IDM at Comment 1B.  Commerce's separate rate determination in *OTR Tires AR5* is also in litigation before this Court.  *See Guizhou Tyre Co., Ltd. v. United States*, Consol. Court No. 17-100.

Commerce's determination in the underlying investigation to deny the separate rate request for GTCIE focused predominantly on the finding that record information specific to GTCIE's parent, GTC, reflected a measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management of GTC.  Commerce, thus, concluded that GTCIE had not adequately substantiated autonomy in the selection of directors and management (the third *de facto* factor).  Failure to establish this prong of the criteria meant that GTCIE failed to rebut the presumption of government control and, thus, Commerce reasonably determined that record evidence indicated a measure of control, or potential for control, of relevant Chinese-government entities over the operations of the companies, including their export activities.

The *Remand Order* concludes that the case precedent cited by Commerce (*i.e.*, the *Advanced Tech II*[77] and *Yantai CMC*[78] cases) are distinguishable because in each underlying case, the SOE shareholder maintained majority ownership of the relevant respondent, whereas in the instant case, GTC's SOE shareholder own less than 50 percent of GTC.

We note that the degree of government ownership is not a distinguishing factor in applying the *de facto* analysis.  The language of the *de facto* framework (*i.e.*, the four prongs), the *Sparklers* or *Silicon Carbide* precedent establishing the standard, nor the *Advanced Tech II* and *Yantai CMC* cases, or other cases, including *Zhejiang Quzhou*,[79] establishing that a respondent must rebut the presumption for all factors, does not mention a threshold for government ownership in applying this relevant analytical framework.  The relevance of the level of government ownership entered into Commerce's overall separate rate analysis following

---

[77] *See Advanced Tech II*, 938 F. Supp. 2d 1342, *aff'd* in *Advanced Tech III*, Case No. 2014-1154 (Fed. Cir. Oct. 24, 2014).
[78] *See Yantai CMC*, 203 F. Supp. 3d 1317.
[79] *See Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*).

the determination in the *Advanced Tech* litigation, where the Court held that majority ownership by a government entity, either directly or indirectly, rules out a respondent's ability to demonstrate an absence of *de facto* control.[80]   Accordingly, majority ownership by a government entity is a consideration only in the sense that such a fact pattern establishes control of a respondent by a government entity to preclude any further analysis of the *de facto* criteria, and is plainly not a qualifying factor in the application thereof.   Though the cases cited involved majority government-owned entities, various other cases involving non-majority government-owned respondents are precedents where Commerce denied a separate rate based on the respondent's inability to rebut the presumption of government control with respect to only one factor of the *de facto* criteria.[81]   Indeed, in the *Silicon Carbide* decision, which established Commerce's four factor standard of analysis for *de facto* control, Commerce found certain respondents ineligible on the basis of a failure to substantiate just one of the factors and without mention of level of government ownership.[82]   Moreover, we note that this Court has upheld Commerce's practice of finding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a

---

[80] *See Advanced Tech I*, 885 F. Supp. 2d 1343, remand *aff'd* in *Advanced Tech II*, 938 F. Supp. 2d 1342, *aff'd* in *Advanced Tech III,* Case No. 2014-1154 (Fed. Cir. Oct. 24, 2014) (collectively, *Advanced Tech*).

[81] *See, e.g.*, *53-Foot Domestic Dry Containers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203 (April 17, 2015) (*Containers*), and accompanying IDM at Comment 10; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 23756 (April 29, 2020), and accompanying IDM at Comment 6, *aff'd I.D.I. International Development And Investment Corporation v. United States*, Court No. 20-00107, Slip Op. 21-82 (CIT July 6, 2021) (*IDI v. United States*).

[82] *See Silicon Carbide*, 59 FR 22586-22587 at Comment 2 ("Respondents Hainan and Shaanxi have failed to establish their eligibility for separate rates because, at verification, these companies failed to produce bank records necessary to prove their retention of proceeds from export sales.  Therefore, these respondents did not meet an important criterion for separate rates.").

minority of shares in the respondent company, and where the record contains requisite additional indicia of control as it does here.[83]

The *Remand Order* also explains that "{t}he question of majority or minority government ownership aside, {Commerce's} analysis fails to clarify or explain whether its finding of government control extended, specifically, to GTCIE's export activities during the {POI}."[84]  We clarify that Commerce did not find that a lack of autonomy in management selection equates to a direct finding of government control of export activities.  Rather, Commerce found that record evidence indicating a lack of autonomy in management selection did not satisfy the third prong of the *de facto* analysis and, thus, that GTC was unable to rebut the presumption of government control.  Our *de facto* criteria explicitly lay out that it is a standard by which we evaluate whether a respondent has affirmatively rebutted the presumption of government control or potential control of export functions/activities.  Notably, under the presumption of government control (which has been upheld repeatedly by the courts)[85] Commerce does not affirmatively establish in each instance that the government is controlling the respondent's export activities, including pricing decisions.  Rather, it is the *burden of the respondent* to rebut the presumption by providing sufficient evidence to establish that it operates autonomously from the government in certain key aspects (*i.e.*, those enumerated in the *de facto* criteria).

---

[83] *See An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (CIT 2018), *appeal dismissed,* No. 18-1713, 2018 WL 4562795 (CAFC August 22, 2018) (*An Giang II*).
[84] *See Remand Order* at 36.
[85] *See, e.g.*, *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028, 1030 (Fed. Cir. 2021) ("Our court has previously approved Commerce's application of a presumption of government control over exporters in NME countries{.}"); and *IDI v. United States*, Slip Op. 21-82 at 3.

As explained above, [

],[86] and [                                        ],[87] who control the operations of

the company, including GTCIE's export activity.  Thus, control of the board and appointment of

management equates to potential control of the company's operations (which necessarily

includes export operations).  While there is no evidence that the SOE owner directly exercised its

control on GTC's or GTCIE's export activities, we consider the *de facto* criteria as indicative of

whether the government controls, or has the potential to control, export functions.  Specifically,

our finding that GTC does not have autonomy in the selection of management allows for the

reasonable inference, considering the presumption of government control in NME country

proceedings, that their respective government shareholders maintain the potential to control the

export operations of GTC and its wholly owned subsidiary, GTCIE, because the management of

a firm controls its operations —including its export functions.  In *Jiasheng I*, the Court ruled that

Commerce could "make reasonable inferences from the record evidence" when examining the

totality of the circumstances in determining whether a respondent had demonstrated *de jure* and

*de facto* control of its export activities.[88]  In *IDI vs. United States*, the Court ruled that

Commerce's determination that an exporter is potentially controlled by the government – in the

sense that the government has the ability to exercise actual control (even without exercising it) –

suffices to establish that the exporter has failed to demonstrate its independence from *de facto*

government control.[89]

---

[86] *See* Guizhou Tyre SQR1 2016 at Exhibit 2B.
[87] *Id*. at Exhibit 2B.
[88] *See Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1339 (CIT 2014) (*Jiasheng I*) (quoting *Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61759 (November 19, 1997), and *Sigma* at 1405 (citation omitted), respectively; and *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record") (quotation marks and citation omitted))).
[89] *See IDI v. United States*, Slip Op. 21-82 at 20 ("A puppet master is no less in control when the strings are slack.") (citing *An Giang II*, 284 F. Supp. 3d at 1359).

Although Commerce considers the entirety of the record when evaluating a respondent's separate rate eligibility, Commerce frequently does not detail its evaluation of the record evidence with respect to all four factors in cases such as this.  The analytical framework specifies four areas which may indicate *de facto* government control of export functions.  Commerce examines the record, as it did in the instant case, to determine whether a respondent has provided sufficient evidence to rebut the presumption of government control that applies in non-market economy country proceedings.  Crucially, a respondent must provide evidence to establish autonomy from government control with respect to all four factors in the *de facto* analysis to demonstrate that it operates free of government control.  For this reason, Commerce's discussion in the underlying investigation focused on the criterion where the proffered record information contradicted GTC's assertions that it operated autonomously with respect to the third factor and, thus, our finding that GTC and GTCIE were unable to rebut the presumption of government control.  The Court has addressed this precise question in the recent *IDI vs. United States* ruling and upheld this approach, holding:

> {Commerce was not obligated to} review evidence pertaining to the remaining elements that were no longer material after {Commerce} concluded that IDI failed to establish the third element {of the *de facto* test}….  Here, Commerce found that IDI was unable to demonstrate "that the government neither actually selects management nor directly or indirectly involves itself in the day-to-day management of the company."  As the four-part test for *de facto* control requires the exporter to satisfy all four elements to demonstrate independence, Commerce was entitled to stop there: "Because Plaintiffs failed to satisfy one *de facto* criterion, Commerce had no further obligation to continue with the analysis."  Contrary to IDI's argument, Commerce did not act contrary to law by declining to consider evidence pertaining to the remaining elements that were unnecessary to address.[90]

---

[90] *See IDI v. United States*, Slip Op. 21-82 at 17-19 (citing *Zhejiang Quzhou* 350 F. Supp. 3d at 1321; *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1348 (CIT 2017) (*Rongxin II*); and *Shandong Rongxin Imp. Exp. Co. v. United States*, 331 F. Supp. 3d 1390, 1400–3 (CIT 2018)).  Critically, the underlying facts of the *IDI v. United States* case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was an SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection.

Though the determination for GTC concentrated on record information related to the third prong, our finding reviewed additional indicia of control, generally.  For example, our evaluation described above considered the percentage of ownership by the SOE as the largest individual shareholder of each respondent and relevant documents, meeting notes, articles of association, and voting actions suggestive of potential for control, generally, as well as information regarding the influence of the SOE-appointed board in GTC's decisions regarding the disposition of profits.  This reflects Commerce's practice that it is the *respondent's burden* to satisfy all four factors to rebut the presumption of government control that applies in NME country proceedings and, thus, further discussion of other factors is moot when a respondent is unable to satisfy any single criterion.

Nevertheless, for clarity, we explain here that the record evidence provided by GTC demonstrated that sales manager(s) set export prices for GTCIE,[91] and there was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor).  Moreover, GTC provided sufficient evidence to demonstrate that it has authority to negotiate and sign contracts and other agreements on its own behalf (the second factor).[92]  Finally, with respect to the fourth factor, as described above, the record demonstrates that GIIG was able to [

].[93]

Finally, the Court stated that Guizhou Tyre "introduced evidence to support its contention that the Chinese government did not control GTCIE's export activities and in particular its export prices" and that "the information Guizhou Tyre put forward was sufficient to require Commerce

---

[91] *See* Guizhou Tyre SRA at 15-16 and Exhibit 10.
[92] *Id.*
[93] *See* Guizhou Tyre SQR2 at Exhibit 2B; *see also* Guizhou Tyre SQR2 at Exhibit 3D.

to consider the record as a whole and make a factual determination on whether the Chinese government actually controlled Guizhou Tyre's export functions and export pricing decisions during the {POI}."[94]  First, as explained in detail above, Commerce analyzed the evidence introduced by Guizhou Tyre and concluded that it did not establish that GTC and GTCIE operated independent of government control.  Second, implicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control).  As explained above, however, the four factors, together, relate to the determination of whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  An approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity would be inconsistent with the *de facto* analytical framework, because it would make the remaining three factors irrelevant.

In our earlier evaluation, we examined the totality of evidence.  Although GTCIE reported that its export prices are not set by, subject to the approval of, or in any way controlled by a government entity at any level,[95] because failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption of government control, our findings related to the first factor do not otherwise overcome Commerce's findings that Guizhou Tyre failed to establish autonomy from government control

---

[94] *See Remand Order* at 38.
[95] *See* Guizhou Tyre SRA at 15.

in making decisions regarding the selection of management, which are corroborated by the totality of evidence indicative of potential for control.

Further, limiting the examination of the *de facto* analysis primarily to the existence of evidence of direct government involvement in price-setting necessarily ignores other aspects of export activities where the government may exert control, such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc*.[96]  A standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a "smoking gun" document exist on the record showing direct involvement on behalf of a government authority in price-setting for an individual firm.  Even in a hypothetical situation where government involvement in price-setting is direct and unambiguous, actual affirmative documentation of such activity is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited. It is for precisely this reason that Commerce evaluates the four factors, as well as any other information on the record that supports sustaining the presumption of government control and may determine that failure to establish independence from the government in any one such factor is sufficient to demonstrate failure to rebut the presumption of control.

---

[96] *See* Policy Bulletin 05.1 at 1-2 ("{T}he test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level."); *see also, e.g.*, *Final Determination of Sales at Less Than Fair Value:  Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61757 (November 19, 1997); and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 62 FR 61276, 61279 (November 17, 1997).

Nevertheless, as described earlier, [

],[97] and [                                                    ],[98] who control the

operations of the company including GTCIE's export activity.  We determine this evidence to be

sufficient to find that Guizhou Tyre has failed to rebut the presumption of government control or

potential for control over export functions.

Based on the foregoing, we continue to find that Guizhou Tyre has not established its *de

facto* independence from the GOC.  As a result, we continue to find that GTCIE, a wholly owned

subsidiary of GTC, is not eligible for a separate rate.

### 3.  Double Coin Separate Rate

In the underlying investigation, we determined that Double Coin was not eligible for a

separate rate because it did not establish *de facto* independence from the GOC.  We based our

decision on the fact that:  (1) Double Coin was 72.15 percent owned by Shanghai Huayi (Group)

Company (Shanghai Huayi), which is 100 percent owned by Shanghai SASAC; (2) as the

majority shareholder, Shanghai Huayi has rights to elect directors at the shareholders' general

meetings in accordance with the number of shares it owns, *i.e.*, 72.15 percent; and (3) Double

Coin's board appoints its general manager and the general manager appoints other managers,

including deputy general managers, and three of Double Coin's four directors are general

manager and deputy general managers.[99]

In the *Remand Order*, the Court found that "{i}t is not clear to the court whether, or to

what extent, {Commerce's} separate rate inquiry was focused on Double Coin's *export*

activities, as opposed to control of the selection of board members and management, and

---

[97] *See* Guizhou Tyre SQR1 2016, at Exhibit 2B.
[98] *Id*. at Exhibit 2B.
[99] *See* Preliminary SRA Denial Memorandum at 3.

24

{Commerce's} statements on this question are internally inconsistent."[100]  The Court stated that "{d}espite the evidence Double Coin placed on the record, including that pertaining to Articles 25 and 27 of the Articles of Association, which place restrictions on the authority of controlling shareholders, the court is asked to speculate that 'shareholder' decisions '*may* affect' the management and operations of Double Coin" and that, "{e}ven were the court to do so, it would require further speculation to conclude that the affected operations were equivalent to government control over Double Coin's export activities during the {POI}."[101]  Noting Double Coin's contention that the price negotiations with unaffiliated U.S. customers for sales of subject merchandise were conducted by Double Coin's U.S. subsidiary, which is far removed from the GOC, the Court stated that Commerce would infer that majority ownership of Double Coin by a government-owned entity affected export pricing without pointing to record evidence or explaining the significance of the concerns it cited in the IDM regarding government manipulation of the cost of inputs or rationalization of industry or output which Commerce claimed affect seller pricing.[102]  Finally, the Court indicated it is unclear "whether government control of selection of board and management is either a rebuttable or irrebuttable presumption of government control over export activities" and, if irrebuttable, the basis for adoption of such a rule or policy.[103]  The Court remanded the *Final Determination* for Commerce to reconsider its denial of a separate rate for Double Coin in light of these issues.[104]

As described above, Commerce typically considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions and Commerce's

---

[100] *See Remand Order* at 48 (emphasis in original).
[101] *Id*. at 52 (emphasis in original).
[102] *Id*. at 49-50.
[103] *Id*. at 50-52.
[104] *Id*. at 52.

practice is to deny a request for a separate rate if an applicant fails to demonstrate separation

from the government with respect to any one of the aforementioned *de facto* factors.

The Court stated that "{i}t is not clear to the court whether, or to what extent,

{Commerce's} separate rate inquiry was focused on Double Coin's *export* activities, as opposed

to control of the selection of board members and management, and {Commerce's} statements on

this question are internally inconsistent."[105]  We clarify that Commerce did not find that a lack of

autonomy in management selection equates to a direct finding of government control of export

activities.  Rather, Commerce found that record evidence indicating a lack of autonomy in

management selection did not satisfy the third prong of the *de facto* analysis and, thus, that

Double Coin was unable to rebut the presumption of government control.  In evaluating the *de*

*facto* factors, Commerce has found that where a government entity holds a majority ownership

share, either directly or indirectly, in the respondent exporter, the majority ownership holding in

and of itself means that the government exercises, or has the potential to exercise, control over

the company's operations.[106]  This may include control over, for example, the selection of

management, which is a key factor in determining whether a company has sufficient

independence in its export activities.[107]  As we explained in the Preliminary SRA Denial

Memorandum, "{a}s the majority shareholder, {Shanghai Huayi} has rights to elect directors at

the shareholders' general meetings in accordance with the number of shares it owns, *i.e.,* 72.15

percent.  Double Coin's board appoints its general manager, and the general manager appoints

other managers, including deputy general managers.  Three of four directors are general manager

---

[105] *Id*. at 48 (emphasis in original).
[106] *See, e.g.*, *Multilayered Wood Flooring from the People's Republic of China, Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 FR 35461 (July 26, 2018), and accompanying IDM at Comment 2.
[107] *Id.*

and deputy general managers.  Therefore, Shanghai SASAC controls the selection of Double

Coin's management and the *de facto* control over Double Coin exists."[108]  Thus, we continue to

find that Shanghai Huayi controls, or has the potential to control, Double Coin's selection of

management and its company operations, including export activities and functions, and that

Double Coin has not rebutted the presumption of government control.

The Court further stated that "{d}espite the evidence Double Coin placed on the record,

including that pertaining to Articles 25 and 27 of the Articles of Association, which place

restrictions on the authority of controlling shareholders, the court is asked to speculate that

'shareholder' decisions '*may* affect' the management and operations of Double Coin" and that,

"{e}ven were the court to do so, it would require further speculation to conclude that the affected

operations were equivalent to government control over Double Coin's export activities during

the {POI}."[109]  As a preliminary matter, we understand that the Articles 25 and 27 to which

Double Coin referred are actually Articles within the China Code of Corporate Governance, not

Double Coin's AoAs.[110]  The record does not support a finding, however, that the China Code of

Corporate Governance prevents the GOC or any of its subsidiaries from controlling a company.

For example, GTC reported that "GTC must follow the rules of Corporate Governance regulated

by China Securities Regulatory Commission" and attached a copy of the China Code of Corporate

Governance.[111]  Nevertheless, as described above, the record demonstrates that GIIG

was able to [

---

[108] *See* Preliminary SRA Denial Memorandum at 3.
[109] *Id*. at 52 (emphasis in original).
[110] *See* Double Coin's Letter, "Double Coin and CMA's AD Case Brief - Truck and Bus Tires from the People's Republic of China," dated December 6, 2016 (Double Coin Case Brief) at 38-39.
[111] *See* Guizhou Tyre RFI at 2 and Exhibit 3.  Double Coin also submitted a copy of the China Code of Corporate Governance.  *See* Double Coin's Letter, "Double Coin's Section A Response - Truck and Bus Tires From China (A-570-040)," dated May 23, 2016 (Double Coin AQR) at Exhibit A2-4.

].[112]  Thus, the China Code of

Corporate Governance clearly did not prevent GIIG from exerting control over GTC.

Similarly, there is no reason to find that Shanghai Huayi, Double Coin's majority

shareholder, cannot exert similar control over Double Coin.  In fact, the Company Law of China,

which was submitted by GTC, indicates that the government has the ability to control the

business activities of a company when the government is a controlling shareholder, which is

precisely the situation here where Shanghai Huayi is the controlling shareholder of Double

Coin.[113]  For example, Article 4 states that "{t}he shareholders of a company shall, in

accordance with the law, be entitled to such rights as to obtain capital proceeds, to participate in

important decision-making, to elect management personnel, etc."[114]  Further, Article 42 provides

that "the shareholders of a company shall exercise their voting rights at shareholders' meetings in

proportion to their respective capital contributions, unless otherwise specified in the company's

articles of association."[115]  In addition, Article 46 provides that "{t}he board of directors of a

company shall be accountable to the shareholders' meeting" and that the board of directors shall

"{formulate} the profit distribution plans and loss recovery plans of the company" and "{make}

decisions on the employment or dismissal of the manager of the company."[116]  Thus, the

Company Law of China makes clear that the shareholders exert control of the company,

specifically with respect to the selection of management and the disposition of profits or

financing of losses.

---

[112] *See* Guizhou Tyre SQR2 at Exhibit 2B; *see also* Guizhou Tyre SQR2 at Exhibit 3D.
[113] *See* Guizhou Tyre RFI at Exhibit 2.  Although Double Coin in its case brief cited to the Double Coin AQR at Exhibit A2-5 as containing the Company Law of China (*see* Double Coin Case Brief at 37-8), Exhibit A2-5 of the Double Coin AQR actually contains the China Code of Corporate Governance.
[114] *Id.*
[115] *Id.*
[116] *Id.*

The record similarly does not support a finding that Double Coin's AoAs prevent Shanghai Huayi from controlling Double Coin.  Besides the provisions of the Company Law of China cited above, we observe that Double Coin's AoAs appear to be standard rules applicable to any company.  Indeed, most of the Articles cited by Double Coin in its case brief (*i.e.*, Articles 34, 35, 36, 37, 39, 110, 113)[117] are very similar to the Articles which appear in GTC's AoAs.[118] Nevertheless, as noted above, the presence of very similar Articles in GTC's AoAs does not prevent GIIG from exerting control over, or having the potential to control, GTC and GTCIE. Thus, we have no reason to conclude that these Articles would prevent Shanghai Huayi, as Double Coin's majority shareholder, from controlling Double Coin when they do not prevent GIIG from controlling GTC and GTCIE.  Therefore, we find that Double Coin's references to its AoAs are insufficient to rebut the presumption of government control.

With respect to the price negotiations with unaffiliated U.S. customers for sales of subject merchandise, although Double Coin's U.S. subsidiary conducted such negotiations, the record shows that Double Coin owned [    ] percent of CMA, who negotiated [   ] percent of Double Coin's U.S. sales.[119]  Shanghai Huayi can effectively appoint Double Coin's directors and managers, who control the operations (including export activities) of Double Coin, by virtue of being the majority shareholder of Double Coin; likewise; Double Coin, in turn, can effectively appoint CMA's directors and managers, who control the operations (including export activities) of CMA, by virtue of being the majority shareholder of CMA.  As we stated in the IDM, "we

---

[117] *See* Double Coin Case Brief at 40-1.
[118] Compare Double Coin AQR at Exhibit A2-13 with GTCIE RFI at Exhibit 4.  While there are some differences in the language, many of the differences appear to be differences in translation.  Compare, *e.g.*, Article 36 of Double Coin's AoAs ("Where the directors or senior managers violates the relevant national statutes or administrative regulations or the articles of association, so as to infringe on the interests of the shareholders of the company, a shareholder is entitled to bring a suit to the People's Court") with Article 36 of GTC's AoAs ("Where the directors or senior management personnel violate the laws and administrative regulations or the Articles of Association, thereby infringing the interests of shareholders, the shareholders have the right to file a suit in the People's Court").
[119] *See* Double Coin AQR at 27 and Exhibit A3-3.

presume that Double Coin's managers are 'beholden to the board that controls their pay, in particular to the chairman of the board as the *de facto* company head under the PRC model,' until proven otherwise."[120]  So, too, it is reasonable to presume that CMA's managers are beholden to the directors appointed by Double Coin.  Thus, even if CMA negotiates prices with unaffiliated U.S. customers, we find that this does not rebut the presumption of control.  Moreover, we reiterate that the actual setting of price is only one of the four *de facto* criteria, and as we explained above, if an applicant fails to establish any one of the criteria, it fails to rebut the presumption of government control.[121]

Although Commerce frequently does not detail its evaluation of the record evidence with respect to all four factors in cases such as this, *i.e.*, when a respondent fails to establish one of the criteria, for clarity, we explain here that the record evidence provided by Double Coin demonstrated that sales manager(s) set export prices for Double Coin,[122] and there was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor).  Moreover, Double Coin provided sufficient evidence to demonstrate that it has authority to negotiate and sign contracts and other agreements on its own behalf (the second factor).[123]  With respect to the fourth factor, as described above, the record demonstrates that Double Coin retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[124]

---

[120] *See Final Determination*, 82 FR 8599, and accompanying IDM at 24 (citing *Advanced Tech I*, 885 F. Supp. 2d at 1359, 1352).

[121] In the *Remand Order*, the Court stated that Commerce did not explain why government manipulation of costs was of concern or how rationalization of industry or output was pertinent to this investigation.  *See Remand Order* at 49-50.  Commerce clarifies that these potential concerns might be present in any case, though we acknowledge that there is no specific information on the record of this proceeding regarding these issues.  As the Court is aware, in *Advanced Tech I* the Court identified these concerns as "among numerous other scenarios of concern that can affect seller pricing."  *See Advanced Tech I*, 885 F. Supp. 2d at 1360.

[122] *See* Double Coin AQR at 20-21 and Exhibits A2-13, A2-17, and A2-18.

[123] *Id*.

[124] *Id*.

Finally, the Court indicated it is unclear "whether government control of selection of board and management is either a rebuttable or irrebuttable presumption of government control over export activities" and, if irrebuttable, the basis for adoption of such a rule or policy.[125]  As discussed above, Commerce presumes that respondents in NME countries are government-controlled, unless a respondent rebuts the presumption.  It is well established that the burden is on the respondent, not on Commerce, to demonstrate that the respondent is free of government control.[126]  Instances where an NME respondent that is majority-owned by the foreign government will be able to demonstrate that it has autonomy from government control may be uncommon.  However, this does not mean that the presumption of government control is irrebuttable, which this Court has recognized.  In *CMC Yantai*, a case involving similar facts in which a SASAC had indirect majority control over the respondent company, the Court reasoned, "{t}hat particular facts (majority ownership) may be sufficient to support an agency determination of control, and the existence of those facts in this particular case (*i.e.,* indirect majority control by SASAC), does not alter the test into an irrebuttable presumption; instead, it means that, on the basis of these facts, Plaintiff failed to rebut the presumption."[127]  Similarly, in *Zhejiang Quzhou*, the Court disagreed with arguments that Commerce converted "the presumption into an irrebuttable finding of government control," noting that "{t}he presence of direct or indirect majority ownership may require exporters to surmount a high bar to demonstrate the absence of *de facto* control, but it does not necessarily preclude exporters from

---

[125] *See Remand Order* at 50-52.

[126] *See Sigma*, 117 F.3d at 1405 ("Commerce, however, has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate.  We agree with the government that it is within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control.") (citations omitted).

[127] *See CMC Yantai*, 203 F. Supp. 3d at 1325-26.

obtaining a separate rate."[128]  Thus, Commerce's presumption of government control is

rebuttable.  Double Coin had the burden rebutting the presumption by establishing it is free from

*de facto* government control but was unable to do so.

## IV.     COMMENTS ON DRAFT RESULTS OF REDETERMINATION

**Comment 1:   The Draft Results Correctly Finds That No Antidumping Duties Can Be
                        Assessed on Subject Merchandise from China Before February 18, 2020**

*Guizhou Tyre's Comments*
   - The Draft Results correctly finds that no antidumping duties can be assessed on truck and
     bus tires from China that entered the United States prior to February 18, 2020.[129]  This
     result is necessitated by the CIT agreeing with Guizhou Tyre that there was no basis in
     law for Commerce to collect antidumping duties before judgment entered affirming the
     affirmative ITC determination on remand.[130]  Guizhou Tyre requests finalization of this
     aspect of the Draft Results and that Commerce take all necessary actions to ensure that
     any antidumping duties collected on entries from truck and bus tires from China that
     entered the United States before February 18, 2020, are refunded with interest.[131]

**Commerce's Position:**

As stated above, to the extent the Court concludes that publication of the *Order* was

premature, Commerce believes the Court's choice of February 21, 2020, as a publication date, is

reasonable.  In the Draft Results, we stated that we understand that the Court's intent was that we

treat February 15, 2019, as the "date of publication" of the *Order* and that we refund, with

interest, cash deposits for merchandise that entered between February 15, 2019, and February 18,

2020.  However, as we stated in the Draft Results and in these final results of redetermination, to

the extent the Court concludes that publication of the *Order* was premature, Commerce believes

---

[128] *See Zhejiang Quzhou*, 350 F. Supp. 3d at 1323; *see also Zhejiang Machinery Import & Export Corp. v. United
States*, 521 F. Supp. 3d 1345, 1352 (ZMC argues that Commerce's Remand Results attempt to transform this
standard into an irrebuttable presumption that could never be overcome.  However, ZMC's arguments erroneously
reverse the burden of rebutting the presumption of government control by arguing that Commerce needed to have
shown more direct evidence of actual control above the evidence relied upon.") (citations omitted).
[129] *See* Guizhou Tyre's Comments at 2.
[130] *Id.*
[131] *Id.*

the Court's choice of February 21, 2020, as a publication date, is reasonable.  We thus erroneously referred to February 18, 2020 (the date the CIT affirmed the ITC's remand redetermination) rather than February 21, 2020 (the date the CIT found would be the earliest an order could have been published) in the Draft Results.  We have corrected this error in these final results of redetermination and clarify that should the Court order its intended remedy, we understand the Court's intent to be that cash deposits should be refunded, with interest, for merchandise that entered between February 15, 2019, and February 21, 2020.

**Comment 2:   The Draft Results With Respect to Guizhou Tyre Are Inconsistent With and Cannot be Reconciled to Applicable Precedent, Misapply the Relevant Presumption, and Misconstrue and Fail to Address the *Remand Order***

*Guizhou Tyre's Comments*
- The standard set up by Commerce's separate rates practice is to determine whether a respondent can demonstrate the absence of *de jure* and *de facto* governmental control over its export activities.[132]  This analysis relies upon a holistic inquiry, examining the totality of circumstances, and Commerce has repeatedly held that government ownership alone does not preclude eligibility.[133]  Indeed, in numerous cases, Commerce has granted separate rates to respondents with even 100 percent government ownership.[134]  Whereas respondents bear the burden of rebutting the presumption of government control, the Court has held that this presumption vanishes when a party produces a "minimum quantum of evidence" against it.[135]
- In numerous prior proceedings, the CIT requires that separate rate denials be based on actual government control as opposed to mere potential for control.[136]  The Court confirmed this principle here in the *Remand Order*, and invalidated the denial of separate rates for GTCIE because it submitted sufficient evidence to rebut the presumption of state control, and Commerce was unable to affirmatively demonstrate that the Chinese government controlled their export pricing decisions during the POR.[137]

---

[132] *See* Guizhou Tyre's Comments at 7-8 (citing *e.g.*, *Sparklers*, 56 FR at 20589; *Silicon Carbide*, 59 FR at 22586-89; *Furfuryl Alcohol*, 60 FR at 22545; and Policy Bulletin 05.1).

[133] *Id.* at 8-9 (citing *e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339 (CIT 2014); and *Silicon Carbide*, 59 FR at 22586-89).

[134] *Id.* at 9-10 (citing *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Hot-Rolled Carbon Steel Flat Products from the People's Republic of China*, 66 FR 49632 (September 28, 2001), and accompanying IDM at Comment 1).

[135] *Id.* at 10 (citing *Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (*Aukerman*)).

[136] *Id.* at 11-13 (citing *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160 and 1348-50 (CIT 2014); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1269 (CIT 2015) (*Jiasheng II*); *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1291-92 (CIT 2017) (*An Giang I*); and *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (April 29, 2021) (*Jilin Forest*)).

[137] *Id.* at 13-14 (citing *Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al. v. United States*, 2021 WL 1944431 (*Guizhou Tyre II*) at 7-8).

<u>The Draft Results Misconstrue the Remand Order and Applicable CIT Precedent</u>

- The continued denial of the separate rate for GTCIE in the Draft Results disregards the CIT's express directive that:  (a) Commerce must find state control over export activities to deny separate rate status; (b) the presumption of state control was rebutted, requiring Commerce to provide affirmative evidence of state control; and (c) precedent involving majority state-owned respondents is readily distinguished and inapposite to the facts underlying GTCIE's separate rate application.[138]

  - In the Draft Results Commerce claims that the CIT erroneously interpreted Commerce's separate rate analysis in stating that "{i}mplicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing… An approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity would be inconsistent with the *de facto* analytical framework, because it would make the remaining three factors irrelevant."[139]

    - The central problem is that the focus on export price-setting comes directly from Commerce's own longstanding practice:  *i.e.*, the purpose of the separate rate analysis has always been to determine whether a respondent can demonstrate the absence of *de jure* and *de facto* governmental control over its export activities.[140]

    - Critically, the *Remand Order* invalidated the separate rate denials of GTCIE because "Commerce identified criteria it considers when determining whether a company is free from '*de facto* government control of its export functions."[141]  The CIT did not graft an additional analytical requirement as the Draft Results insinuate; the CIT merely required that the separate rate denial be tethered to the respondents' export functions – in accordance with longstanding practice.  In this sense, the Draft Results refuse to heed a direct judicial finding, not an implicit one, that the denial of the separate rate for the respondents must be "supported by valid factual findings that the Chinese government, rather than ... GTC, controlled the prices at which these companies' subject merchandise were sold for export during the POR."[142]

    - Rather than suggest that export pricing is the long relevant inquiry, the CIT found that Commerce could not ignore this overarching purpose of the separate rate analysis in denying separate rates for GTC.  The Draft Results concede that "there is no evidence that the SOE owners directly exercised their control on GTC's or GTCIE's export activities" because "the record evidence provided by GTC demonstrated that sales manager(s) set export prices for GTCIE" and "GTC provided sufficient evidence to demonstrate that

---

[138] *Id.* at 15.
[139] *Id.*
[140] *Id.* at 15-16.
[141] *Id.* at 16 (citing *Remand Order* at 34).
[142] *Id.* at 16-17 (citing *Guizhou Tyre II* at *9).

34

it has authority to negotiate and sign contracts."[143]  The Draft Results thereby correctly and candidly acknowledge that there is no explicit evidence that the Chinese government "actually did control" export pricing.[144]  Accordingly, the *Remand Order* leaves Commerce no room to deny separate rates for GTCIE, yet the Draft Results do exactly that, by recasting the CIT's mandate as "{a}n approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity."[145]

▪ It defies credulity to treat the *Remand Order* as merely requesting confirmation that the record is devoid of any indicia of state control with respect to export activities in order to deny the separate rates.  Rather, the CIT was clear that such findings were a legal prerequisite to denying the separate rates in stating the continued denials must be "supported by valid factual findings that the Chinese government, rather than . . . GTC, controlled the prices at which these companies' subject . . . tires were sold for export."[146]

<u>Commerce Misconstrued the Legal Standards with Respect to the Rebuttable Presumption and Is Required, but Failed, to Present Affirmative Evidence of Control</u>

● The Draft Results err by misconstruing the analytical framework in which the presumption of control operates, including various statements which incorrectly suggest that the respondents are required to conclusively establish a lack of state control.[147]  However, the party against whom a presumption operates need not "establish," "demonstrate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control), rather, once GTC submitted the "minimum quantum of evidence" creating "genuine dispute" as to whether they were state controlled during the POR, the presumption vanished.[148]  The respondents surpassed this minimal evidentiary threshold, proved independence with respect to price setting and sales negotiating, and sufficiently satisfied this standard with respect to management selection and profit disposition.[149]

○ The Draft Results improperly conflate "sufficient evidence" to rebut the presumption – *i.e.*, the "minimum quantum" – with evidence to conclusively "establish" the presumed fact – *i.e.*, that GTC operates autonomously from the government.[150]

○ The Draft Results ignore the CIT, having found that GTC did in fact provide the requisite "sufficient evidence" to cast doubt upon their being state controlled, and Commerce thus became obligated to "affirmatively establish in each instance {that} the government is actually controlling the respondent's export activities, including pricing decisions" before denying the separate rate.[151]  Commerce was thus

---

[143] *Id.* at 17 (citing the Draft Results at 21 and 24).
[144] *Id.* (citing the Draft Results at 4).
[145] *Id.*
[146] *Id.* at 18-19 (citing *Guizhou Tyre II* at 7).
[147] *Id.* at 19-20 (citing Draft Results at 11, 18, 20, 21, 23, and 25-26).
[148] *Id.* at 20 (citing *Aukerman*, 960 F.2d at 1037 (Fed. Cir. 1992)).
[149] *Id.*
[150] *Id.* at 21-22.
[151] *Id.*

required to adequately establish state control, and that the "measure of control" was insufficient.[152]

- Commerce's finding that GTC failed to establish autonomy from government control in making decisions regarding the selection of management thus:  (1) misconstrues the operation of presumptions, as discussed above; (2) ignores contrary record evidence to rebut this factor, as detailed separately; and (3) disregards the CIT *Remand Order* findings that GTC rebutted the presumption of state control in all respects.[153]

- The Draft Results claim that the *Remand Order* establishes "{a} standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a 'smoking gun' document exist on the record showing direct involvement on behalf of a government authority in price-setting for an individual firm."[154]  Commerce's complaint about supposed difficulties in obtaining the requisite evidence to deny separate rates for GTC is both incorrect and irrelevant.[155]  Governmental price-setting is expected to be documented, and Commerce can readily solicit such information in response to questionnaires – in the form of narrative responses, in the event documentation does not exist.[156]

- Even if such information were difficult to obtain, that does not relieve Commerce from its obligation to affirmatively demonstrate state control.[157]  Commerce faults the requirement for direct "evidence of government involvement in price setting" as "ignor{ing} other aspects of export activities where the government may exert control" (such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc.*), yet the Draft Results proffers no evidence of state control.[158]  It is improper for the Draft Results to avoid the CIT's requirement for affirmative evidence of state control by listing potential ways in which state control could be exercised.[159]

- The Draft Results only identifies "voting actions suggestive of potential for control" and other "evidence indicative of potential for control."[160]  Such findings of potential control cannot be reconciled with the CIT's articulation of Commerce's practice:  "Commerce's practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity."[161]  Indeed, the CIT expressly rejected this very position in *Guizhou Tyre II*, stating, Commerce "{p}resumes, without evidentiary support,

---

[152] *Id.*
[153] *Id.*
[154] *Id.* at 23 (citing Draft Results at 25).
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.* at 24 (citing Draft Results at 25).
[159] *Id.*
[160] *Id.* (citing Draft Results at 23 and 25).
[161] *Id.* (citing *An Giang I*, 203 F. Supp. 3d at 1291-92 (CIT 2017)).

that Commerce's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities".[162]  The Draft Results cannot credibly maintain the exact same reasonable inference of state control based on the exact same record which the CIT expressly found could not sustain a reasonable inference.[163]

Commerce's Denial of Separate Rates Disregards the CIT's Finding That Precedent Involving Majority SOE Ownership Precedent Is Inapposite to Guizhou Tyre

- The Draft Results contradict established CIT precedent by improperly discounting the fact that GTC had minority – and not majority – SOE ownership.[164]  The Draft Result are incorrect that SOE ownership percentage is only relevant insofar as making it easier for Commerce to deny separate rates for majority SOE respondents.[165]  Rather, SOE ownership percentage concomitantly makes it more difficult for Commerce to deny separate rates for minority SOE respondents; the CIT has affirmed the principle that "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."[166]  The Draft Results improperly denied separate rates for the respondents having minority SOE ownership without evidencing any state control, let alone the "additional indicia" required.[167]
- The CIT has repeatedly found that substantially more evidence is required to deny separate rates for respondents having minority SOE ownership,[168] and has found that "the degree of government ownership is . . . a distinguishing factor in applying the *de facto* analysis," in finding that Commerce cannot rely on precedent involving majority SOE ownership to deny separate rates for GTC,[169] as it did in the Draft Results.  Accordingly, the Draft Results flout the *Remand Order* by continuing to deny companies their separate rates through invalidated reliance on prior cases where management selection was discussed as a factor in denying the separate rate for a majority government-owned respondent,[170] and further misplaces reliance on a single CIT ruling where management selection was a factor in the denial of the separate rate for a non-majority SOE owned firm (as well as other cases which the Court has not reviewed).[171]
- Commerce is incorrect in characterizing the *IDI v. United States* case as one which mirrors the instant litigation, where the largest minority shareholder of the respondent in question was an SOE, and the respondent's separate rate was denied based on a failure to rebut the

---

[162] *Id.*  at 25 (citing *Guizhou Tyre II*, 2021 WL 1944431, *6).

[163] *Id.*

[164] *Id.*

[165] *Id.* at 26.

[166] *Id.* (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).

[167] *Id.*

[168] *Id.* at 27 (citing *Zhejiang Quzhou*, 350 F. Supp. 3d at 1318 (CIT 2018)).

[169] *Id.* at 27-28 (citing *Guizhou Tyre II*, 2022 WL 203346, *14 (quoting *Yantai CMC Bearing Co. v. United State*s, 203 F. Supp. 3d 1317, 1323 (CIT 2017); and *Advanced Tech. & Materials Co. v. United States*, 37 CIT 1487, 1494 (2013), *aff'd*, 581 F. Appx. 900 (Fed. Cir. 2014))).

[170] *Id.* at 28.

[171] *Id.* at 28 (citing *IDI v. United States*, Slip Op. 21-82 (CIT July 6, 2021)).

presumption with respect to autonomy of management selection.[172]  Rather, the IDI separate rate was denied based on specific factual findings including that "Commerce found that a government official and Communist Party member— referred to as Mr. X—represented the Vietnamese government on the boards of both IDI and its corporate parent, Company Y."[173]  In that litigation, the Court rejected the respondent's claim that Commerce found only the possibility of state control and, unlike in the instant case, upheld that Commerce's finding that the Vietnamese government actually controls the respondent.[174]  Commerce has not and cannot make findings that important managerial decisions for GTC, GTCIE, and their parent companies during the POI were made by both Chinese government officials and Communist party members.[175]  However, assuming *arguendo* that the IDI decision is not limited to cases in which multiple government and party officials make important decisions for relevant respondent corporate entities during the POI, Commerce should not apply that decision to the facts in this case, as the CIT noted that none of the decisions relied upon by Commerce to deny the GTCIE's separate rate have binding precedential effect and the only precedent governing the Draft Results is the CIT *Remand Order* itself.[176]

GTC Rebutted the Presumption of Control

- The CIT *Remand Order* correctly found that GTC rebutted the presumption of state control.[177]  This finding – based on extensive evidence submitted by Guizhou Tyre – was "sufficient to put the existence of the presumed fact" – *i.e.*, government control – into genuine dispute.[178]  GTC sufficiently rebutted the presumption of state control: record evidence demonstrates that GTC exceeded the "minimum quantum of evidence;" thus, the presumption completely vanished, and Commerce became obligated to affirmatively demonstrate that GTC were in fact controlled by the Chinese government, but did not do so.[179]
  - The CIT has affirmed that "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."[180]  Yet that is precisely what Commerce has done, by relying on select facts that, at most, establish a mere potential for government control.[181]
  - CIT rulings in consecutive reviews of the AD order on frozen fish fillets from Vietnam demonstrates how the presumption operates in the minority SOE ownership context: the respondent in that proceeding initially failed to overcome the

---

[172] *Id.* at 28-29.
[173] *Id.* at 29 (citing *IDI v. United States*, Slip Op. 21-82 (CIT July 6, 2021)).
[174] *Id.*
[175] *Id.* at 30.
[176] *Id.* (citing *D&L Supply Co. v. United States*, 22 CIT 539, 540 (CIT 1998) (*D&L Supply*); *Advanced Tech III*, 581 F. App'x 900 (Fed. Cir. 2014); and *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (CIT 2008) (*Nakornthai*)).
[177] *Id.* at 43-44 (citing *Remand Order* at 37-38).
[178] *Id.* at 44 (citing *Aukerman,* 960 F.2d at 1037 (Fed. Cir. 1992)).
[179] *Id.*
[180] *Id.* (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).
[181] *Id.*

presumption of government control by neglecting to submit an AoA covering the entire POR, and the CIT found that it had not carried its "burden to populate the record with evidence rebutting the existence of *de facto* government control" because "restrictions placed on the minority government shareholder" in the AoA may have not extended throughout the POR.[182]  However, in the subsequent review where Caseamex submitted its AoA for the entire POR, the CIT invalidated Commerce's separate rate denial because "the AoA precludes the minority government shareholder from exercising any independent influence on the Board of Directors or any manager . . . . Although Caseamex has the burden of rebutting government control, it has rebutted that presumption here."[183]  *CASEAMEX* is, thus, entirely on point and compels granting a separate rate to GTC, who like Caseamex have minority SOE ownership.[184]  It is undisputed that GTC submitted its AoA encompassing the entire POR.[185]  With such shareholder protections against majority SOE owner control in effect throughout the POR, GTC rebutted the presumption of state control.[186]  Given the schism depending on whether the SOE ownership is majority or minority recognized by the CIT in the *Remand Order* and prior precedent, Commerce misplaced reliance on instances involving majority SOE ownership; such precedent is wholly inapposite with respect to minority SOE ownership, such as GTC.[187]

**Commerce's Position:**

Guizhou Tyre asserts that Commerce incorrectly interpreted the directive of the *Remand Order* in characterizing the Court's reasoning as effectively requiring a standard by which the primary consideration is whether export prices are set by, or are subject to, the approval of a government entity.  Guizhou Tyre contends that Commerce's attempt to re-state the CIT's directive merely serves to set up a "straw man" argument to re-cast the clear mandate from the Court.  However, Guizhou Tyre later argues that the *Remand Order* requires a finding that the Chinese government controlled export price-setting as a legal pre-requisite to denying the separate rate of a respondent.[188]  Guizhou Tyre cannot have it both ways—faulting Commerce understanding of the *Remand Order* as indicating that the preeminent consideration is whether

---

[182] *Id.* at 44-45 (citing *An Giang II*, 284 F. Supp. 3d at 362-64 (CIT 2018)).
[183] *Id.* (citing *Can Tho Import-Export Joint Stock Co. v. United States*, 415 F. Supp. 3d 1187, 1195 (CIT 2019) (*CASEAMEX*)).
[184] *Id.* at 45.
[185] *Id.*
[186] *Id.*
[187] *Id.* at 46.
[188] *See* Guizhou Tyre's Comments at 18-19.

export prices are set by the government while simultaneously asserting that government control of export prices is a legal prerequisite to denying a separate rate.  Moreover, Commerce's discussion of the implications of the Court's reasoning is not meant to create a straw man or avoid the Court's mandate, but rather to explain our understanding of the Court's analysis and clarify how Commerce considers the four factors in its separate rate analysis.  As we have explained, the four factors all relate to whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  Additionally, prior decisions supports Commerce's practice that, if a respondent is unable to establish autonomy from the government under one of the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate.[189]

Additionally, we disagree with Guizhou Tyre's characterization of the *Remand Order* as unambiguous on certain conclusions or dictating a specific result.  The *Remand Order* is clear that the instant redetermination requires reconsideration of the separate rate decision and that any revisions to the AD rates are to be implemented only as may be required by such reconsideration. Yet, the operative language of the remand does not dictate specific findings or restrict others, only specifying reconsideration in accordance with the opinion.  As part of this reconsideration, we clarified certain aspects of our analysis and the separate rate test to address concerns raised by the Court.  Specifically, we explained that a respondent must submit evidence for all four factors and such evidence is considered but, because each factor must be satisfied to rebut the presumption of government control, we may not expressly discuss other factors in a decision memorandum when a respondent is unable to satisfy any single factor.  Additionally, we explained that the four factors, together, relate to the determination of whether a respondent has

---

[189] *See, e.g.*, *IDI v. United States*, Court No. 20-00107, Slip Op. 21-82 (CIT July 6, 2021); *Zhejiang Quzhou*, 350 F. Supp. 3d at 1320-21; and *Silicon Carbide*, 59 FR 22586-22587, and IDM at Comment 2.

rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  Contrary to Guizhou Tyre's assertions, these explanations are not part of an attempt to flout the CIT's reasoning or to refuse to comply with the *Remand Order*.

Guizhou Tyre would have Commerce abandon its prior findings based on a supposition regarding the scope of the remand directive.  Specifically, Commerce made findings based on the record evidence for GTCIE that the company failed to establish its autonomy in the selection of management.  The *Remand Order* does not address these particular findings or rule on whether they are supported by substantial evidence.  Moreover, the *Remand Order* does not expressly state that Commerce's established practice—where a company fails to rebut the presumption of government control if it fails to satisfy any one of the factors—is invalid or inconsistent with the law.  Rather, it merely concludes that the fact patterns in the cases cited by Commerce (*Advanced Tech.* and *Yantai CMC*) are distinguishable from those here.[190]  Accordingly, we do not understand the Court to have invalidated the bases upon which Commerce found that GTCIE failed to rebut the presumption of government control.  Instead, the Court focused on the lack of specific evidence regarding Chinese government control of GTCIE's export activities during the POI.[191]  We responded to the Court's concerns by clarifying our practice and our findings in key respects, as detailed above.  Thus, we believe that our redetermination here complies with the *Remand Order*.

Guizhou Tyre then argues that Commerce's decision to deny it a separate rate is contrary to the manner in which the presumptions should operate.  According to Guizhou Tyre, a presumption "*vanishes upon introduction of evidence sufficient to support a finding of the*

---

[190] *See Remand Order* at 35-36.
[191] *Id.* at 36.

41

*nonexistence of the presumed fact*" (emphasis added by Guizhou Tyre).[192]  Notwithstanding this claim, Guizhou Tyre does not establish that Commerce misapplied the NME presumption in this case.  Here, Guizhou Tyre ignores that the evidence it submitted did not establish that it operated autonomously from the government in selecting management.  GTCIE has, therefore, not met its burden in rebutting the presumption of government control, *i.e.*, that it must demonstrate autonomy from the government under each of the four *de facto* factors in the separate rate analysis.

Guizhou Tyre argues that Commerce erroneously applied the presumption of state control because Commerce erroneously treated GTCIE under criteria reserved for exporters that are majority-owned by the government, whereas, in this case, state-owned entities own a minority of shares of GTC, GTCIE's parent company.  Guizhou Tyre cites to *Jiasheng I* and *An Giang II* in arguing that Commerce requires additional indicia of government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company and that, where the government owns a majority of the shares, Commerce finds that government ownership, in and of itself, precludes a finding of *de facto* autonomy.  We disagree with Guizhou Tyre.  In this investigation Commerce properly applied its separate rate analysis; in minority ownership situations, Commerce evaluates evidence related to the four *de facto* factors to determine whether there are indicia of government control or whether a respondent has established that it operates autonomously from the government.

Guizhou Tyre claims that, as explained in the Draft Results, Commerce continues to deny it a separate rate through invalidated reliance on prior cases where management selection was discussed as a factor in denying the separate rate for majority government-owned respondents,

---

[192] *See* Guizhou Tyre's Comments at 10 (citing *Aukerman*, 960 F.2d 1020, 1037 (Fed. Cir. 1992)).

and further misplaces reliance on a single CIT ruling where management selection was a factor in the denial of the separate rate for a non-majority SOE-owned firm (as well as other cases which the Court has not reviewed).  However, as the Draft Results note, the degree of government ownership is not a distinguishing factor in applying the *de facto* analysis.  Nowhere in the language of the *de facto* framework (*i.e.*, the four prongs), the *Sparklers* or *Silicon Carbide* precedent establishing the standard, nor the *Advanced Tech.*, *Yantai CMC*, or *Zhejiang Quzhou* cases affirming Commerce's practice that a respondent must rebut the presumption for all factors, is there any mention of a threshold for government ownership in applying this relevant analytical framework.  For example, in *Advanced Tech. II*, this Court sustained Commerce's denial of a separate rate to a respondent that failed to rebut the presumption of government control over its selection of management.[193]  Here, as in *Advanced Tech. II*, Commerce reasonably determined that Chinese-owned entities possessed the ability to appoint the GTC's board, and therefore, management.  Accordingly, *Advanced Tech. II* supports Commerce's determination that the respondents failed to rebut the presumption of government control.  Thus, majority ownership by a government entity is a consideration only in the sense that such level of ownership establishes that a government entity controls, or has the potential to control, a respondent's operations, including export activities, and given that control or potential for control, a respondent cannot demonstrate that it operates autonomously from the government under the four factors, unless it successfully rebuts the presumption of control.  These are both crucial considerations for the Court.

Moreover, Guizhou Tyre too quickly dismisses the relevance of the cases cited with respect to minority ownership, noting that most were not subject to judicial review, without

---

[193] *See Advanced Tech II*, 938 F. Supp. 2d at 1350.

acknowledging the similarities to the separate rate analysis applied in the instant case.  Indeed, as

noted in the Draft Results, one such non-reviewed case was the very *Silicon Carbide* decision

which established Commerce's four factor standard of analysis for *de facto* control.[194]  Guizhou

Tyre then attempts to dismiss *IDI v. United States* as inapposite.  We disagree.  Guizhou Tyre

attempts to distinguish this case based on Commerce's finding in the underlying decision that the

Vietnamese government actually did control management selection, whereas in the instant case,

Commerce found only the potential for control.  However, this ignores the critical preface to the

CIT's holding in that case.  In addressing the plaintiff's argument that Commerce determined the

Vietnamese government only had the potential to control IDI and not that it actually controlled

IDI, the Court explained:

> {E}ven if IDI's characterization of Commerce's decision were correct,
> {Commerce}'s determination that an exporter is potentially controlled by the
> government—in the sense that the government has the '*ability* to exercise actual
> control (even without exercising it)'—suffices to establish that the exporter has
> failed to demonstrate its independence from *de facto* government control.  A
> puppet master is no less in control when the strings are slack."[195]

Although Guizhou Tyre notes that board members in the *IDI* case were members of the

Communist Party, whereas the SASAC-appointed directors for Guizhou Tyre in the instant case

are not, this fact goes to the sufficiency of our determination in this review that Guizhou Tyre

failed to demonstrate autonomy in the selection of management.  On that substantive point,

Commerce reconsidered and further explained GTCIE's separate rate status in light of the record

evidence as a whole, in accordance with the *Remand Order*.  Notably, the fact that the board

members in *IDI* were party members was not a factor discussed by the Court as relevant to its

---

[194] *See Silicon Carbide*, 59 FR 22586-22587 at Comment 2 ("Respondents Hainan and Shaanxi have failed to
establish their eligibility for separate rates because, at verification, these companies failed to produce bank records
necessary to prove their retention of proceeds from export sales.  Therefore, these respondents did not meet an
important criterion for separate rates.").
[195] *See IDI v. United States*, Slip Op. 21-82 at 20 (citing *An Giang II*, 284 10 F. Supp. 3d 1350, 1359 (CIT 2018)).

decision that Commerce's separate rate analysis was lacking, nor was it relevant to the Court's statements that potential government control suffices to establish the exporter has failed to demonstrate its independence from *de facto* control.  Finally, we note that in the *IDI* case, state-controlled actors held no ownership interest in the relevant respondent, whereas a SOE is the largest individual shareholders of GTC in the instant case.  Our characterization of the *IDI* case as "mirroring" that of the instant case was not an indication that all facts and considerations were precisely the same; no two cases are identical.  Regardless, Commerce maintains that the *IDI* case is indeed instructive in drawing reasonable inferences based on record evidence and relevant precedent when examining the totality of the circumstances.  Thus, we continue to find the precedent involving denial of separate rates (whether the firms are majority or minority owned) to be relevant to this case, and that these cases undermine Guizhou Tyre's claim that Commerce erred in basing its decision on separate rate eligibility primarily on whether GTCIE operated autonomously from the government in making decisions regarding the selection of management.

Guizhou Tyre erroneously concludes that the *Remand Order* made an explicit finding that GTCIE rebutted the presumption of state control in all respects.  The Court  held that Commerce's implementation of its *de facto* separate rate analysis was deficient with respect to Commerce's discussion of the July 2015 meeting and whether Commerce's inquiry focused on government control of GTCIE's export activities.  The CIT found that the information Guizhou Tyre put forward was sufficient to require Commerce to consider the record as a whole and determine whether the Chinese government actually controlled Guizhou Tyre's export functions and export decisions.  As detailed above, Commerce evaluated the record as a whole in this remand.  Commerce determined that while there is no evidence that the SOE owner directly

exercised its control on GTC's or GTCIE's export activities, we consider the *de facto* criteria as indicative of whether the government controls, or has the potential to control, export functions, and this is sufficient to establish that GTCIE has failed to demonstrate its independence from *de facto* control.

Guizhou Tyre asserts that Commerce's "complaint" about supposed difficulties in obtaining the requisite evidence is both incorrect and irrelevant, as governmental price-setting is expected to be documented and Commerce can readily solicit such information in response to questionnaires – in the form of narrative responses, in the event documentation does not exist. We agree that Commerce has the authority to solicit such information and gather evidence. Such information is solicited and scrutinized by Commerce, as it was in this case, which involved multiple rounds of questionnaires to Guizhou Tyre regarding responses and documentation relevant to the separate rate analysis. However, to require that Commerce identify record evidence that the Chinese government actually engaged in export price-setting before denying a separate rate would impose an unreasonable threshold on the *de facto* analysis and potentially result in companies improperly receiving a separate rate even when the Chinese government retains the potential to control export functions. Under such a standard, Commerce would need to rely on direct evidence unambiguously demonstrating government involvement in price-setting as the pre-eminent consideration in whether the presumption remains. This would result in granting a separate rate in situations, for example, where the government maintains direct and unambiguous control over a firm's export activities, and that control is exerted and even reflected in an extant agreement document, but not apparent in sales documentation and correspondence kept in the normal course of business (*i.e.*, the documentation Commerce requests that respondents provide with respect to this prong of the analysis). In contrast, under

Commerce's current separate rates analysis, which examines all four *de facto* factors and any additional indicia, Commerce would be able to consider all evidence probative to the government's actual control or potential to control and deny the company a separate rate if the company failed to demonstrate autonomy from the government with respect to one or more of these factors.

Guizhou Tyre suggests that Commerce is over-stating the standard that would be required, and that such affirmative evidence is only required to deny a separate rate where a firm otherwise provides sufficient information to reasonably rebut the presumption for each of the other factors, as Guizhou Tyre maintains it did here.  However, Commerce's concerns are legitimate because Commerce is limited in the type of information it can reasonably obtain from respondents and that information may not explicitly demonstrate that the government actually controlled export functions or pricing.

Similarly, Guizhou Tyre maintains that because the record only includes evidence suggestive of the potential for control for one or two factors and no direct evidence of control for any one factor, whereas other evidence for those factors supported finding that GTCIE had rebutted the presumption, the decision to deny the separate rate for GTCIE could not be sustained.  We disagree.  The CIT has recognized that Commerce may examine the totality of the circumstances and make reasonable inferences from the record evidence when determining whether a respondent had demonstrated *de jure* and *de facto* control of its export activities.[196] We maintain that our analysis with respect to the third and fourth *de facto* factors and additional indicia establishing the potential to control is sufficient to sustain the denial of the separate rates for GTCIE in the instant case.  Because the Court did not yet decide on the merits of

---

[196] *See, e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339.

Commerce's analysis of the remaining factors and because Commerce provided further

explanation of its separate rate methodology and analysis, we find it inappropriate to presume,

like Guizhou Tyre does, that Commerce may not rely on such information in finding that GTCIE

has not rebutted the presumption of government control.

## Comment 3:  The Denial of GTC's Separate Rate is Unlawful

*Guizhou Tyre's Comments*
- Commerce misplaces its reliance on GIIG having accounted for most of the votes electing the 6th Board of GTC in 2012.[197]  These board members were nominated by the Nomination Committee, and GIIG had no involvement with said nomination.[198]  GTC directors, having been nominated by the board, and not shareholders, do not suggest government control.[199]  GIIG had no role in the nomination process, and the protections against domination by any one shareholder enshrined in GTC's AoAs disprove government control; it is irrelevant that the shareholders did not nominate candidates.[200]
- The extent to which other shareholders participated does not change the facts that:  (1) shareholders were not involved in the nomination process; and (2) the 2012 Meeting election complied with all legal requirements proscribed by GTC's AoAs, the Chinese Law, and Code for Listed Companies – including protections against domination by any one shareholder.[201]  Rather than indicate impropriety, the 2012 Meeting reveals that GTC acted as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions.[202]
- Since *OTR Tires AR5* in which Commerce granted GTC a separate rate, GIIG has *decreased* its investments in GTC, *i.e.*, GIIG's investment reduced from 33.36 percent to 25.20 percent, and the Guiyang SASAC ceased conducting performance reviews during that period of time.[203]  It strains credulity to conclude that the Chinese government controlled GTC in AR7 merely because years earlier a 25 percent shareholder – which was not involved in the nomination process and acted in accordance with extensive legal safeguards – voted to elect the board.[204]  According to Commerce, the Chinese government is presumed to control GTC indefinitely by virtue of a vote by GIIG years before the POI.[205]  This unreasonable fiction defies common sense, agency practice, and Commerce's own findings in prior decisions.[206]
- The Draft Results improperly fixate on a July 2015 shareholder meeting to find control by GIIG, while ignoring the May 2015 shareholder meeting that disproves GIIG's control.[207]  At

---

[197] *See* Guizhou Tyre's Comments at 31.
[198] *Id.*
[199] *Id.*
[200] *Id.* at 32.
[201] *Id.*
[202] *Id.*
[203] *Id.* (citing *OTR Tires AR5*, 80 FR at 20198-99).
[204] *Id.* at 32-33.
[205] *Id.* at 33.
[206] *Id.*
[207] *Id.* at 34.

the May 2015 meeting, two managerial candidates advocated by GIIG were voted upon but not elected due to dissenting votes from shareholders other than GIIG.[208]  If GIIG controlled GTC, it would have been able at that time to appoint its preferred members to GTC's board.[209]  Although, two months later, GIIG was able to elect its preferred members to GTC's board, the record only demonstrates that GIIG did so within the bounds of GTC's decision-making processes through the normal courses granted to all shareholders.[210]  Thus, there is no record evidence of any instance of control by GIIG.[211]  GIIG having its favored proposals voted down by other shareholders disproves Commerce's theory that GIIG controls GTC.[212]  The fact that between May and July 2015 GIIG garnered sufficient votes through ordinary corporate protocol to pass resolutions it favored does not mean that GIIG controlled the voting process.[213]  GIIG's success in July 2015 does not mean it can always have its way; other shareholders can and did vote down proposals favored by GIIG.[214]  Further, GIIG is not the only shareholder authorized to convene shareholders meetings.[215]

- The Draft Results misplace reliance on GTC's Chairman in a strained attempt to manufacture government control emphasizing that he serves as the proxy representing GIIG at GTC's shareholders' meetings.[216]  GTC's board chairman may have served as GIIG's proxy, but he did not work for GIIG or any other governmental entity.[217]  The fact that GTC's Chairperson served as GIIG's proxy does not mean that he was controlled by GIIG.[218]  GIIG explicitly instructed GTC's Chairperson to vote GIIG's shares a certain way.[219]  He was selected to vote GIIG's shares in this manner because he was the "Host" for all relevant meetings.[220]  Commerce decades ago granted a separate rate when a board chairman acted as a proxy for the SOE shareholder.[221]  Commerce did not – and could not – find overlapping management amongst GTC and GIIG, and the fact that GTC's Chairperson served as a proxy for GIIG does not constitute overlapping management.[222]  Moreover, the fact that GTC's Chairperson was appointed as Chairperson at its 2012 Meeting – during which time Commerce recognized GTC's separate rate status – does not make him a state actor.[223]  He personally owns shares in GTC and is not beholden to any other shareholder.[224]  Commerce further misplaces reliance on Article 118 of GTC's AoAs allowing the Chairperson to conduct

---

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] *Id.*

[212] *Id.* at 35.

[213] *Id.*

[214] *Id.*

[215] *Id.*

[216] *Id.* at 36.

[217] *Id.*

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.* at 36-37 (citing *Notice of Decision of the Court of International Trade:  Certain Cased Pencils from the People's Republic of China*, 70 FR 56889 (September 29, 2005)).

[222] *Id.* at 37.

[223] *Id.*

[224] *Id.*

unilateral company decisions.[225]  That GTC's Chairman has the authority to temporarily act in emergencies does not indicate government control.[226]

- Commerce failed to consider contradictory record evidence, including extensive legal requirements and safeguards that prevent GIIG from dominating GTC management decisions, which include not only GTC's AoAs but also relevant Chinese company laws and codes.[227]  Commerce gave these protections short shrift, despite initially acknowledging that certain individual AoAs place safeguards against undue influence by large shareholders in the selection of GTC's senior managers.[228]  Commerce belabored its findings based on cherry-picked facts to proclaim that those safeguards were unsuccessful in the instant case, as GIIG was ultimately able to dominate GTC's decision-making process and appoint its preferred members to GTC's board, as well as control profit distribution.[229]  On the contrary, GIIG merely acted as an ordinary shareholder subject to legal restraints, as evidenced by its inability to pass preferred proposals at the May 2015 Meeting.[230]  Finally, Commerce misread various other articles regarding the board of directors' ability to appoint management, issue a proposal for profit distribution, as such actions are subject to the vote of all shareholders, not just GIIG.[231]

- Commerce never identified instances in which GIIG exerted direct control over export activities over GTCIE.[232]  Rather, Commerce repeatedly relied on conjecture to deny GTC's separate rate.[233]  Separate rate denials must be based on actual government control as opposed to mere potential to control.[234]  In fact, Commerce has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as company officials (including through the selection of management and preparation of profit distribution plans), these persons were directing the companies' export pricing decisions based on the will of the Chinese government.[235]

**Commerce's Position:**

Guizhou Tyre challenges Commerce's finding that GTC failed to establish *de facto* independence from the Chinese government in selection of its board of directors.  Guizhou Tyre challenges Commerce's findings regarding the board selection process and finding of a lack of autonomy from the government despite granting GTC a separate rate in *OTR Tires AR5*.  Further,

---

[225] *Id.*
[226] *Id.*
[227] *Id.* at 38-39.
[228] *Id.* at 39-40.
[229] *Id.* at 40.
[230] *Id.*
[231] *Id.* at 40-41.
[232] *Id.* at 41.
[233] *Id.* at 41-42.
[234] *Id.* at 42 (citing *An Giang I*, 203 F. Supp. 3d 1256, 1291- 92 (CIT 2017)).
[235] *Id.* at 43.

Guizhou Tyre challenges Commerce's findings regarding the relationship between GTC and its SOE shareholder, and Commerce's alleged misinterpretation of record evidence.  We disagree.

First, Guizhou Tyre asserts that the December 2012 meeting does not demonstrate government control.  Guizhou Tyre states that the board selected at the 2012 meeting was nominated by the GTC board, and therefore, Commerce's conclusion that there were no nominations of directors without GIIG involvement is unsupported.  Guizhou Tyre's arguments, however, take Commerce's statement out of context.  Commerce was explaining that, under Article 83 of GTC's articles of association, the only shareholders who can nominate directors are those with ten percent or more of shares held individually or jointly.  Guizhou Tyre's argument assumes that Commerce inferred GIIG was itself involved as a shareholder in nominating directors.  To the contrary, Commerce specifically stated that GTC's nomination committee nominates any new directors, that the nominees are elected to the board by shareholder vote, and [

].[236]  Thus, Commerce considered that the board members [                                    ] and that [                                                    ].[237]

Nevertheless, Commerce emphasized that, once nominated, the candidates were elected by shareholder vote, with [

].[238]  Guizhou Tyre asserts Commerce's statement that the GTC board [

] does not indicate GIIG involvement in nominating board members.  Guizhou Tyre's argument ignores that Commerce based its finding on the fact that the board [

---

[236] *See* Preliminary SRA Denial Memorandum at 4.
[237] *Id.*
[238] *Id.*

] and was then elected at a meeting where GIIG comprised [

].[239]

Guizhou Tyre asserts that it is irrelevant that shareholders did not nominate candidates because GIIG had no role in the nomination process and GTC's articles of association have protections against domination by any one shareholder that disprove government control. Guizhou Tyre's focus on nomination, rather than the full process of board election, ignores that

[                                                                                    ] at the meeting electing the nominated candidates.[240]  Guizhou Tyre emphasizes that shareholders are able, pursuant to GTC's articles of association, to nominate board members, but at the same time, cites the fact that no shareholders were involved in nominating GTC's board.

Guizhou Tyre states that the December 2012 meeting complied with all legal requirements, and that the meeting, therefore, does not indicate impropriety.  Guizhou Tyre misconstrues the extent of Commerce's findings.  Commerce did not evaluate the legality of board election, nor did it find that GTC has done anything contrary to its articles of association. Instead, Commerce found that GIIG effectively selected GTC's board.  Such a finding need not be inconsistent with relevant Chinese law to demonstrate a lack of independence from the Chinese government.  Guizhou Tyre faults Commerce's reliance on the December 2012 meeting that elected the board in place during the POI because the meeting itself took place prior to the POI.  Guizhou Tyre asserts that Commerce's reliance on the 2012 vote is unreasonable because it would result in an indefinite presumption of control based on a vote that took place years before the POI.  To follow Guizhou Tyre's logic, however, would leave Commerce unable to consider government involvement in selecting a board if that involvement pre-dated the period of

---

[239] *Id.*
[240] *Id.*

investigation or review at issue, even if the board remains the same during the period at issue, as it did here.  Such a result would curtail Commerce's ability to consider the level of government control in a company—even significant government involvement in the selection of a company's board could not be considered as long as that involvement took place before the period of investigation or review.  However, the election that took place before the POI is relevant to Commerce's analysis because it relates to the level of government involvement in the selection of the board members in place during the current POI.  Commerce therefore appropriately considered the level of government involvement in the selection of that board.

Next, Guizhou Tyre states that it is disingenuous for Commerce to deny GTCIE a separate rate in the underlying investigation based on a December 2012 meeting when Commerce granted GTC a separate rate in *OTR Tires AR5*, which was also after the December 2012 meeting.  Guizhou Tyre further argues that the case for independence would seem to be stronger in the underlying investigation than in *OTR Tires AR5*, considering that GIIG's ownership percentage was reduced and that certain performance reviews are no longer performed.  As discussed above, that GTC may have been eligible for a separate rate during an earlier period in another proceeding is not dispositive here.  Moreover, Guizhou Tyre's arguments ignore the evolution of Commerce's separate rate analysis since *OTR Tires AR5*.  Commerce has previously explained that, following litigation before the CIT and the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios."[241]  Thus, Commerce's differing

---

[241] *See Final Results of Redetermination Pursuant to Remand*, Court No. 17-00100, Slip Op. 19-64 (CIT May 24, 2019) (*OTR Tires AR7 First Remand Redetermination*) at 24 and 40 (citing *Advanced Tech III*); *see also 53-Foot Domestic Dry Containers from the People's Republic of China:  Final Determination of Sales at Less Than Fair*

conclusions between *OTR Tires AR5* and the underlying investigation are not unexplained, and instead reflect the reasonable evolution of Commerce's analysis in response to court decisions.

Guizhou Tyre erroneously asserts that Commerce misconstrued GTC's relationship with its SOE shareholders. First, Guizhou Tyre argues that Commerce's finding is undermined because GTC's board members do not hold positions in any government agency. Guizhou Tyre's assertion misses the point. Whether or not the board members work directly for GIIG or another government body does not change the fact that they were effectively elected by GIIG. The factor at issue, autonomy in the selection of management, is implicated because GIIG elected the board that is responsible for the selection of management. Guizhou Tyre argues that board members and management owe fiduciary duties to GTC, but government control does not require that officials act in favor of the government in breach of a fiduciary duty to a company, it only requires that the company not have the requisite independence from the government. Here, an SOE exerted control over the selection of the board and, by extension, the selection of management, which demonstrated a lack of independence from the government.

Guizhou Tyre focuses on a shareholder meeting in May 2015 where GIIG's preferred proposals were voted down, arguing that it demonstrates GIIG did not, in fact, have the ability to unilaterally impose its own agenda. Commerce, however, considered the fact that GIIG is the only company with enough shares individually to convene an interim shareholders meeting.[242] Commerce concluded that, even though GIIG's proposals initially failed, GIIG was able to

---

*Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203 (April 17, 2015), and accompanying IDM at Comment 10 (Commerce examined the totality of circumstances and concluded that a Chinese SASAC had the ability to exercise control, despite owning a minority or shares, and denied that company a separate rate).
[242] *See* Draft Results at 14-15.

convene an interim meeting only two months later where, representing the vast majority of votes present, GIIG passed the very proposals that failed previously.[243]

Guizhou Tyre emphasizes that GIIG was only able to enact its preferred proposals through the normal courses available to all shareholders.  Although GIIG did not violate the law or GTC's articles of association, no other shareholder has the requisite shares to individually call an interim meeting—only GIIG.[244]  Accordingly, although Guizhou Tyre argues that there is no instance of control by GIIG, Commerce concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management.[245]

Guizhou Tyre argues that the fact that in a subsequent meeting GIIG garnered sufficient votes through normal corporate procedures does not mean that GIIG controls the voting process. The record suggests, however, that GIIG prevailed at the subsequent meeting because it [

], not because other shareholders who previously opposed GIIG's proposals changed their positions.[246]

Guizhou Tyre next argues that Commerce misconstrued the record because GIIG is not the only shareholder authorized to convene shareholder meetings—GTC's articles of association provide that shareholders holding ten percent individually or jointly can convene meetings so other shareholders holding lesser percentages could join together and request an interim meeting. This argument mischaracterizes Commerce's statement about GIIG's sole ability to convene meetings and does not, in fact, contradict Commerce's findings.  Commerce correctly understood

---

[243] *Id*. at 15; s*ee also* Preliminary SRA Denial Memorandum at 4.
[244] *See* Draft Results at 14-15.
[245] *Id.* at 15.
[246] *See* Preliminary SRA Denial Memorandum at 4 (citing Guizhou Tyre SQR2 at 1 and Exhibits 3A and 3B).

that GTC's AoAs allow "[



]."[247]   Therefore, even though shareholders can join together to convene meetings, this fact does not contradict Commerce's statements, as Guizhou Tyre contends.  Instead, Commerce accurately concluded that GIIG's status as the only individual shareholder with enough shares to convene interim meetings provided additional evidence of the potential for GIIG to control GTC's board.[248]

Guizhou Tyre next contests Commerce's reliance on the relationship between GTC's chairman and GIIG.  Guizhou Tyre argues that Commerce disingenuously conflated instruction for proxy voting with state control in denying the separate rate.  First, Commerce did not rely on this relationship alone as sufficient to deny GTC a separate rate.  Second, Commerce is not required to show *overlapping* management to deny a separate rate.  Rather, Commerce considers a company's autonomy in the *selection* of management.[249]  That GTC's chairman's status as proxy does not constitute overlapping management therefore does not invalidate Commerce's decision, as GTC claims.  Finally, Guizhou Tyre asserts that Commerce failed to consider record evidence.  We disagree.  Commerce addressed the means through which it found that GIIG exerted control while considering GIIG's less-than-majority ownership.[250]

Regarding Guiyang SASAC's statement that it does not have authority to make decisions for GTC, Commerce considered the information that GIIG was wholly owned by Guiyang SASAC and therefore constitutes an SOE, and that GIIG voted on the election of the board in

---

[247] *See* Draft Results at 14-15 (quoting Guizhou Tyre RFI at Exhibit 4).
[248] *Id.* at 15.
[249] *See Advanced Tech II*, 938 F. Supp. 2d at 1345.
[250] *See* Draft Results at 12-16.

place during the POI, as well as on the appointment of management and profit distribution. Therefore, GIIG, an SOE, was involved in making decisions at GTC.

Regarding the statements Guizhou Tyre highlights from its annual report about minority shareholders expressing their opinions and claims and abiding by laws and regulations, Commerce never found that minority shareholders were silenced, or that GTC failed to abide by relevant laws.  Rather, Commerce found that these protections were ineffective at preventing GIIG's control.[251]

Guizhou Tyre's argument that the board's selection of general manager and deputy managers does not mean GIIG controls selection of management relies on Guizhou Tyre's argument that there is no basis to conclude that GIIG controls board selection.  As already discussed, Commerce explained its finding that GIIG was the dominant voter at the meeting electing the board in place during the POI.  Regarding profit distribution, as GTC states, a plan would be put to a meeting open to all shareholders, but in this case, GIIG called an interim meeting once its preferred proposals failed.

Guizhou Tyre insists that Commerce relied on conjecture in denying GTC a separate rate. Commerce's separate rate analysis, however, is consistent with its practice, which relies on the reasonable conclusion that, "we would expect any large shareholder, including a government entity, to control the operations of the company in which it holds the largest number of shares, if its shareholder rights afford it that ability."[252]  This Court has stated that, "{i}n both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence."[253]  Therefore, we continue to find that we have appropriately considered the factor of

---

[251] *Id.* at 17.
[252] *Id.* at 12-13 (citing *Steel Wire Rod*, 79 FR 68860, and accompanying IDM).
[253] *See Jiasheng I*, 28 F. Supp. 3d at 1339.

autonomy in management in considering whether GTCIE has independent control over export

functions, consistent with our separate rate practice.

## Comment 4:  New Separate Rate Analysis Contradicts Findings in Prior Proceedings

*Guizhou Tyre's Comments*

- Commerce myopically focuses on management selection, instead of examining the "totality of the circumstances."[254]  Under the holistic approach, both respondents indisputably set their export prices without government approval and have independent authority to negotiate and sign contracts demonstrating their eligibility for a separate rate.[255]  Commerce's new approach does not examine whether the government controls the companies' export activities, and instead focuses on management selection.[256]  By conceding that the respondents' export activities are conducted with complete independence from the Chinese government while denying their separate rates, Commerce has implemented a new separate rate policy.[257]
- Commerce treated government ownership as dispositive, using a truncated analysis that relied upon SOE ownership percentages to deny separate rate status.[258]  Decades ago, Commerce determined that ownership 'by all the people' in and of itself cannot be considered dispositive in establishing whether a company can receive a separate rate.[259]
- Commerce further based its separate rate denials on the mere "potential control" by the Chinese government, when it previously had required affirmative evidence of actual control.[260]  Commerce relied solely upon the government's potential to nominate a manager or a board member, deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company.[261]
- Commerce has, thus, established a new separate rate analysis inconsistent with separate rate findings in the LTFV investigation and prior reviews and lacking reasonable explanation of the change in practice.[262]  Relevant precedent holds that Commerce only has discretion to change its policies so long as the agency's decisions are explained, yet Commerce failed to acknowledge implementing a changed policy, let alone provide the requisite adequate

---

[254] *See* Guizhou Tyre's Comments at 46 (citing *e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160 (CIT 2014); and *Shandong Huanri*, 493 F. Supp. 2d at 1357 (CIT 2007)).

[255] *Id*.

[256] *Id*. at 46-47.

[257] *Id*. at 47.

[258] *Id*.

[259] *Id.* at 47-48 (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results and Partial Termination of Antidumping Duty Administrative Review*, 62 FR 6173, 6174 (February 11, 1997)).

[260] *Id.* (citing *Notice of Amended Final Results of Antidumping Duty Administrative Reviews:  Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China*, 71 FR 10009 (February 28, 2006), and accompanying IDM at Comment 3.

[261] *Id.* (citing *An Giang I*, 203 F. Supp. 2d at 1292).

[262] *Id*. at 48-50 (citing *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008) (*OTR Tires LTFV*)).

explanation for the change.[263]  Accordingly, because Commerce here provides no reasonable explanation for changing a practice that it has consistently followed, such a change is an unacceptable agency practice.[264]  Moreover, the U.S. Supreme Court requires that agencies show a more detailed justification when a new policy rests upon factual findings that contradict those which underlay its prior policy.[265]  Commerce's separate rate denials rest upon factual findings that contradict those made under *Sparklers* and *Silicon Carbide* – as evidenced by the fact that GTC was previously granted a separate rate, despite having significantly greater SOE ownership at that time.[266]  It is disingenuous for Commerce to justify its automatic denial of Guizhou Tyre's separate rate based on a case in which respondents failed verification – an opportunity not extended to Guizhou Tyre.[267]

**Commerce's Position:**

Guizhou Tyre argues that Commerce's focus on one factor of its *de facto* control analysis is flawed because Commerce's practice is to evaluate the totality of the circumstances.  Guizhou Tyre asserts that, by not evaluating each factor, Commerce has departed from its separate rate analysis as established in *Sparklers* and *Silicon Carbide*, despite purporting to apply that analysis.  However, we disagree, because previous decisions of this Court and the Federal Circuit have upheld Commerce's methodology for application of the presumption of state control as applied here.

Guizhou Tyre's arguments ignore the context in which Commerce stated that it "analyzes each exporting entity in an NME country under the test established in *Sparklers*, as amplified by *Silicon Carbide*, and further clarified by *Diamond Sawblades*."[268]  After providing the separate rate factors, Commerce explained that it continues to evaluate its practice with regard to the

---

[263] *Id.* at 48 (citing Nakornthai, 32 CIT at 1276; *SKF USA, Inc. v. United States*, 630 F. 3d 1365, 1373 (Fed. Cir. 2011)).

[264] *Id.* at 48-49 (citing *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344 (CIT 2012)).

[265] *Id.* at 49 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)).

[266] *Id*. at 49-50 (citing *OTR Tires LTFV*, 73 FR at 40487, and accompanying IDM at Comment 25).

[267] *Id*. at 51 (citing *Silicon Carbide*, 59 FR at 22586-87).

[268] *See* Draft Results at 11; *see also Truck and Bus Tires from the People's Republic of China:  Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, and Postponement of Final Determination*, 81 FR 61186, and accompanying PDM at 13.

separate rates analyses in light of the *Diamond Sawblades from China* antidumping proceeding, and Commerce's determinations therein.[269]

Moreover, both Policy Bulletin 5.1 and Commerce's restatement of the factors in the Draft Results provide that Commerce *typically* considers four factors in evaluating whether each respondent is subject to *de facto* government control.[270]  Therefore, contrary to Guizhou Tyre's assertions, Commerce has not purported to follow one practice while following another.  Rather, Commerce explained the evolution and state of its practice.

Guizhou Tyre argues that, since *Silicon Carbide* in 1994, Commerce has granted separate rates despite significant ownership by SOEs.  Guizhou Tyre thus suggests that, by identifying the test established in *Sparklers* and further developed in *Silicon Carbide*, Commerce was signaling a return to earlier practice in disregard of the developments in *Diamond Sawblades*.  Guizhou Tyre also argues that Commerce's application of the presumption of state control amounted to a "new separate rate methodology" that Commerce failed to disclose.

Commerce's application of the factors for *de facto* control did not constitute a "new separate rate methodology" as Guizhou Tyre contends.  As Commerce thoroughly explained above, Commerce's practice has evolved in response to court decisions.  It is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios.[271]  Commerce continued to follow its existing policy that "all commercial entities in the country are presumed to export under the control of the state, and that

---

[269] *Id.* 11-12.
[270] *Id.*; *see also* Policy Bulletin 5.1 at 2.
[271] *See OTR Tires AR7 First Remand Redetermination* at 24 and 40 (citing *Advanced Tech III*).

no manufacturer would receive a separate antidumping duty rate unless it could demonstrate that it enjoyed both *de jure* and *de facto* independence from the central government."[272]

Finally, we disagree with Guizhou Tyre's contention that our citation to *Silicon Carbide* as support for our position is disingenuous because the respondents in that case "failed verification – an opportunity not extended to Guizhou Tyre."[273]  Our citation to *Silicon Carbide* to which Guizhou Tyre refers was to demonstrate that there are precedents involving non-majority government-owned respondents to which Commerce denied a separate rate based on the respondents' failure to substantiate just one of the *de facto* criteria and without mention of level of government ownership.[274]  With respect to the possibility of verifying Guizhou Tyre, we made our decision based upon Guizhou Tyre's submissions as submitted.  Because verification is a spot check of a respondent's submitted information, and not an opportunity to introduce new factual information, verification would only have evaluated what information had been submitted and would not have changed the overall contents of the administrative record.

### Comment 5:  Commerce Must Determine That Double Coin Is Eligible for a Separate Rate

*Double Coin's Comments*
- Although the CIT directed Commerce to reconsider its decision not to accord separate rate status to Double Coin in order to explain whether its inquiry is focused on government control of export activities, the Draft Results fail to address this key point and instead simply reiterate Commerce's prior justification for denying a separate rate to Double Coin.[275]  The CIT's opinion already addressed Commerce's prior justification and Commerce's new position on this issue still fails to move beyond the surface level conclusion that majority ownership by a SASAC entity results in the potential for corporate control that renders the rest of the *de facto* test meaningless.[276]
- This flaw is most clear in Commerce's discussion of Double Coin's relationship with CMA and CMA's authority to negotiate prices with unaffiliated customers in the United States: the CIT's direct questions about Commerce's reasoning that it could ignore the activities of

---

[272] *See Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1310-11 (Fed. Cir. 2017) (quoting *Sigma*, 117 F.3d at 1405).
[273] *See* Guizhou Tyre's Comments at 51.
[274] See Draft Results at 20.
[275] *See* Double Coin's Comments at 2.
[276] *Id*.

61

CMA in the United States and continue to rely exclusively on its corporate control logic are not addressed.[277]  The CIT questioned Commerce's reasoning with respect to CMA observing that "Commerce would infer that majority ownership of Double Coin by a government-owned entity affected export pricing in these ways without pointing to record evidence or explaining the significance of these 'concerns.'"[278] The Court also questioned "why government manipulation of input costs was 'of concern' when input pricing in China is disregarded in the determination of normal value under {Commerce's} long-established NME country methodology."[279]  Further, the CIT found that Commerce's determination did not "shed any light on how the issue of 'rationalization of industry or output' was pertinent to this investigation as it related to Double Coin."[280]

- To the extent Commerce is abandoning its earlier position regarding the importance of CMA's activities the current reliance on corporate control alone still presents an analysis that is "unclear and ambiguous as to whether, upon a finding by Commerce of majority ownership by a government entity allowing control of the selection of board and management, Commerce's presumption of control of export activities by the government of China remains rebuttable or, in effect, becomes irrebuttable."[281]

- Commerce's new position would seem to reinforce the idea that a finding of majority ownership by a SASAC entity is in fact a bright line test for which there is no evidentiary escape, given that Commerce continues to decline to address the evidence surrounding CMA's ability to independently negotiate export prices identified by the CIT as central to the Double Coin's eligibility for a separate rate. [282]

- Commerce's determination not to grant Double Coin a separate rate is not supported by substantial evidence.[283]

  o The CIT found fault with Commerce's analysis of the legal controls in Double Coin's AoAs and the Company Law of China that place "restrictions on the authority of controlling shareholders."[284]

    ▪ Commerce made an observation about the record evidence as it relates to GTC and makes an unsupported leap that the same applies to Double Coin based on the similarity between GTC's AoAs and Double Coin's AoAs.[285]  There is, however, no demonstration in this record that Double Coin's AoAs were ineffective or that officials within Double Coin's corporate tree violated the Company Law of China or the China Code of Corporate Governance. [286]

    ▪ While Commerce may have specific evidence that would lead it to conclude those controls are ineffective with respect to GTC it does not follow that those controls are necessarily ineffective with respect to Double Coin; Commerce has identified no affirmative evidence in this record that shows that those controls were ineffective

---

[277] *Id*. at 3.
[278] *Id*. (citing *Remand Order* at 50).
[279] *Id*. (citing *Remand Order* at 50).
[280] *Id*. (citing *Remand Order* at 50).
[281] *Id*. at 3-4 (citing *Remand Order* at 50).
[282] *Id*. at 4 (citing *Remand Order* at 48, 50).
[283] *Id*. at 5.
[284] *Id*. (citing *Remand Order* at 49).
[285] *Id*. at 5-6.
[286] *Id*. at 6.

with respect to Double Coin.[287]  The only affirmative evidence on the record regarding the effectiveness of the legal controls established by Chinese law with respect to Double Coin is the affidavit of Sun Yong, Double Coin's Legal Director, which supports Double Coin's claims.[288]

■ The record shows that the Company Law of China forbids shareholders, directors, or management from acting contrary to the interests of the company for example by lowering export prices and impinging company profits.[289]  Similarly, the Code of Corporate Governance provides that publicly traded companies must act independently from controlling shareholders and that directors and management must act in the interests of the company.[290]  Double Coin's AoAs erect further barriers to the type of undue influence that Commerce has found here.[291]  Commerce cannot ignore these controls on the sole basis that GTC appears to have taken an action that is inconsistent with certain elements of that legal framework; GTC's activities have no bearing on whether the aforementioned legal controls were effective with respect to Double Coin's export activities.[292]

■ Commerce has now conceded that Double Coin was successful in proving the other three factors of the *de facto* control test.[293]  As a result, the lack of evidence supporting the conclusion that Double Coin does not have independence from the government in selecting management requires Commerce to find that Double Coin has met the *de facto* independence test and is thus eligible for a separate rate.[294]

o With respect to CMA's ability to negotiate prices charged to unaffiliated customers in the United States, the record contradicts Commerce's assumption that CMA's managers are beholden to the directors appointed by Double Coin.[295]

■ Double Coin submitted evidence showing that CMA engages in price negotiation with U.S. customers based on price lists that are created and updated regularly to reflect various market conditions.[296]  Commerce points to no contrary evidence on the record.[297] Having submitted affirmative evidence on this point, any presumption that Commerce might apply should dissolve and Commerce must make a factual determination with regard to that evidence.[298]

---

[287] *Id.*

[288] *Id.* at 6-7.

[289] *Id.* at 7.

[290] *Id.*

[291] *Id.*

[292] *Id.* at 7-8.

[293] *Id.* at 8.

[294] *Id.*

[295] *Id.*

[296] *Id.*

[297] *Id.*

[298] *Id.* at 8-9 (citing *Nippon Steel Corp. v. United States*, 301 F. Supp. 2d 1355, 1364 (CIT 2003) (citing *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 488 (1951))).

**Commerce's Position:**

Double Coin asserts that Commerce incorrectly interpreted the directive of the *Remand Order* in characterizing the Court's reasoning as effectively requiring a standard by which the primary consideration is whether export prices are set by, or are subject to, the approval of a government entity.  We disagree with Double Coin's assertion that we failed to address the Court's question about whether our inquiry is focused on government control of export activities; we explained our position in both the Draft Results[299] and above.  Additionally, we explained that government manipulation of costs and rationalization of industry or output could be concerns in any case, but acknowledged that there is no specific information on the record of this proceeding regarding these issues.[300]

We also disagree with Double Coin's assertion that our position renders the rest of the *de facto* test meaningless.  As discussed above, Commerce's longstanding practice is to consider four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions and, if a respondent is unable to establish autonomy from the government under one of the four *de facto* criteria, the respondent fails to rebut the presumption of government control and is ineligible for a separate rate.  In other words, a respondent must establish autonomy from the government under each of the four *de facto* criteria (in addition to establishing autonomy from the government in each of the *de jure* criteria) to be eligible for a separate rate.  Thus, each of the four *de facto* criteria, far from being meaningless, is critical in determining whether a respondent is eligible for a separate rate.

Double Coin asserts that Commerce's position would seem to reinforce the idea that a finding of majority ownership by a SASAC entity is a bright line test for which there is no

---

[299] *See* Draft Results at 28-29.
[300] *Id.* at 32, fn. 131.

evidentiary escape.  To clarify, if the majority ownership by a SASAC entity entitles the SASAC entity to make decisions regarding the selection of management of a respondent, then the respondent will necessarily not be able to show that it has autonomy from the government in making decisions regarding the selection of management (the third factor) and, thus, it will necessarily be ineligible for a separate rate.  We disagree, however, that a finding of majority ownership by a SASAC entity is a bright line test for which there is no evidentiary escape.  While we acknowledge that we would expect such instances to be rare, if a respondent were to show that the SASAC entity could not make decisions regarding the selection of management of the respondent despite owning a majority share of the respondent, then the respondent may satisfy the third factor and, assuming it satisfied all of the other *de facto* and all of the *de jure* factors, it would be eligible for a separate rate.

Double Coin further claims that there has been no demonstration that Double Coin's AoAs were ineffective or that officials within Double Coin's corporate tree violated the Company Law of China or the China Code of Corporate Governance.  Double Coin misses our point in citing GTC's AoAs.  In fact, we expressly stated that "Commerce did not find that GTC failed to abide by relevant laws, regulations, or its AoAs but, rather, that these protections were ineffective at preventing GIIG from exercising control over GTC in the selection of board members."[301]  Similarly, we do not find that Double Coin failed to abide by relevant laws, regulations, or its AoAs.  Rather, the point is that, just as the relevant laws, regulations, or GTC's AoAs did not prevent a minority government owner from controlling GTC, there is no reason to believe that the relevant laws, regulations, or Double Coin's AoAs would or could prevent a majority government owner from controlling Double Coin.  As we stated in the *Final*

---

[301] *See* Draft Results at 17, repeated above.

*Determination*, "{r}egardless of the restrictions of the {Chinese} laws and the protection afforded to minority shareholders, Double Coin's articles of association demonstrate that a majority shareholder – and particularly one with 72.15 percent ownership – would be expected to have near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company" and "{w}hether or not Shanghai Huayi, which is Double Coin's majority owner, demonstrably exercised control over Double Coin's daily operations does not refute the fact that a government-owned entity appears to have near complete control of shareholder decisions of Double Coin."[302]

Furthermore, Double Coin's citation to the affidavit of Sun Yong is unavailing:  Mr. Yong merely states what Double Coin has already argued, *i.e.*, that Double Coin must adhere to the relevant laws, regulations, and Double Coin's AoAs.[303]  As discussed above, our determination is not that Double Coin's managers violated those laws, regulations, or its AoAs. Rather, our determination is that Double Coin does not have autonomy from the government in making decisions regarding the selection of management because Shanghai Huayi has rights to elect directors at the shareholders' general meetings in accordance with the number of shares it owns, *i.e.*, 72.15 percent, and the directors appoint Double Coin's managers.

Finally, Double Coin contends that we declined to address the evidence surrounding CMA's ability to independently negotiate export prices.  According to Double Coin, it submitted evidence showing that CMA engages in price negotiation with U.S. customers based on price lists that are created and updated regularly to reflect various market conditions.  This evidence Double Coin cites includes a claim "the American employees of CMA, a U.S. company,

---

[302] *See Final Determination* IDM at 23.
[303] *See* Double Coin AQR at Exhibit A2-5.

conducts independent price negotiation with its U.S. customers,"[304] sales documentation which Double Coin cites as support for its claim,[305] and affidavits that Double Coin submitted as support for its claim.[306]  We find this evidence to be unavailing.  As we stated in the Draft Results, "Shanghai Huayi can effectively appoint Double Coin's directors and managers, who control the operations (including export activities) of Double Coin, by virtue of being the majority shareholder of Double Coin" and that "Double Coin, in turn, can effectively appoint CMA's directors and managers, who control the operations (including export activities) of CMA, by virtue of being the majority shareholder of CMA."[307]  Although Double Coin claims that it conducts independent price negotiation with its U.S. customers, Double Coin also reported that "CMA utilized established price lists for all its sales of subject merchandise."[308]  These price lists presumably were approved, if not generated, by CMA's managers, whom, as we have previously stated, are presumably beholden to the directors appointed by Double Coin, who are similarly beholden to Shanghai Huayi.[309]  Indeed, although CMA is not a Chinese company, section 771(33) of the Act explains that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  Given that Double Coin owned [     ] percent of CMA, we consider that Double Coin is, at minimum, legally in a position to exercise restraint or direction over CMA.  Double Coin's evidence does not demonstrate otherwise.

For the foregoing reasons, we continue to find that Double Coin is not eligible for a separate rate.

---

[304] *Id.* at 16-17.
[305] *Id.* at Exhibit A2-1.
[306] *Id.* at Exhibit A2-14.
[307] *See* Draft Results at 31-32, repeated above.
[308] *See* Double Coin AQR at 29.
[309] *See* Draft Results at 31-32, repeated above.

## IV.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has, as discussed above, reconsidered the separate rate status of GTCIE and Double Coin and has continued to find that neither of these entities are eligible for a separate rate.

Should the Court hold that the AD order was prematurely issued and order its intended remedy when it enters a final judgment in this case, Commerce intends to publish a notice of amended order in the *Federal Register* and issue appropriate customs instructions to CBP, consistent with the discussion above.

4/22/2022

X

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

68