# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY C. STANCEU

<table>
<tr><td colspan="2">_____ x</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>GUIZHOU TYRE CO., LTD. and GUIZHOU TYRE<br>IMPORT AND EXPORT CO., LTD.,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td align="right">Plaintiffs,</td><td>:</td><td>Consol. Court No. 19-00031</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td align="right">v.</td><td>:</td><td>**PUBLIC**</td></tr>
<tr><td></td><td>:</td><td>**VERSION**</td></tr>
<tr><td>UNITED STATES,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td align="right">Defendant.</td><td>:</td><td></td></tr>
<tr><td colspan="2">_____ x</td><td></td></tr>
</table>

## PLAINTIFFS' COMMENTS ON REMAND REDETERMINATION

Ned H. Marshak
Jordan C. Kahn
Elaine F. Wang

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
**
1201 New York Ave., NW
Suite 650
Washington, DC 20005

*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: May 25, 2022

# TABLE OF CONTENTS

BACKGROUND ............................................................................................ 1

STANDARD OF REVIEW .......................................................................... 4

ARGUMENT ................................................................................................ 4

I.  COMMERCE'S SEPARATE RATE DENIAL DOES NOT COMPLY WITH
    *GTC* .................................................................................................... 4
    A.  PRECEDENT INVOLVING MAJORITY SOE OWNERSHIP IS
        INAPPOSITE ............................................................................... 5
    B.  GTC REBUTTED THE PRESUMPTION OF STATE CONTROL ..... 11
    C.  THIS COURT REQUIRED EVIDENCE OF GOVERNMENT PRICE-
        SETTING ...................................................................................... 15
    D.  COMMERCE DOES NOT RELY ON EVIDENCE OF ACTUAL STATE
        CONTROL ..................................................................................... 19

II. THE SEPARATE RATE DENIAL IS UNSUPPORTED BY SUBSTANTIAL
    EVIDENCE ........................................................................................ 23
    A.  THE 2012 MEETING DOES NOT EVIDENCE GOVERNMENT CONTROL 23
    B.  THE 2015 MEETINGS DO NOT EVIDENCE GOVERNMENT CONTROL ... 25
    C.  RECORD EVIDENCE REBUTS THE PRESUMPTION OF STATE
        CONTROL ..................................................................................... 27

III. COMMERCE UNLAWFULLY IMPLEMENTED A NEW ANALYSIS ................. 28

IV. THE REMAND CORRECTLY FOUND NO ADD BEFORE FEBRUARY 21,
    2020 .................................................................................................. 31

CONCLUSION ............................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advanced Tech. & Materials Co. v. United States*, 37 CIT 1487 (2013) *aff'd*, 581 F.App'x 900 (Fed. Cir. 2014) ............................................................................................................... 3, 5, 11

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350 (2018) ... 6

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United State*, 203 F.Supp.3d 1256 (CIT 2017) ............................................................................................................................................ 20, 21

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ............ 11, 12, 14, 27

*D&L Supply Co. v. United States*, 22 CIT 539 (1998) ................................................................ 11

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .......................................................... 30

*GTC v. United States*, 519 F.Supp.3d 1248 (CIT 2021) ..................................................... passim

*GTC. v. United States*, 557 F.Supp.3d 1302, 1316-20 (CIT 2022) ....................................... passim

*IDI v. United States*, 2021 WL 3082807 (July 6, 2021) ....................................................... 10, 11

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317 (CIT 2014) ............................................................................................................................................ 21, 22, 28

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F.Supp.3d 1224 (CIT 2021) ................................................................................................................................................ 17, 18

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ........................................ 20

*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272 (CIT 2008) ...................... 4, 11, 30

*Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F.Supp.2d 1353 (CIT 2007)................. 17

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................. 30

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)................................................. 30

*WelCom Prods., Inc. v. United States*, 865 F.Supp.2d 1340 (CIT 2012) .................................... 30

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308 (CIT 2018).. 7

**Statutes**

19 U.S.C. § 1516a ......................................................................................................................... 4

**Regulations**

19 C.F.R. § 351.303 ............................................................................................... 23

**Administrative Decisions**

*Cased Pencils from the China*, 59 Fed. Reg. 55,625 (Nov. 8, 1994)............................................ 24

*Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514
   (Mar. 31, 2009) .......................................................................................... 8

*Furfuryl Alcohol from China*, 60 Fed. Reg. 22,544 (May 8, 1995)............................................ 16

*Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006) ............................ 7

*Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001) ............................ 7

*Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335 (Apr. 19, 2010) ............................ 8

*OTR from China*, 73 Fed. Reg. 40,485 (July 15, 2008).......................................................... 1, 30

*OTR from China*, 80 Fed. Reg. 20,197 (Apr. 15, 2015) .......................................................... 1, 30

*Silicon Carbide*, 59 Fed. Reg. 22,285 (May 2, 1994)........................................................... passim

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) ......... 8, 28

*Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991) ................................................ passim

*Tapered Roller Bearings from China*, 62 Fed. Reg. 6173 (Feb. 11, 1997) ............................ 29, 31

*TBT from China*, 82 Fed. Reg. 8599 (Jan. 27, 2017) (final determination)................................... 2

*Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012)............................. 8

Plaintiffs Guizhou Tyre Co., Ltd. ("GTC") and its wholly-owned subsidiary Guizhou

Tyre Import and Export Co., Ltd. ("GTCIE") (collectively "Guizhou Tyre") hereby comment on

the Department of Commerce's ("Commerce" or "Department") Final Results of

Redetermination (Apr. 25, 2022), ECF66-67, C.R.R.3/P.R.R.4 ("Remand"). Guizhou Tyre

challenges Commerce's continued separate rate denial for GTCIE in the less-than-fair-value

("LTFV") investigation of truck and bus tires ("TBT") from the People's Republic of China

("China" or "PRC"), a nonmarket economy ("NME"). Remand at 6-24, 32-61.

## BACKGROUND

GTC was granted a separate rate in Commerce's 2008 LTFV investigation of new

pneumatic off-the-road tires ("OTR") from China and the fifth administrative review ("AR5") of

the antidumping duty ("ADD") order with the period of review ("POR") September 1, 2012 –

August 31, 2013. *OTR from China*, 73 Fed. Reg. 40,485, 40,487 (July 15, 2008) ("*OTR LTFV*

*Final*"); *OTR from China*, 80 Fed. Reg. 20,197, 20,198-99 (Apr. 15, 2015) ("*OTR AR5 Final*").

During those periods, GTC was more than one-third owned by the state-owned enterprise

("SOE") Guiyang Industry Investment (Group) Co., Ltd. ("GIIG" or "GIIC"), a state-owned

investment company under the supervision of the Guiyang State-Owned Assets Supervision and

Administration Commission ("SASAC"). *OTR LTFV Final* Issues and Decision Memorandum

("IDM") Comment 25. However, for the seventh administrative review ("AR7") of the OTR

order, with the POR September 1, 2014 – August 31, 2015, Commerce denied GTC's separate

rate despite GIIG's ownership reducing to 25.2%. *GTC v. United States*, 519 F.Supp.3d 1248,

1256 (CIT 2021). This Court has twice invalidated Commerce's denial of GTC's separate rate

for OTR AR7, in an ongoing case that the Remand characterizes as "a factual situation that is

**essentially identical** to the factual situation in this investigation." *Id*. at 1252-53, 1255-62;

Remand at 15 (emphasis added).

For the 2015-16 LTFV investigation of TBT from China, Commerce likewise denied

GTCIE's separate rate despite GIIG's reduced ownership to 25.2%. *TBT from China*, 82 Fed.

Reg. 8599 (Jan. 27, 2017) (final determination) P.R. 868, IDM, P.R. 855 Comment 8; Commerce

Memorandum (Aug. 26, 2016), C.R. 903, P.R. 725 ("Separate Rate Memo"), at 4. Of the four *de*

*facto* criteria in Commerce's separate rate analysis, the denial rested primarily on the "selection

of management" (third) factor and to a lesser extent the "disposition of profits" (fourth) factor –

without consideration of the "export prices are set by . . . a governmental authority" (first) or

"ability to negotiate contracts" (second) factors. IDM at 27-28; Remand at 9. Commerce found

that GTCIE had not rebutted the presumption of state control because GIIG elected managers

and approved profit distribution at GTC's 2015 3rd Interim Shareholders' General Meeting ("July

2015 Meeting"), which was found not open to all shareholders. IDM at 27-28; Separate Rate

Memo at 4.

Guizhou Tyre appealed and demonstrated that evidence rebutted the presumption of state

control for all factors, emphasizing:

- GTC's 2014 Annual General Meeting ("May 2015 Meeting"), where GIIG could
  not elect managers or approve its profit distribution;

- myriad safeguards afforded to GTC shareholders by GTC's Articles of
  Association ("AoA"), GTC's 2015 Annual Report, PRC Company Law, and PRC
  Code of Corporate Governance for Listed Companies ("Code for Listed
  Companies"); and

- formal confirmation by the Guiyang SASAC that **"it does not have the authority
  to make decisions for GTC"** and that, despite having an interest in GTC, it
  **"does not have the right to make a decision on appointment or dismissal of
  board directors or management of your company."**

GTC Memorandum of Law (Oct. 2, 2019), ECF39-40 ("GTC Opening Brief"), at 24-34.

(quoting Letter from GDLSK to Commerce (May 6, 2019), P.R. 438-40 ("RFI"), Exhibit 1:

Reply of Guiyang Municipal {SASAC} to {GTC} regarding "Request to Clarify and Explain

and Administration Authority of Guiyang Municipal {SASAC} on {GTC}" (Mar. 5, 2016)

("Guiyang SASAC Clarification") (emphases added))

This Court in January 2022 remanded for Commerce to reconsider its separate rate denial

on different grounds. *GTC v. United States*, 557 F.Supp.3d 1302, 1316-20 (CIT 2022). First, that

denial  was erroneously based on Commerce's "invalid assumption" that GTC's 2015 3rd Interim

Shareholders' General Meeting ("July 2015 Meeting") was not available to all shareholders. *Id.*

at 1318. Second, the denial was not tethered to government control over export activities during

the period of investigation ("POI"): "Commerce . . . **failed to show a factual relationship**

**between the findings it made** as to selection of board members and distribution of profits **and**

**the purpose it identified for applying its *de facto* separate rate criteria** . . . , which was **to**

**determine whether the government of the PRC exercised control of GTCIE's 'export**

**activities'** . . . ." *Id*. at 1318-20 (emphases added) (citations omitted).

Third, the denial improperly relied on distinguishable judicial precedent involving

majority SOE ownership: "{D}efendant relies on {*Yantai CMC Bearing Co. v. United State*s,

203 F. Supp. 3d 1317, 1323 (CIT 2017)} and {*Advanced Tech. & Materials Co. v. United States*,

37 CIT 1487, 1494 (2013) ("*Advanced Tech. III*"), *aff'd*, 581 F.Appx. 900 (Fed. Cir. 2014)}, but

**neither decision was based on facts analogous to those in this investigation, in which**

**ownership by government-controlled entities was only 25.20%**." *Id*. at 1319 (emphasis

added). Finally, this Court invalidated the separate rate denial because – contrary to Commerce's

finding – GTCIE in fact rebutted the presumption of government control such that the separate

rate could only be denied based on affirmative evidence of government control over export

activities: "Guizhou Tyre {having} introduced **evidence to support its contention that the**

**Chinese government did not control GTCIE's export activities . . .** require{d} Commerce to

consider the record as a whole and make a factual determination on whether the Chinese

government actually controlled Guizhou Tyre's export functions and export pricing decisions

during the {POI}." *Id*. at 1320 (emphases added).

Commerce now acknowledges that GTC's July 2015 Meeting was open to the public,

despite initially finding that meeting was closed. Remand at 8. Commerce further concedes that:

> {T}he record evidence provided by GTC demonstrated that sales manager(s)) set
> export prices for GTCIE, and there was **no indication of direct involvement or
> approval on behalf of any government authority regarding price-setting** (the
> first factor). Moreover, **GTC provided sufficient evidence to demonstrate that
> it has authority to negotiate and sign contracts and other agreements on its
> own behalf** (the second factor).

*Id*. at 21 (emphases added). Commerce nevertheless continued denying GTCIE's separate rate,

characterizing the first and second factors undeniably favoring the grant of separate rate as

irrelevant given its finding that GTCIE did not rebut the presumption for the third factor –

selection of management. *Id*. at 4, 15-23, 40-42, 54-57.

## STANDARD OF REVIEW

"The court reviews remand determinations for compliance with the court's remand

order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274 (CIT 2008). This

Court must also invalidate redetermination that are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## ARGUMENT

## I.    COMMERCE'S SEPARATE RATE DENIAL DOES NOT COMPLY WITH *GTC*

Commerce's continued separate rate denial for GTCIE does not comply with this Court's

order because the Remand: (a) improperly relies on judicial precedent involving majority SOE

ownership; (b) does not acknowledge that the presumption of state control has been rebutted,

requiring affirmative evidence of state control to deny GTCIE's separate rate; and (c) fails to

provide the necessary evidence of state control over export prices.

### A.   Precedent Involving Majority SOE Ownership Is Inapposite

*GTC* expressly rejected Commerce's attempt to defend its separate rate denial based on

judicial precedent involving respondents who were majority SOE-owned:

> {D}efendant argues that "Commerce may deny a request for a separate rate if an
> applicant fails to demonstrate separation from the government with respect to any
> one of the *de jure* or *de facto* criteria." . . . Defendant further elaborates that,
> "if an applicant fails to establish any one of the *de jure* or *de facto* criteria,
> **Commerce is not required to continue its analysis and determine whether the
> applicant has, or has not, established the other applicable criteria.**" . . . . For
> this argument, defendant relies on *Yantai* and *Advanced Tech. III*, but **neither
> decision was based on facts analogous to those in this investigation, in which
> ownership by government-controlled entities was only 25.20%, with 74.80%
> owned by public shareholders**. . . . In *Yantai*, the respondent had a "chain of
> ownership" that "extended to the Chinese government because Yantai CMC is
> more than majority owned by CMC, which is, in turn, more than majority owned
> by Genertec, and Genertec is wholly-owned by the {SASAC}." . . . . In *Advanced
> Tech. III*, the respondent was similarly majority owned by a company that was
> wholly-owned by the SASAC.

557 F.Supp.3d at 1319 (emphases added) (citations omitted).

Commerce continues relying on instances of majority SOE ownership where separate rate

denials were affirmed with an abbreviated inquiry into management selection. Remand at 8-10,

16-17, 40-43, 56 & nn.38-41, 78-81, 190, 194, 250. Commerce minimizes this critical distinction

by claiming that *GTC* "merely concludes that the fact patterns in the cases cited by Commerce

(*Advanced Tech.* and *Yantai CMC*) are distinguishable from those here." *Id.* at 41. Yet by

rejecting Defendant's reliance on such precedent, this Court reaffirmed the principle that

"Commerce has required **additional indicia of control** prior to concluding that a respondent

company could not rebut the presumption of de facto government control **where the

government owns**, either directly or indirectly, **only a minority of shares** in the respondent

company." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350, 1359 (CIT 2018) (emphases added).

Commerce claims authority to deny GTCIE's separate rate based on management selection and profit disposition – without considering other factors. Remand at 15-16, 18-21, 23, 40-42. While precedent for majority SOE-owned respondents may support this truncated analysis, this Court – **in this appeal** – rejected Commerce's effort to avoid the first and second *de facto* factors. *GTC*, 557 F.Supp.3d at 1318-20. By expressly rejecting Defendant's contrary claim, this Court recognized that Commerce is in fact "**required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria.**" *Id*. at 1319 (emphasis added) (quotation omitted). Beyond "merely conclud{ing} that the fact patterns . . . are distinguishable," this Court required consideration of the first two factors before denying GTCIE's separate rate on account of its minority SOE ownership. Remand at 41. By mandating that all factors and additional indicia be considered for minority SOE-owned respondents, this Court – contrary to Commerce's claim – made "the degree of government ownership . . . a distinguishing factor in applying the *de facto* analysis." *Id*. at 16, 42.

Commerce purports to have "considered the percentage of ownership by the SOE as the largest individual shareholder," but does not address GIIG having only a minority ownership interest in GTC. Remand at 20. By contrast, any obligation to evaluate SOE percentage was denied: "in minority ownership situations, Commerce evaluates evidence relating to the four *de facto* factors to determine whether there are indicia of government control or whether the respondents have established that they operate autonomously from the government." *Id*. at 42. Commerce misconstrues judicial precedent in stating that "majority ownership by a government entity is **a consideration only in the sense** that such a fact pattern establishes control of a

respondent by a government entity to preclude any further analysis of the *de facto* criteria." *Id*. at 17, 43 (emphasis added). Commerce correctly understands that majority SOE ownership makes it easier to deny separate rates as such respondents "cannot demonstrate that they operate autonomously from the government," *id*. at 43 – ignoring that, conversely, minority-owned SOE respondents can only be denied separate rates after considering all factors.

Moreover, Commerce unpersuasively tries extending precedent involving majority SOE-ownership, claiming those cases are devoid of "any mention of a threshold for government ownership in applying this relevant analytical framework." *Id*. This Court, however, has repeatedly found – per Commerce practice – that substantially more evidence is required to deny separate rates for respondents having minority SOE-ownership. Notably, this Court in affirming the separate rate denial for a majority SOE-owned respondent distinguished precedent involving minority ownership because "**Commerce views government ownership differently depending on whether the government is a majority or minority owner**." *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308, 1318 (CIT 2018) (emphasis added).

Commerce next belittles the importance of GTC's minority SOE-ownership by claiming that "in the *Silicon Carbide* decision, which established Commerce's four factor standard of analysis for *de facto* control, Commerce found certain respondents ineligible . . . without mention of level of government ownership." Remand at 17, 61. This claim is misleading. Until its recent change of practice, Commerce applied *Silicon Carbide* by granting separate rates to respondents having significant – even 100 percent – SOE ownership:

- *Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001), IDM Comment 1 (granting separate rates despite government ownership);

- *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006), IDM Comment 3 ("information submitted by the Petitioner **addresses only potential control by SASAC** . . . , **rather than any actual control** of the PRC

government over the numerous individual export decisions . . . during the POR.") (emphasis added);

- *Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Mar. 31, 2009), IDM Comment II (separate rate granted to subsidiary of company directly owned by SASAC);

- *Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335, 20,338-40 (Apr. 19, 2010) (well-known SOE granted separate rate);

- *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012), IDM Comment 6 ("**the Department has previously found an absence of de jure government control for companies with various forms of state ownership**") (emphasis added); and

- *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) ("*SDGE*"), IDM Comment 1 ("examin{ing} whether the holding of a minority stake of a producing entity which is a subsidiary of the exporter, by a local SASAC entity, amounts to de facto government control . . . . {B}ased on the totality of the circumstances, we find that there is an absence of government control.").

When Commerce changed its practice to automatically deny separate rates for majority SOE-owned respondents, it improperly found minority SOE-owned GTCIE ineligible without considering factors that favor eligibility. Here, Commerce purported to find the requisite additional indicia from "relevant documents, meeting notes, {AoA}, and voting actions suggestive of potential for control, generally, as well as information regarding the influence of the SOE-appointed board in GTC's decisions regarding the disposition of profits." Remand at 20-21. Yet these sources, of which Commerce claims "further discussion . . . is moot," *id*. at 21, merely refer to its finding that GTCIE has not rebutted the presumption of state control by virtue of GIIG's actions at the July 2015 Meeting. *See id*. at 10, 55. Guizhou Tyre has repeatedly demonstrated that evidence concerning GIIG's inability to pass resolutions at the May 2015 Meeting and the protections afforded to other shareholders in GTC's AoA rebut the presumption of state control with respect to the third and fourth *de facto* factors. GTC Opening Brief at 24-32.

This Court rejected Commerce's denial of GTC's separate rate based on distinguishable precedent involving majority SOE-ownership. *GTC*, 557 F.Supp.3d at 1319 (emphases added). The sparse precedent that Commerce relies upon to deny separate rates for minority SOE-owned respondents without consideration of all factors is not persuasive. *See* Remand at 17 & n.82, 43. Commerce chides "the respondents {for} too quickly dismiss the relevance of the cases cited with respect to minority ownership, noting that most were not subject to judicial review, without acknowledging . . . one such non-reviewed case was the very *Silicon Carbide* decision which established Commerce's four factor standard of analysis for *de facto* control." *Id*. at 43. Yet Commerce notes that the *Silicon Carbide* respondents "failed to establish their eligibility for separate rates because, **at verification, these companies failed to produce bank records** necessary to prove their retention of proceeds from export sales." *Id*. at 43-44 n.195 (quoting *Silicon Carbide*, 59 Fed. Reg. 22,285, 22,586-87 (May 2, 1994) (emphasis added)). It is disingenuous for Commerce to justify its automatic denial of GTCIE's separate rate on a case where respondents failed verification – an opportunity not extended to GTCIE. Commerce's retort that "verification would only have evaluated what information had been submitted" confirms that *Silicon Carbide* supports GTCIE, because those respondents were recognized as eligible for a separate rate before failing verification. *Id*. at 61. GTCIE was by contrast automatically denied a separate rate merely by virtue of GIIG's 25.2% ownership.

Commerce heralds this Court's July 2021 decision affirming the separate rate denial for I.D.I. International Development and Investment ("IDI") in an administrative review of the AD order on Fish Fillets from Vietnam. Remand at 17-20, 40, 44-45. According to Commerce, "the underlying facts of the *IDI* . . . case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was a SOE, and the respondent's separate rate

was denied based on a failure to rebut the presumption with respect to autonomy of management

selection." Remand at 20 n.91. Commerce is wrong. IDI's separate rate denial was based on

multiple, additional factual findings. For example, "Commerce found that a government official

and Communist Party member—referred to as Mr. X—represented the Vietnamese government

on the boards of both IDI and its corporate parent, Company Y." *IDI v. United States*, 2021 WL

3082807, *2 (July 6, 2021). These facts were emphasized by this Court's rejection of IDI's claim

that Commerce found only the possibility of state control:

> . . . **Commerce{} . . . found that government official Mr. X and his fellow
> Communist Party members on the boards of IDI and Company Y select
> company management and make "important decisions,"** . . . . "Mr. X's
> presence on the board of IDI and Company Y, along with his role in Company
> Y's management, indicates that the {government of Vietnam} *is involved* in
> company-level decision making." . . .
>
> **Commerce thus found that the Vietnamese government, through the
> presence of Mr. X and his party colleagues on the IDI and Company Y
> boards, controls the selection of IDI's management** and . . . Mr. X himself has
> **direct involvement in such affairs as an executive** in Company Y. Commerce
> therefore did not rely on just the *ability* of the Vietnamese government to control
> IDI; the Department determined that the Vietnamese government *actually*
> controls IDI through **the involvement of Mr. X and his party colleagues**.

*Id.* *7 (emphasis added) (citations omitted).

Commerce has not and cannot make similar findings for Guizhou Tyre. There is no

evidence that important managerial decisions for GTCIE during the POI were made by Chinese

government officials and Communist party members, or that a government official was an

executive for the respondent's parent company. *IDI* is thereby inapposite and does not

"mirror{}" the TBT LTFV investigation. Remand at 20 n.91. Commerce asserts that "the fact

that the board members in IDI were party members was not . . . relevant" and emphasizes *dicta*

which it claims "that potential government control suffices to establish the exporter has failed to

demonstrate its independence from *de facto* control." *Id*. at 44. Yet Commerce concedes that *IDI*

is not entirely on-point. *Id.* at 45. Moreover, *IDI* was not appealed and is not binding – even if it applies beyond where government and party officials make key decisions for relevant respondent corporate entities in the period. *D&L Supply Co. v. United States*, 22 CIT 539, 540 (1998).

Indeed, this Court noted that no decision relied upon by Commerce to deny Guizhou Tyre's separate rate has precedential effect. *GTC*, 519 F.Supp.3d at 1256 n.6 ("this summary affirmance . . . is **not a precedential decision**.") (emphases added) (citing *Advanced Tech.*, 581 F.App'x 900 (Fed. Cir. 2014)). The only precedent governing the Remand is this Court's remand order that required Commerce to support its finding that the Chinese government controlled GTCIE's export activities. *Nakornthai*, 32 CIT at 1274. Neither *IDI* nor any other argument raised by Commerce justify its failure to follow judicial instruction.

### B.   GTC Rebutted the Presumption of State Control

Commerce emphasizes "the presumption of government control (which has been upheld repeatedly by the courts)," through which "it is the *burden of the respondent to rebut the presumption* by providing sufficient evidence to establish that it operates autonomously from the government in certain key aspects." Remand at 18 (emphasis in original). However, as the Court of Appeals for the Federal Circuit ("CAFC") explained decades ago:

> . . . {A} presumption is not merely rebuttable but **completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of a presumed fact into genuine dispute. **The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases added) (citations omitted).

Once Guizhou Tyre submitted the "**minimum quantum of evidence**" creating "genuine dispute" as to whether it was state-controlled during the POI, the presumption vanished and

Commerce became obligated to affirmatively establish such control by the Chinese government. *Id*. (emphasis added). Such evidence surpassed this minimal evidentiary threshold, proving independence as to price setting and sales negotiating, Remand at 21-22, and creating genuine issues as to management selection and profit disposition. GTC Opening Brief at 24-34; Section II, *infra*. *GTC* invalidated the separate rate denial by finding the applicable presumption rebutted:

> **Guizhou Tyre introduced evidence to support its contention that the Chinese government did not control GTCIE's export activities and in particular its export prices**. . . . **Under the "rebuttable presumption" method of the Department's separate rate analysis, the information Guizhou Tyre put forward was sufficient to require Commerce to consider the record as a whole and make a factual determination on whether the Chinese government actually controlled Guizhou Tyre's export functions and export pricing decisions** during the {POI}. Having **failed to address this pivotal inquiry**, Commerce must do so on remand and reach a result supported by the record evidence.

*GTC*, 557 F.Supp.3d at 1320 (emphases added) (citations omitted).

Commerce does not contest GTC carrying its burden for factors one and two, but repeats its mantra that the presumption for each factor is evaluated in isolation. Remand at 15-16, 18-21, 23, 40-42. While such truncated analysis may be permissible in the majority-SOE context, this Court has found that such precedent is not "based on facts analogous to those of the review at issue"; Commerce here is "**required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria**." *GTC*, 519 F.Supp.3d at 1256 (emphases added) (quotation omitted). The extensive information evidencing independence far surpassed the "minimum quantum of evidence . . . **to support a finding of the nonexistence of the presumed fact**" – *i.e.*, creating "genuine dispute" as to whether GTCIE was state controlled during the POI. *Aukerman*, 960 F.2d at 1037. Accordingly, the presumption that GTCIE was state controlled "**completely vanishe{d}**" and Commerce became obligated to affirmatively demonstrate state control in the POI before denying GTCIE's separate rate. *Id*.

(emphasis added).

Commerce errs by misconstruing judicial instruction regarding the necessity of evaluating all factors and the operation of presumptions, with multiple statements that incorrectly require GTC to have conclusively established a lack of state control for all factors:

> {I}f a respondent is **unable to establish autonomy** from the government under one of the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate. . . . Commerce's practice is to deny a request for a separate rate if an applicant **fails to demonstrate separation from the government** . . . .

> GTCIE had not **adequately substantiated** autonomy in the selection of directors and management (the third *de facto* factor). **Failure to establish this prong of the criteria meant that the respondents failed to rebut the presumption of government control** and, thus, Commerce reasonably determined that record evidence indicated **a measure of control, or potential for control**, of relevant Chinese-government entities over the operations of the companies as a whole, including their export activities. . . .

> Commerce found that record evidence indicating a lack of autonomy in management selection **did not satisfy the third prong** of the *de facto* analysis and, thus, that GTC **was unable to rebut the presumption** . . . . {I}t is **the burden of the respondent to rebut the presumption by providing sufficient evidence to establish that it operates autonomously from the government** . . . .

> {I}t is the *respondent's burden* to **satisfy all four factors to rebut the presumption** of government control . . . .

> {F}ailure to **establish autonomy** with respect to one prong of the analysis means that a respondent has **not met its burden to rebut** the presumption of government control . . . .

> {F}ailure to **establish independence** from the government in any one such factor is **sufficient to demonstrate failure to rebut** the presumption of control. . . .

> {I}f an applicant **fails to establish** any one of the criteria, **it fails to rebut** the presumption of government control. . . .

> {I}f a respondent is **unable to establish** autonomy from the government under one of the four *de facto* criteria, that company **fails to rebut** the presumption of government control and is ineligible for a separate rate. . . .

> GTCIE has . . . not met its burden in rebutting the presumption of government control, *i.e.*, that it **must demonstrate autonomy** from the government under each of the four *de facto* factors in the separate rate analysis. . . .

> Commerce determined that while there is **no evidence that the SOE owner directly exercised its control on GTC's or GTCIE's export activities**, we consider the *de facto* criteria as indicative of whether the government controls, or has the potential to control, export functions, and this is sufficient to establish that **GTCIE has failed to demonstrate its independence** from *de facto* control.

Remand at 9, 16-18, 21-23, 40-42, 45 (emphases added).

Guizhou Tyre need not "establish," "demonstrate," "substantiate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control) for each factor in isolation, as Commerce claims. *Id*. This requirement cannot be reconciled with either the CAFC articulation of how presumptions operate or this Court's order requiring Commerce to address all factors. *Aukerman*, 960 F.2d at 1037; *GTC*, 519 F.Supp.3d at 1259. Commerce lays bare its misconstruction as follows:

> We determine this **evidence to be sufficient to find that Guizhou Tyre has failed to rebut the presumption** of government control or potential for control over export functions. . . .

> Guizhou Tyre ignores that the evidence it submitted **did not establish that it operated autonomously from the government in selecting management. GTCIE has, therefore, not met its burden** in rebutting the presumption of government control, i.e., **that it must demonstrate autonomy from the government** . . . .

Remand at 23, 41-42 (emphasis added).

Commerce improperly conflates "sufficient evidence" to rebut the presumption – *i.e.*, the "minimum quantum" – with evidence to conclusively "establish" the presumed fact – *i.e.*, that GTCIE "operates autonomously from the government." *Id*. at 19; *Aukerman*, 960 F.2d at 1037. Moreover, it ignores this Court's finding that Guizhou Tyre provided "sufficient" evidence to cast doubt over state control, such that denying GTCIE's separate rate required Commerce to "affirmatively establish in each instance the government is actually controlling the respondent's

export activities, including pricing decisions." Remand at 18; *GTC*, 557 F.Supp.3d at 1320. With

such an affirmative demonstration of state control necessary, an amorphous "measure of control"

is insufficient; with the presumption rebutted, Commerce had to "adequately substantiate" state

control. Remand at 16. Commerce unpersuasively resists this Court's finding that GTCIE

rebutted the presumption, effectively maintaining an "irrebuttable presumption" that discounts

record evidence. The flawed lynchpin of the Remand is that "Guizhou Tyre **failed to establish**

**autonomy from government control** in making decisions regarding the selection of

management." Remand at 22 (emphasis added). Again, GTCIE was under no such obligation.

Commerce mangled the presumption by denying the separate rate based on GTCIE not having

conclusively established independence; Guizhou Tyre's sufficient evidence made Commerce

obligated to disprove that fact.

###   C.   This Court Required Evidence of Government Price-setting

This Court found that Commerce unlawfully denied GTCIE's separate rate based on the

absence of evidence that TBT export prices were set by the Chinese government during the POI:

> **{T}he Department's reasoning is flawed, being vague and ambiguous as to
> whether its inquiry is focused on government control of export activities**. . . .

> {T}he analysis as to GTCIE in that document does not focus specifically on
> export activities or functions in addressing government control. As a result, **the
> separate rate analysis Commerce applied to GTCIE failed to show a factual
> relationship between the findings it made as to selection of board members
> and distribution of profits and the purpose it identified for applying its *de
> facto* separate rate criteria** . . . , **which was to determine whether the
> government of the PRC exercised control of GTCIE's "export activities" or
> "export functions."** . . . .

> {T}he Department's analysis **fails to clarify or explain whether its finding of
> government control extended, specifically, to GTCIE's export activities
> during the {POI}**. . . . The Department's rationale for placing GTCIE within the
> PRC-wide entity was that Commerce considered GTCIE . . . to be part of a single
> exporting entity consisting of all Chinese exporters of the subject merchandise
> that are under government control. . . . Even if the court were to presume
> Commerce to be correct in its findings that GIIC controlled the selection of board

members and the distribution of profits (and, as discussed above, the analysis Commerce has put forth does not allow it to so presume), **the court could not conclude solely from those findings that the government of China exercised control of export "functions" or, specifically, the prices at which subject merchandise exported by GTCIE was sold during the period of investigation. Because the pricing decisions were already made by the time Commerce made its separate rate decision for GTCIE, a vague presumption that the government had the potential to control GTCIE's export activities and prices during the {POI} is unconvincing and does not suffice for the purposes Commerce itself stated for its separate rate analysis.**

*GTC*, 557 F.Supp.3d at 1318-20 (emphases added).

Yet Commerce continued denying GTCIE's separate rate, despite acknowledging that the record evidenced an absence of state control for the first and second *de facto* factors. Remand at 21. Commerce in critical respects misconstrues *GTC* specifically and applicable precedent generally. First, Commerce claimed that this Court misinterpreted the separate rate analysis:

> **{I}mplicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing** (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control). . . .{H}owever, the four factors, together, relate to the determination of whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.

Remand at 22 (emphases added).

The fundamental problem with Commerce's attempt to recast *GTC* is that the focus on exports comes from Department practice. The multi-factor separate rate analysis' purpose – as recognized by Commerce and this Court, over decades through the TBT LTFV investigation – has always been, and continues to be, to determine whether respondents can demonstrate the absence of governmental control **over its export activities**. *Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991); *Silicon Carbide*, 59 Fed. Reg. at 22,587; *Furfuryl Alcohol from China*, 60 Fed. Reg. 22,544, 22,545 (May 8, 1995); Separate Rate Memo at 2 ("the Department will assign

a separate rate in NME proceedings if a respondent can demonstrate the absence of . . .

**government control over its export activities**.") (emphasis added). *Shandong Huanri (Gr.)*

*Gen. Co. v. United States*, 493 F.Supp.2d 1353, 1357 (CIT 2007) (separate rates granted for "an

absence of central government control, both in law and in fact, **with respect to exports**."); *Jilin*

*Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F.Supp.3d 1224, 1234 (CIT 2021)

("**the fundamental question here concerns state control over *export functions*.**") (emphasis

modified); *GTC*, 519 F.Supp.3d at 1257 ("**Commerce has identified a respondent's 'export**

**functions' (or 'activities') as the subject of its separate rate inquiry**.") (emphasis added).

This Court did not graft an additional requirement as Commerce insinuates; it required

that separate rate denials be tethered to the respondents' export functions – per longstanding

Department practice. Commerce declines to heed what it characterizes as "{i}mplicit in the

Court's discussion" – but is actually a clear judicial finding – that GTC's separate rate denial

"must necessarily rely upon evidence indicative of government influence on export pricing (and

that affirmative evidence demonstrating a firm's independence in export price setting is alone

sufficient to rebut the presumption of control)." Remand at 22. As this Court ruled in OTR AR7,

any separate rate denial must be "**supported by valid factual findings that the Chinese**

**government, rather than . . . GTC, controlled the prices at which**" TBT was "**sold for**

**export during the**" **POI**. *GTC*, 519 F.Supp.3d at 1258 (emphasis added).

Commerce employs a straw-man argument by recasting this Court's finding as "{a}n

approach whereby **the only relevant consideration** is whether export prices are set by, or are

subject to, the approval of a government entity." Remand at 22 (emphasis added). Rather than

suggest that export pricing is the lone relevant inquiry, this Court found that Commerce could

not ignore this overarching purpose of the separate rate analysis in denying GTC's separate rate.

Commerce concedes that "there is **no evidence that the SOE owner directly exercised its control on GTC's or GTCIE's export activities**" because "GTC demonstrated that sales manager(s) set export prices for GTCIE" and "provided **sufficient evidence** to demonstrate that it has the authority to negotiate and sign contracts and other agreements on its own behalf." *Id*. at 21 (emphasis added). Commerce thereby correctly and candidly acknowledges that "there was **no indication of direct involvement or approval on behalf of any government authority regarding price setting**." *Id*. (emphasis added).

Accordingly, there is no basis to deny GTC's separate rate in the TBT LTFV investigation per Commerce's longstanding practice – as this Court recently and repeatedly recognized. *Jilin Forest*, 519 F.Supp.3d at 1234; *GTC*, 557 F.Supp.3d at 11319. This Court did not merely request confirmation that the record is devoid of any indicia of state control with respect to export activities in order to deny Guizhou Tyre's separate rate; it faulted Commerce for denying the separate rates without – as articulated in OTR AR7 – "discussion of specific government control over the setting of prices of exported subject merchandise during the POR" and "sidestep{ing} the issue of whether the record evidence supported a finding of control of those prices during the POR." *GTC*, 519 F.Supp.3d at 1260-61. Moreover, this Court was clear that such findings were a legal prerequisite to denying the separate rates in holding that denials must be "**supported by valid factual findings that the Chinese government, rather than . . . GTC, controlled the prices at which these companies' subject {OTR} were sold for export during the POR**." *Id*. at 1258 (emphases added).

Commerce ignores these passages and misreads this Court's concern that "focused on the lack of specific evidence regarding Chinese government control of GTCIE's export activities during the POI." Remand at 41. *GTC's* clear holding cannot plausibly be construed as merely a

request that Commerce should have been clearer about the lack of evidence. Commerce incorrectly "responded to the Court's concerns by clarifying" that it could not make findings to support denying GTC's separate rate with respect to the first two factors. *Id*. (emphasis added). In fact, this Court specifically required Commerce to find that "the Chinese government actually controlled Guizhou Tyre's export prices and export pricing decisions during the {POI}" to deny the separate rate *Id*. at 1320. The Remand does not comply with this Court's order since Commerce continued denying separate rates while confirming that it could not find control over export prices by the Chinese government.

### D.      Commerce Does Not Rely on Evidence of Actual State Control

Rather than cite responsive information, Commerce faults the requirement for "evidence of direct government involvement in price setting" as "ignor{ing} other aspects of export activities where the government may exert control." Remand at 22. Yet Commerce proffers no evidence of state control "such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc*." *Id*. at 22-23. It is improper for Commerce to avoid this Court's requirement to provide affirmative evidence of state control by merely listing potential ways in which state control could be exercised. Indeed, Commerce only identifies "voting actions **suggestive of potential for control**" and other "evidence indicative of **potential for control**." *Id*. at 23, 25 (emphases added). Tellingly, Commerce claims:

> {F}inding that GTC has autonomy in the selection of management allows for **the reasonable inference**, considering the presumption of government control in NME country proceedings, **that their respective government shareholders maintain the potential to control the export operations** of each company because the management of a firm controls its operations – including its export functions.

*Id*. at 19 (emphases added).

Such finding of potential control cannot be reconciled with this Court's summary of Department practice: "**Commerce' practice does not require a respondent to rebut the potential for government control, but rather actual control** by the government entity." *An Giang*, 203 F.Supp.3d 1256, 1291-92 (CIT 2017) (emphases added). Indeed, this Court rejected the very position that the Remand adopts: "the information Guizhou Tyre put forward was sufficient to **require Commerce to consider the record as a whole and make a factual determination on whether the Chinese government actually controlled Guizhou Tyre's export functions and export pricing decisions** during the period of investigation." *GTC*, 557 F.Supp.3d at 1320 (emphasis added). As this Court likewise ruled in OTR AR7:

> {Commerce} **presumes, without evidentiary support, that the Department's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities,"** . . . , or "export functions," . . . , during the POR. **Nor can the court agree that, on this record, Commerce made what can be described as a "reasonable inference."** Under the applicable standard of review, **the court may not sustain a factual finding that ignores record evidence and relies upon speculation**.

*GTC*, 519 F.Supp.3d at 1256-57 (emphases added) (citations omitted).

Commerce cannot credibly maintain the exact same "reasonable inference" of state control based on the exact same record on which this Court expressly could not "agree that, on this record, Commerce made what can be described as a 'reasonable inference.'" *Id*.; Remand at 19. With this Court finding the presumption rebutted and requiring that finding state control be based on affirmative evidence rather than speculation, Commerce improperly continues denying GTCIE's separate rate without the necessary evidence. "**It is well established that speculation does not constitute substantial evidence.**" *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009) (emphasis added). Yet Commerce's separate rate denial is based on

conjecture. For example, Commerce states that "**we would expect** any large shareholder, including a government entity, to control the operations of the company" and purports to have provided sufficient "evidence of **the potential for GIIG to control** GTC's board." Remand at 10, 56 (quotations omitted) (emphases added).

This Court has repeatedly held that separate rate denials must be based on actual government control as opposed to mere potential to control:

> {T}hese facts alone are not dispositive of the *de facto* autonomy inquiry, because they speak solely to the *possibility* for governmental control over export activities through these persons, not whether such control was in fact reasonably likely to have been exercised . . . .
>
> {I}n an NME country, there will usually be state involvement and *authority* to intervene in commercial affairs. But this fact alone does not necessarily lead to the conclusion that all NME producers and exporters should be categorically treated as in fact setting their prices according to some centralized strategy.

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1348-50 (CIT2014) (footnotes omitted). This judicial holding is based on Commerce's own findings:

> Commerce' practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity. . . .
>
> {I}f Commerce relied solely upon the government's potential to nominate a manager or a board member with control over day-to-day company operations, it would be deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company.

*An Giang*, 203 F.Supp.3d at 1291-92 (footnote omitted).

These decisions cannot reconcile with Commerce's separate rate denial based on speculation that GIIG's participation as an ordinary GTC shareholder somehow constituted control over export decisions. Commerce found that – at most – GIIG's voting raised "the *possibility* for governmental control over export activities," when agency practice prevents such "reli{ance} solely upon the government's potential" to control. *Jiasheng*, 28 F.Supp.3d at 1348-

50. Uncontroverted evidence shows that GTCIE: (1) independently sets export prices; (2) has

negotiating authority; (3) selects management; and (4) retains export sale proceeds, making

independent decisions regarding the disposition of profits. GTC Opening Brief at 24-34;

Separate Rate Application for Guizhou Tyre (Apr. 8, 2016), P.R. 396, C.R. 506-07 ("SRA"), at

12-17, Exhibits 9-13. In fact, Commerce "**has not pointed to any specific evidence that, in**

**influencing the companies' operations pursuant to their duties as *company* officials**

(including through the selection of management and preparation of profit distribution plans),

**these persons were directing the companies' export pricing decisions based on the will of**

**the PRC government**." *Jiasheng*, 28 F.Supp.3d at 1348-50 (emphases added).

Commerce unpersuasively complains of difficulties finding state control after the

presumption is rebutted: "A standard requiring evidence of direct government involvement in

price-setting before finding government control would be almost impossible to meet, requiring

that a 'smoking gun' document exist on the record showing direct involvement on behalf of as

government authority in price-setting for an individual firm." Remand at 23. Yet with the

presumption rebutted, Commerce became affirmatively obligated to establish state control. *GTC*,

557 F.Supp.3d at 1320. As Guizhou Tyre provided more than the requisite minimum quantum of

evidence, requiring that "Commerce would need to rely on direct evidence unambiguously

demonstrating government involvement in price-setting" is an accurate summary of controlling

law – not "an unreasonable threshold" as claimed. Remand at 46.

Commerce's complaint about supposed difficulties obtaining evidence to deny separate

rates is both incorrect and irrelevant. Commerce claims that, even "where the government

involvement is price-setting is direct and unambiguous, actual affirmative documentation is

unlikely to exist, and the ability of Commerce to compel that any such information to be

provided to the record extremely limited." Remand at 23. Commerce is wrong. It can readily

solicit information regarding price in its questionnaires – in the form of narrative responses, in

the event documentation does not exist. Indeed, Commerce acknowledges its "authority to solicit

such information and gather evidence." *Id*. at 46. As respondents must certify the accuracy of

information submitted to Commerce, those falsely stating they could set prices free of

government interference or control are subject to severe penalties. 19 C.F.R. § 351.303(g).

Guizhou Tyre certified that its representations regarding price setting and other indicia of state

control were accurate when submitting evidence to rebut the presumption. That contrary

evidence may be difficult to obtain does not relieve Commerce from its obligation to

affirmatively demonstrate state control before denying a separate rate for GTCIE, which:

- is not majority SOE-owned;

- fully cooperated with Commerce; and

- provided evidence to establish a negative (*i.e.*, absence of state control) – always a difficult task. *GTC*, 557 F.Supp.3d at 1320.

## II.   THE SEPARATE RATE DENIAL IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce erred by denying GTCIE's separate rate based on selected facts and

speculation, while failing to meaningfully consider contrary evidence.

### A.   The 2012 Meeting Does Not Evidence Government Control

Commerce misplaces reliance on GTC's Third Interim Shareholders' Meeting ("2012

Meeting"), when GTC's 6th Board was elected – which was substantially similar to the GTC

board during the TBT LTFV investigation.[1] Remand at 12-13, 51. Commerce concedes "that

---

[1]   GTC's board members selected Ma Shichun as chairman at the 2012 Meeting. Despite his not working for GIIG or any other governmental entity, Commerce relied upon his serving GIIG's proxy to deny GTCIE's separate rate. Remand at 13. However, Commerce long ago conferred separate rate status on a company whose board chairman served as proxy for the SOE

[                                        ]. Remand at 51. Rather, "the 6th session of board of **directors of GTC were nominated by** the Nomination Committee under **the Board of Directors of GTC**; **GIIC did not have any involvement in the nomination stage of election of GTC's 6th session** of the board of directors." Second Supplemental SRA Questionnaire Response (July 22, 2016), C.R. 785-86, P.R. 651 ("2SSRA"), at 1 (emphases added).

Commerce overlooks the lack of GIIG involvement in the nomination process by denying GTCIE's separate rate "based on its finding that the board [                    ] and was then elected at a meeting where GIIG comprised [                              ]." Remand at 51. Yet the extent to which other shareholders participated does not change the facts that: (1) shareholders were not involved in the nomination process; and (2) the 2012 Meeting election complied with all legal requirements proscribed by GTC's AoA, the PRC Law, and Code for Listed Companies – including protections against domination by any one shareholder. Rather than indicate impropriety, the 2012 Meeting reveals that GTC acted as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions. One critical legal protection refutes Commerce's theory that of GIIG control:

> **The board of directors** . . . of a listed company **shall operate in an independent manner**. **There shall be no subordination relationship between, on the one hand, a listed company . . . and, on the other hand, the company's controlling shareholders** . . . and the latter shall not give plans or instructions concerning the listed company's business operation to the former, nor shall the latter interfere with the **independent operation** of the former in any other manner.

RFI Exhibit 3: Code for Listed Companies Art. 26 (emphases added).

---

shareholder. *Cased Pencils from China*, 59 Fed. Reg. 55,625, 55,628 (Nov. 8, 1994). Commerce concedes this is not "sufficient to deny a separate rate" and "{t}hat GTC's Chairman's status as proxy does not constitute overlapping management." Remand at 56. As he personally owns GTC shares and is not beholden to any other shareholder, 2SSRA Exhibit 3, Commerce misplaced reliance on GTC's AoA giving emergency authority to the board chairman. Remand at 14.

Commerce acknowledges the legality of the 2012 Meeting but wrongly claims state control because "an SOE exerted state control over board selection and, by extension, the selection of management." Remand at 54. That GIIG comprised the majority of shareholders participating in the 2012 Meeting does not mean that it selected those board members, particularly since shareholders do not select management. These board members do not have any position in GIIG or SASAC or any other government agency – they are GTC directors who act on behalf of GTC. Moreover, GTC management conducts the day-to-day operation of GTC, not board members. While managers are selected by the board, they must work for the best interests of GTC; board members and management owe fiduciary duties to GTC and **all** of its shareholders. RFI Exhibit 4: AoA Arts. 98-99. The SOE shareholder voting for board members who served in the POI does not make GTC management beholden to the Chinese government. Assuming *arguendo* that "GIIG effectively selected GTC's board," Remand at 52, GTC's 6th Board and management operate the company independently from shareholders including GIIG.

Commerce's reliance on the 2012 Meeting presumes perpetual government control over GTCIE by virtue of a vote by GIIG years before the POI. This presumption constitutes an unreasonable fiction that defies Commerce's own findings. After conferring separate rate status on GTC in 2015, *AR5 Final*, 80 Fed. Reg. at 20,197-200, it is disingenuous for Commerce to afterwards deny GTCIE separate rate status – particularly GIIC's investment in GTC since that time **was reduced** from 33.36% to 25.2% and Guiyang's SASAC no longer conducted GTC performance reviews. RFI at 2, 7, Exhibit 1.

### B.   The 2015 Meetings Do Not Evidence Government Control

GTC's May 2015 Meeting disproves GIIG control during the POI, as the managerial candidates advocated by GIIG were **not** elected "**due to dissenting votes from shareholders other than GIIC**." 2SSRA at 2 (emphasis added), Exhibit 3. Commerce denied GTCIE's

separate rate through speculation that GIIG "force{d} an interim meeting to re-vote on its favored proposal." Remand at 55. Yet despite Commerce's initial factual error, the July 2015 Meeting was conducted transparently in compliance with all legal requirements, including the AoA which Commerce recognizes "**appear on their face to place safeguards against undue influence by large shareholders in the selection of GTC's senior managers**." *Id*. at 12 (emphasis added). That GIIG was then able to achieve what it could not at the May 2015 Meeting – through a democratic and legal process – demonstrates only that GIIC may only participate in GTC's decision making through the normal courses available to all shareholders. There is no record evidence of any instance of "control" by GIIC.

At the May 2015 Meeting, where GIIC's proposals were rejected, participating shareholders accounted for 58.4416% of total voting shares. 2SSRA Exhibit 3D. This vote explicitly shows that **all GTC shareholders** are on equal footing with respect to voting, and that the 75% of ownership of GTC by non-GIIC shareholders can readily overturn a proposal made by GIIG. It is irrelevant that proposals were accepted at the July 2015 meeting; the point is that GTC demonstrated that all management decisions are made through shareholders' meetings, which are open to all shareholders – including the shareholders that comprise the 75% of GTC not held by GIIG. The May 2015 Meeting establishes that GIIG has no ability to control GTC.

GIIG's success in July 2015 does not mean it can always have its way; other shareholders can, and two months before did, vote down proposals favored by GIIG. Moreover, GIIG is **not** the only shareholder authorized to convene shareholders meetings. Commerce recognizes that "Article 49 of GTC's AoA allows: 'shareholders individually or jointly holding ten percent of the shares of the company . . . to propose to the Board of Directors to convene an interim shareholders' meeting.'" Remand at 12 (quoting RFI Exhibit 4). GTC's minority shareholders

have all rights afforded by GTC's AoA, the PRC Law, and Code for Listed Companies. GTCIE's separate rate was erroneously based on "GIIG's sole ability to convene interim shareholders meetings." Remand at 55.

### C.    Record Evidence Rebuts the Presumption of State Control

The record contains extensive evidence rebutting the presumption of state control. For example, the Guiyang SASAC Clarification provides that, as to GTC, the SOE "**which has an interest in your company, does not have the right to make a decision on appointment or dismissal of board directors or management of your company**." RFI Exhibit 1 (emphasis added). Similarly, GTC's 2015 Annual Report states:

- minority shareholders have the opportunity to fully express their opinions and claims;

- the Company strictly abides by relevant provisions of laws, statutes and rules and regulations; and

- The Company . . . completely separates from the controlling shareholder {GIIC} in personnel, assets and finance, etc., with independent organization and independent business. The controlling shareholder strictly abides by the provisions of laws and regulations and exercise shareholders' rights pursuant to laws.

Supplemental SRA Questionnaire Response (July 8, 2016), C.R. 740-47, P.R. 607-08, at 1-3, Exhibit 4.

Commerce discounts this evidence through its mantra that "GIIG, an SOE, was involved in making decisions at GTC" and the extensive minority shareholder "protections were ineffective at preventing GIIG's control." Remand at 14-15. Again, GIIG's participation in the 2012 and 2015 Meetings does not evidence state control; GIIG merely acted as an ordinary shareholder subject to legal restraints, as proven by its inability to pass preferred proposals at the May 2015 Meeting. Section II.A/B, *supra*. GTCIE was only required to rebut the presumption of state control and submitted overwhelming evidence – far surpassing the requisite "minimum

quantum," *Aukerman*, 960 F.2d at 1037, Section I.B, *supra* – including extensive legal

requirements and safeguards for minority shareholders such as:

- AoA Article 40 together with PRC Company Law Articles 37 & 99 provide strict election procedures – through which GTC board members were democratically elected by shareholders, and its chairman was elected by board;

- AoA Article 43 together with PRC Company Law Article 100 provide for interim meetings to address management selection, as occurred in July 2015;

- Code for Listed Companies Articles 20-21 limit controlling shareholders, prohibiting GIIC from: circumventing shareholders' meetings or the board of directors in selecting management; or interfering with GTC or other shareholders;

- AoA Article 83 limits GIIG from nominating more than one third of GTC's directors; the 6th Board was nominated in 2012 by the previous board – without the involvement of GIIG or Guiyang SASAC;

- AoA Articles 57 & 88 provide strict voting procedures, with Article 83 allowing for cumulative voting to prevent GIIC from controlling the GTC election, and GTC's allowance for internet voting further maximizing participation; and

- AoA Articles 124, 130, 132 & 134 provide strict election procedures for senior management, through which GTC's management was selected by board members.

RFI Exhibits 2-4.

## III.   COMMERCE UNLAWFULLY IMPLEMENTED A NEW ANALYSIS

Commerce incorrectly claims the GTCIE separate rate denial is supported by "long-

standing practice." Remand at 64. Rather, the denial contradicts Commerce's separate rate

analysis followed since *Sparklers* and *Silicon Carbide*. First, Commerce myopically fixates on

management selection and to a lesser extent profit distribution. Remand at 18-21, 54-57.

Commerce's conclusion that "if a respondent is unable to establish autonomy from the

government under one of the four *de facto* criteria, the company . . . is ineligible for a separate

rate," *id*. at 40, is anathema to agency practice that considers the "totality of the circumstances."

*Id*. at 45; *SDGE* IDM Comment 1; *Jiasheng*, 28 F.Supp.3d at 1339 n.160. Commerce provides

no support for its claim that when the first two factors prove independence from state control, the

remaining factors "establishing the potential to control is sufficient to sustain the denial of separate rates" for minority SOE-owned respondents. Remand at 47. This Court in OTR AR7 found that Commerce failed to "examine{} the totality of the circumstances" by denying the separate rate on remand, and that failure continues. *GTC*, 519 F.Supp.3d at 1256.

Commerce's new approach disregards the critical nexus to assess whether a respondent shows an absence of governmental control **over its export activities**. *Sparklers*, 56 Fed. Reg. at 20,588; Section I.C, *supra*. Commerce in the TBT LTFV investigation explained that it: "will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of . . . **government control over its export activities**." Separate Rate Memo at 2 (emphasis added). As this Court found, "Commerce did not indicate . . . that it intended to make a change to the methodology" granting separate rates "if a respondent can demonstrate the absence of . . . *de facto* government control over its *export activities*.'" *GTC*, 519 F.Supp.3d at 1260. *GTC*, 557 F.Supp.3d at 1319 (emphasis in original) (quoting Commerce Decision Memorandum (Aug. 26, 2016), P.R. 716, at 15).

Commerce treated government ownership as dispositive, using a truncated analysis that equated GIIG's 25.2% ownership with government control. Yet Commerce previously found that such a consideration "**cannot be considered as dispositive**." *Silicon Carbide*, 59 Fed. Reg. at 22,586 (emphasis added). Indeed, Commerce specifically reversed course on this point. *Tapered Roller Bearings from China*, 62 Fed. Reg. 6173, 6174 (Feb. 11, 1997) ("*TRBs*") ("we have modified our separate-rates policy . . . . {O}wnership 'by all the people' in and of itself cannot be considered dispositive in establishing whether a company can receive a separate rate."). Commerce further reversed practice by denying GTC's separate rate based on the mere potential for government control. Section I.D, *supra*.

Commerce only has "discretion to change its policies . . . so long as the agency's decisions are explained," *Nakornthai*, 32 CIT at 1276, but failed to provide the requisite "adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). Where – as here – "the Department provides no reasonable explanation for changing a practice that it has consistently followed, **such a change in an unacceptable agency practice**." *WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340, 1344 (CIT 2012) (emphasis added). Indeed, agencies must show "a **more detailed justification** . . . when, for example, its **new policy rests upon factual findings that contradict those which underlay its prior policy**." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis added).

GTCIE's separate rate denial rests on findings that contradict those made under *Sparklers* and *Silicon Carbide*, including Commerce granting GTC's separate rate in OTR AR5 with greater GIIG ownership. RFI at 6; *OTR AR5 Final*, 80 Fed. Reg. at 20,198-99. Commerce also contradicted extensive its OTR LTFV investigation findings detailing separate rate propriety based on verification, despite 33.84% GIIG ownership. *OTR LTFV Final* IDM Comment 25. By feigning adherence to practice while reaching diametrically opposite results, *see* Remand at 59-61, Commerce has arbitrarily "offer{ed} insufficient reasons for treating similar situations differently." *SKF*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

It strains credulity to accept that Commerce has not changed its separate rate practice, but rather merely "continue{d} to evaluate its practice with regard to separate rates in light of the *Diamond Sawblade*s antidumping proceeding." Remand at 59. This Court in *Diamond Sawblades* rejecting Commerce's separate rate conclusion for a respondent with 100% SASAC ownership does support denial based on a 25.2% SOE ownership. Commerce incorrectly claims that GTCIE's separate rate denial "reflect{s} the reasonable evolution of Commerce's analysis in

response to court decisions" involving majority SOE-ownership. Remand at 15. Implementing a practice that Commerce expressly disavowed decades ago, *TRBs*, 62 Fed. Reg. at 6174, is neither reasonable nor an evolution – but instead an unlawful and unexplained contradiction of practice.

## IV.    THE REMAND CORRECTLY FOUND NO ADD BEFORE FEBRUARY 21, 2020

This Court invalidated Commerce's ADD assessment upon issuance of the ADD order on TBT from China, given that such issuance occurred in the midst of ongoing litigation before the U.S. International Trade Commission's ("ITC") redetermination was affirmed. *GTC*, 557 F.Supp.3d at 1306-16. The Remand properly confirms that entries of TBT from China prior to February 21, 2020 – the earliest date on which the TBT from China ADD order could have published, as this Court having affirmed the ITC on February 18, 2020. *Id*. at 1315; Remand at 4-6, 32-33. Accordingly, Guizhou Tyre requests affirmance of this aspect of the Remand so that ADD cash deposits collected on such entries are refunded with interest per 19 U.S.C. § 1677g.

## CONCLUSION

Based on the foregoing, Guizhou Tyre requests that this Court direct Commerce to grant GTCIE's separate rate.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Jordan C. Kahn*
Ned H. Marshak
Jordan C. Kahn
Elaine F. Wang

599 Lexington Ave., 36th Floor
New York, New York 10022
**
1201 New York Ave., NW,
Suite 650
Washington, DC 20005

PUBLIC VERSION

*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: May 25, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Comments on Remand Redetermination, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 9,992 words, less than the 10,000 word limit.


/s/ Jordan C. Kahn
*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*


Dated: May 25, 2022


11641952_1