## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  **THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| GUIZHOU TYRE CO. LTD. and GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., <br><br> Plaintiffs, <br><br> CHINA MANUFACTURERS ALLIANCE LLC, AND SHANGHAI HUAYI GROUP CORPORATION LIMITED, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Consol. Court No. 19-00031 <br><br> **PUBLIC VERSION** |

## <u>DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
ELIO GONZALEZ
Senior Attorney
Office of the Chief Counsel
    For Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C. 20230

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 305-7571
Fax:  (202) 514-8640
Email:  kara.m.westercamp@usdoj.gov

June 14, 2022

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE**

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

    I.      Proceedings Before Commerce And The International Trade Commission .......... 2

    II.     The Court's Remand Order.................................................................................. 3

    III.    Remand Results .................................................................................................... 5

          A.      Commerce Continued To Deny GTCIE A Separate Rate ........................ 5

          B.      Commerce Continued To Deny Double Coin A Separate Rate................. 8

          C.      The Issuance Of The Antidumping Duty Order ......................................... 9

Argument ............................................................................................................................ 10

    I.      Standard Of Review............................................................................................ 10

          A.      Review Of Commerce's Remand Redetermination................................. 10

          B.      Legal Framework For Establishing An Absence Of Government Control In Proceedings Involving Non-Market Economy Countries ....... 11

    II.     Commerce's Determination That GTCIE Is Ineligible For A Separate Rate Complies With The Remand Order .................................................................... 13

          A.      Commerce's Separate Rate Analysis Is In Accordance With Law And Supported By Substantial Evidence........................................................... 13

          B.      Guizhou Tyre's Arguments Are Unavailing............................................ 20

                1.      Substantial Evidence Supports Commerce's Determination That, Despite Minority Ownership, GTCIE Failed To Rebut The Presumption Of Government Control................................... 21

                2.      Substantial Evidence Supports Commerce's Determination That GTCIE Failed To Rebut The Presumption Of Government Control Regarding Autonomy In The Selection Of Management................................................................................ 25

III.    Commerce's Determination That Double Coin Is Ineligible For A
        Separate Rate Complies With The Remand Order ................................ 31

IV.     Commerce's Comments Regarding The Premature Issuance Of The
        Antidumping Duty Order ........................................................................ 39

Conclusion ............................................................................................................ 40

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013) ............................................................ 11

*Adv. Tech. & Materials Co. v. United States*,
   938 F. Supp. 2d 1342, 1345 (Ct. Int'l Trade 2013) (*Adv. Tech. II*), *aff'd*,
   581 F. App'x 900 (Fed. Cir. 2014) ............................................................................ 13

*AMS Assocs. v. United States*,
   719 F.3d 1376 (Fed. Cir. 2013) .......................................................................... 11, 12

*An Giang Fisheries Imp. & Exp. Joint Stock Co., v. United States*,
   284 F. Supp. 3d 1350 (Ct. Int'l Trade 2018) .............................................. 17, 18, 33

*Bristol Metals L.P. v. United States*,
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ............................................................ 10

*China Manufacturers Alliance, LLC v. United States*,
   1 F.4th 1028 (Fed. Cir. 2021) ............................................................................ passim

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................................................. 10

*Diamond Sawblades Manufacturers Coalition v. United States*,
   866 F.3d 1304 (Fed. Cir. 2017) ........................................................................ passim

*Guizhou Tyre Co., Ltd. v. United States*,
   557 F. Supp. 3d 1302 (Ct. Int'l Trade 2022) ...................................................... passim

*I.D.I. Int'l Dev. and Inv. Corp. v. United States*,
   Court No. 20-00107, Slip Op. 21-82, 2021 WL 3082807 (Ct. Int'l Trade July 6, 2021) ......... 17

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
   28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ......................................................... 17, 37

*Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*,
   121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015) ............................................................ 19

*Materials Co. v. United States*,
   938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) ............................................................ 13

*McMicking v. Schields*,
   238 U.S. 99 (1915) .................................................................................................. 30

*Michaels Stores, Inc. v. United States,*
    766 F.3d 1388 (Fed. Cir. 2014) ............................................................. 11

*Sigma Corp. v. United States,*
    117 F.3d 1401 (Fed. Cir. 1997) ............................................... 11, 12, 22

*Tianjin Magnesium Int'l Co., Ltd. v. United States,*
    836 F. Supp. 2d 1377 (Ct. Int'l Trade 2012) ...................................... 10

*Yantai CMC Bearing Co. v. United States,*
    203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ............................. 13, 14, 38

*Zhejiang Machinery Imp. & Exp. Corp. v. United States,*
    521 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ...................................... 38, 39

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,*
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .................................. passim

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................................... 10

19 U.S.C. § 1673b(d)(2) ........................................................................... 3, 4

19 U.S.C. § 1673d(c)(1)(B)(i)(I) ...................................................................... 4

19 U.S.C. § 1673d(c)(2) ................................................................................ 3

19 U.S.C. § 1673e(a) .................................................................................... 3

## ADMINISTRATIVE DETERMINATION

*53-Foot Domestic Dry Containers from the People's Republic of China,*
    80 Fed. Reg. 21,203 (Dep't Commerce Apr. 17, 2015) ........................ 19

*Sparklers from the People's Republic of China,*
    56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) ...................... 11

*Silicon Carbide from the People's Republic of China,*
    59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) ...................... 12

*Diamond Sawblades from China,*
    71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) ........... 12

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,*
    80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015) ...................... 29

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*,
 82 Fed. Reg. 18,733 (Dep't of Commerce Apr. 21, 2017) ...................................................... 29

*Truck and Bus Tires from the People's Republic of China*,
 82 Fed. Reg. 8,599 (Dep't of Commerce Jan. 27, 2017) ........................................................... 2

*Truck and Bus Tires from the People's Republic of China:  Antidumping Duty Order*,
 84 Fed. Reg. 4,436 (Dep't of Commerce Feb. 15, 2019) ........................................................... 2

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  **THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| _____ ) | |
| GUIZHOU TYRE CO. LTD. and GUIZHOU ) TYRE IMPORT AND EXPORT CO., LTD., ) | |
|  ) | |
| Plaintiffs, ) | |
|  ) | |
| CHINA MANUFACTURERS ALLIANCE ) LLC, AND SHANGHAI HUAYI GROUP ) CORPORATION LIMITED, ) | Consol. Court No. 19-00031 |
|  ) | **PUBLIC VERSION** |
| Consolidated Plaintiffs, ) | |
|  ) | |
| v. ) | |
|  ) | |
| UNITED STATES, ) | |
|  ) | |
| Defendant. ) | |
| _____ ) | |

<u>**DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION**</u>

Defendant, the United States, respectfully submits this response to the comments filed by plaintiffs Guizhou Tyre Co., Ltd. (GTC) and Guizhou Tyre Import and Export Co., Ltd. (GTCIE) (collectively, Guizhou Tyre), ECF Nos. 69 & 70 (Guizhou Tyre Cmts.), and consolidated plaintiffs China Manufacturers Alliance LLC (CMA) and Shanghai Huayi Group Corporation Limited (Shanghai) (collectively, Double Coin), ECF No. 71 (Double Coin Cmts.), concerning the United States Department of Commerce's (Commerce) final results of redetermination filed in accordance with this Court's decision and remand order in *Guizhou Tyre Co., Ltd. v. United States*, 557 F. Supp. 3d 1302 (Ct. Int'l Trade 2022).  *See* Final Results of Redetermination Pursuant to Court Remand, Apr. 22, 2022, ECF Nos. 66-1 and 67-1 (Remand Results).

In response to the Court's request, the United States also provides Commerce's comments on the Court's intended remedy in the remand order following the Court's holding

that Commerce prematurely issued the antidumping duty order in this case.  For the reasons

explained below, we respectfully request that the Court sustain Commerce's remand results and

enter final judgment for the United States.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.**     **Proceedings Before Commerce And The International Trade Commission**

On January 27, 2017, Commerce published an affirmative final determination of less than

fair value and critical circumstances in the investigation of truck and bus tires from the People's

Republic of China.  *Truck and Bus Tires from the People's Republic of China*, 82 Fed. Reg.

8,599 (Dep't of Commerce Jan. 27, 2017) (final determ.) (P.R. 868), and accompanying Issues

and Decision Memorandum (IDM) (P.R. 855).[1]  In the final determination, Commerce

determined that GTCIE and Double Coin were not eligible for separate rates because each

company failed to rebut the presumption of *de facto* government control.  IDM at 16-28.

Several months later, in March 2017, the International Trade Commission (ITC) notified

Commerce of its final determination that an industry in the United States is not materially injured

or threatened with material injury, by reason of imports of truck and bus tires from China.  *See*

*Truck and Bus Tires from the People's Republic of China:  Antidumping Duty Order*, 84 Fed.

Reg. 4,436 (Dep't of Commerce Feb. 15, 2019) (Order).  Accordingly, Commerce instructed

U.S. Customs and Border Protection (CBP) to liquidate entries of subject merchandise without

regard to antidumping duties.

But following litigation before this Court, the ITC, on remand, issued an affirmative final

determination that an industry in the United States is materially injured by reason of imports of

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of
the antidumping duty investigation.

truck and bus tires from China, and notified Commerce of this determination.  *Id.*  On February

15, 2019, Commerce published the antidumping duty order, in accordance with 19 U.S.C.

§ 1673e(a).  *Id.*

## II.    <u>The Court's Remand Order</u>

On January 24, 2022, the Court issued its remand order, holding that Commerce's final

results were "contrary to law in certain respects."  *Guizhuo Tyre*, 557 F. Supp. 3d at 1304.  First,

the Court found merit in Guizhou Tyre's claim that "Commerce, before issuing the Order, should

have awaited the outcome of litigation in this Court contesting the initial final determination of

the ITC, which reached a negative finding of injury or threat to the domestic industry."  *Id.* at

1308.  The Court explained that "the effect of the publication of the ITC's initial, negative

determination on March 17, 2017, as provided by 19 U.S.C. § 1673d(c)(2), was termination of

the investigation, termination of the suspension of liquidation that previously had been imposed

under 19 U.S.C. § 1673b(d)(2), the release of any security, and the refund of any cash deposits."

*Id.* at 1316.  But because the investigation was terminated until ITC, on remand, made an

affirmative determination with respect to the investigation, "the first possible effective date of an

antidumping duty order . . . appears to have been February 21, 2020."  *Id.*  As a result, the Court

invited Commerce in the remand redetermination to "comment on the remedy the court intends

to order, including in particular the court's choice of February 21, 2020 as the earliest possible

date the Order could have been entered."  *Id.*

Second, the Court held that Commerce must reconsider its denial of separate rate status to

GTCIE in the remand redetermination.  *Id.* at 1316-20.  Specifically, the Court held that the

evidence Commerce relied upon in its determination that shareholders of Guiyang Industry

Investment Group Co., Ltd. (GIIG)[2], which is 100 percent owned by the Guiyang State-owned Assets Supervision and Administration Commission (SASAC), "succeeded in electing board members at the July 2015 meeting after being unsuccessful in attempting to do so at the May 2015 meeting, is less than substantial evidence for {Commerce's} conclusion that GIIC effectively 'appointed' board members at the July 15 meeting." *Id.* at 1317.  Moreover, the Court held that Commerce's analysis was deficient "with respect to the findings on board member and management selection, and on profit distribution," which led to a "vague and ambiguous" analysis of whether the Chinese government "exercised control of GTCIE's 'export activities' or 'export functions.'" *Id.* at 1318-19.  Relatedly, the Court held that Commerce's "analysis fails to clarify or explain whether its finding of government control extended, specifically, to GTCIE's export activities during the period of investigation." *Id.* at 1320.  Thus, the Court held that "{u}nder the 'rebuttable presumption' method" of Commerce's separate rate analysis, on remand, Commerce must "consider the record as a whole and make a factual determination on whether the Chinese government actually controlled Guizhou Tyre's export functions and export pricing decisions during the period of investigation." *Id.*

Third, the Court considered Double Coin's challenges to Commerce's final determination. *Id.* at 1320-27.  The Court rejected Double Coin's contention that Commerce could not use the China-wide entity rate when assigning a rate to Double Coin, because the holdings in *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021), were controlling. *Id.* at 1323-24.  Specifically, as in *China Manufacturers*, here, Commerce's use of the China-wide entity rate "qualifies as an 'estimated weighted average dumping margin' within the meaning of that term as used in 19 U.S.C. § 1673d(c)(1)(B)(i)(I)." *Id.* at 1323.

---

[2]  For clarity, the Court's remand order instead uses the acronym of "GIIC."

But with respect to Commerce's denial of separate rate status to Double Coin, the Court

held that Commerce's underlying reasoning was "unclear and ambiguous." *Id.* at 1324.  To wit,

it was unclear "whether, or to what extent, {Commerce's} separate rate inquiry was focused on

Double Coin's *export* activities, as opposed to control of the selection of board members and

management, and {Commerce's} statements on this question are internally inconsistent." *Id.* at

1325.  The Court also explained that Commerce's analysis was "unclear and ambiguous as to

whether, upon a finding by Commerce of majority ownership by a government entity allowing

control of the selection of board and management, {Commerce's} presumption of control of

export activities by the {Chinese} government remains rebuttable or, in effect, becomes

irrebuttable." *Id.* at 1326.  Thus, the Court directed Commerce to address the Court's various

concerns, but deferred addressing Double Coin's argument that Commerce should have verified

its factual information.  *Id.* at 1326-27.

## III.  Remand Results

On remand, Commerce complied with the Court's remand order and reconsidered and

further explained its separate rate determinations for GTCIE and Double Coin, as well as

commented on the Court's proposed effective date of the order.  Remand Results at 4-33.

### A.  Commerce Continued To Deny GTCIE A Separate Rate

Commerce explained that although "details of the May 2015 and July 2015 meetings

indicate that public notices were available to all shareholders{, . . . } other record evidence

demonstrates that GTCIE did not operate independent of government control." *Id.* at 8.

Commerce provided further explanation of its presumption of state control in non-market

economy countries, in that it "considers that the four *de facto* criteria and the related questions

that appear in the separate rate application constitute Commerce's analysis of 'export functions,'

which is a required part of Commerce's *de facto* control analysis." *Id.* at 9; *see also id.* at 8-10.

Considering the record as a whole, however, Commerce continued to find GTCIE ineligible for a

separate rate because GIIG, a state-owned enterprise, had control over GTC, and ultimately

GTCIE, including the selection of management and the profitability of the companies. *Id.* at 10-

16. For example, while GTC claimed that its Articles of Association in place during the period

of investigation "appear on their face to place safeguards against undue influence by large

shareholders in the selection of GTC's senior managers, the record demonstrates that those

safeguards were unsuccessful in the instant case" because GIIG was ultimately able to dominate

GTC's decision-making process, despite such safeguards, and appoint its preferred members to

GTC's board." *Id.* at 12.

Regarding the shareholders' meeting in question, Commerce considered that only GIIG

individually has the requisite number of shares to convene a shareholders meeting, and that it can

therefore effectively convene meetings on GIIG's favored proposals until they prevail, which

happened at the July 2015 meeting. *Id.* at 10-16. And during the July 2015 shareholder meeting,

record evidence demonstrated that [███████████████████████████████████████

████████████████████████████████████████████████████████████████]."

*Id.* at 13.

Commerce also considered the remaining evidence relating to GIIG's ownership stake in

GTC and GTCIE and its consequent level of control over board selection and profit distribution,

in addition to connections between GTC's board chairman and GIIG, and concluded that GTCIE

continued to be ineligible for a separate rate. *Id.* For example, Commerce explained that the

record showed that "GTC's Chairman is [████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ ].” *Id.*

As to the degree of government control, that is, majority or minority ownership, Commerce explained that it remains the "*burden of the respondent* to rebut the presumption by providing sufficient evidence to establish that it operates autonomously from the government in certain key aspects (*i.e.*, those enumerated in the *de facto* criteria)." *Id.* at 18 (emphasis in original). But with respect to GTCIE, Commerce explained that "[███████████████████ ████████████████████████████████████████ ], and [███████████████████ ██████ ], who control the operations of the company, including GTCIE's export activity." *Id.* Thus, as Commerce noted, "control of the board and appointment of management equates to potential control of the company's operations (which necessarily includes export operations)." *Id.* at 18-19.

Relatedly, Commerce also addressed Guizhou Tyre's argument that Commerce's separate rate analysis contradicts its longstanding practice. *Id.* at 59-61. In the remand results, Commerce provided the criteria it examines to determine whether a company has demonstrated *de jure* and *de facto* independence, including in minority government ownership scenarios. *Id.* at 8-10, 59-61. Commerce explained that it continues to evaluate its practice in line with relevant caselaw, including *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304 (Fed. Cir. 2017). *Id.* at 60. Consistent with its practice, Commerce examined "whether the government might be able to exercise, or have the potential to exercise, control of a company's operations through a *minority* government ownership under certain factual scenarios." *Id.* (emphasis in original). And here, despite minority ownership, Commerce "concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass

was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management." *Id.* at 55.

Thus, Commerce determined that GTCIE was not eligible for a separate rate because Guizhou Tyre failed to "rebut the presumption of government control or potential for control over export functions." *Id.* at 23.

### B.   Commerce Continued To Deny Double Coin A Separate Rate

In addition, Commerce provided further explanation and continued to find that Shanghai Huayi (Group) Company (Shanghai Huayi), Double Coin's majority shareholder, controls, or has the potential to control, Double Coin's selection of management and its company operations, including its export activities and functions. *Id.* at 24-26. Commerce clarified that it did not find that a lack of autonomy in management selection equates to a direct finding of government control of export activities, but rather that record evidence "indicating a lack of autonomy in management selection did not satisfy the third prong of the *de facto* analysis, and thus, that Double Coin was unable to rebut the presumption of government control." *Id*. at 25-26. In other words, because Shanghai Huayi as the majority shareholder "has rights to elect directors at the shareholders' general meetings in accordance with the number of shares it owns, *i.e.*, 72.15 {percent}" and three of four of Double Coin's board directors are general and deputy general managers which Shanghai Huayi appointed, Commerce determined that Shanghai State-owned Assets Supervision and Administration Commission (Shanghai SASAC) controls the selection of Double Coin's management. *Id.*

And although Double Coin cited articles of association, Commerce noted that the articles to which it referred "are actually Articles within the China Code of Corporate Governance, not

Double Coin's {Articles of Association}" and despite the articles, there was "no reason to find that Shanghai Huayai, Double Coin's majority shareholder, cannot exert … control over Double Coin." *Id.* at 27.

Commerce also considered the price negotiations with unaffiliated U.S. customers for sales of subject merchandise, and explained that "the record shows that Double Coin owned [████] percent of CMA, who negotiated [██] percent of Double Coin's U.S. sales. *Id.* at 28. Thus, Commerce determined that because "Shanghai Huayi can effectively appoint Double Coin's directors and managers, who control the operations (including export activities) of Double Coin, by virtue of being the majority shareholder of Double Coin; likewise, Double Coin, in turn, can effectively appoint CMA's directors and managers, who control the operations (including export activities) of CMA, by virtue of being the majority shareholder of CMA." *Id.* at 29.

Finally, Commerce explained that in accordance with its presumption of government control in non-market economy cases, it is the respondent's burden to demonstrate that it is free of government control. *Id.* at 30-31. Commerce explained that while it may be uncommon for a non-market economy respondent that is majority-owned by the foreign government to demonstrate that it is free of government control, that does not mean that the presumption of government control is irrebuttable. *Id.* And in this instance, "Double Coin had the burden of rebutting the presumption by establishing it is free from *de facto* government control but was unable to do so." *Id.* at 31.

### C.    The Issuance Of The Antidumping Duty Order

In response to the Court's holding that the order's issuance date was unsupported and its invitation for Commerce to comment on the Court's selection of February 21, 2020, as the

earliest date the order could have been published, Commerce stated that the proposed date is

reasonable.  *Id.* at 4.  At the Court's invitation, Commerce also commented on the Court's stated

intention of ordering Commerce to direct CBP to liquidate entries made prior to February 21,

2020, without regard to antidumping duties and to refund all cash deposits, with interest as

provided by law.  Commerce stated that it understands the Court's intention to be that Commerce

would refund, with interest, cash deposits for merchandise that entered between February 15,

2019, and February 21, 2020.  *Id.* at 5-6.  Commerce also observed that the Court's intended

remedy would apply only to entries exported by GTCIE because those are the only entries that

are enjoined and remain unliquidated.  *Id.* at 5.

## ARGUMENT

I.    **Standard Of Review**

A.    **Review Of Commerce's Remand Redetermination**

This Court sustains Commerce's determinations unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i); *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1373 (Ct. Int'l

Trade 2010).  This standard applies equally to remand redeterminations.  *See, e.g.*, *Tianjin*

*Magnesium Int'l Co., Ltd. v. United States*, 836 F. Supp. 2d 1377, 1380 (Ct. Int'l Trade 2012)

(applying the standard of review to Commerce's remand redetermination).  Substantial evidence

is "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's findings

from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607,

620 (1966).

**B.    Legal Framework For Establishing An Absence Of Government Control In Proceedings Involving Non-Market Economy Countries**

In proceedings involving non-market economy countries, Commerce uses a rebuttable presumption that all companies within the country are subject to government control over their export activities and should be assigned a single antidumping duty rate.  *See, e.g.*, *AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)).  Under this presumption, an exporter receives the non-market economy countrywide rate unless it affirmatively demonstrates an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to exports.  *Id*.  The burden of rebutting the presumption of government control rests solely with the exporter.  *Sigma Corp.*, 117 F.3d at 1405-06 (affirming Commerce's authority to place burden of proof on respondents, as they have the best access to necessary information).

If the company fails to rebut the presumption of government control, it continues to receive the single, countrywide, dumping rate.  *See Diamond Sawblades*, 866 F.3d at 1311 (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388 (Fed. Cir. 2014)).  That is, the company applying for a separate rate bears the burden to demonstrate that its export activities are free from *de jure* and *de facto* government control.  *AMS Assocs.*, 719 F.3d at 1379-80; *Sigma Corp.*, 117 F.3d at 1405-06.

A company that receives a company-specific rate separate from the China-wide entity is referred to as having "separate rate status."  *See, e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013).  To establish whether a company is sufficiently independent to be entitled to a separate rate, Commerce applies a test first established in a proceeding concerning sparklers from China, and further developed during a proceeding concerning silicon carbide from China.  *See Sparklers from the People's Republic of*

11

*China*, 56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) (final determ.); *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) (final determ.).

Pursuant to this test, Commerce considers certain *de jure* criteria in determining whether an individual company may be granted a separate rate. *See Sparklers from China*, 56 Fed. Reg. at 20,588; Policy Bulletin on the Topic of Separate Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (Apr. 5, 2005) (Policy Bulletin 05.1), *available* at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited June 11, 2022). Commerce's analysis of the *de jure* factors, and its conclusion that GTCIE and Double Coin rebutted the presumption of *de jure* government control, are not at issue in this case.

Separately, Commerce generally considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See AMS Assocs.*, 719 F.3d at 1379 (citing *Sigma Corp.*, 117 F.3d at 1405); *Diamond Sawblades from China*, 71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final determ.); *Silicon Carbide from China*, 59 Fed. Reg. at 22,585; *Sparklers from China*, 56 Fed. Reg. at 20,589; Policy Bulletin 05.1.

12

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria. *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017); *see also Adv. Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1345 (Ct. Int'l Trade 2013) (*Adv. Tech. II*), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (affirming determination where Commerce did not make a *de facto* finding on two of the four criteria). Further if an applicant fails to establish any one of the *de jure* or *de facto* criteria, Commerce is not required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria. *Yantai CMC Bearing*, 203 F. Supp. 3d at 1326.

## II.     Commerce's Determination That GTCIE Is Ineligible For A Separate Rate Complies With The Remand Order

### A.     Commerce's Separate Rate Analysis Is In Accordance With Law And Supported By Substantial Evidence

Commerce's determination that GTCIE is ineligible for a separate rate addresses the issues that the Court ordered Commerce to reconsider in the remand order and is supported by substantial evidence and in accordance with law.

In the remand order, because the Court found that Commerce had no basis for finding that the May and July 2015 shareholder meetings were not open to all shareholders, it also rejected Commerce's finding that the record evidence demonstrated that GIIG intentionally selected a shareholders meeting that is most favorable to it to elect members of GTC's board.[3] *See Guizhou Tyre*, 557 F. Supp. 3d at 1318-19. In the remand results, Commerce acknowledged that the details of the May 2015 and July 2015 meetings indicated that they were publicly noticed

---

[3] Guiyang SASAC has a 100 percent-owned affiliate, GIIG, which is also a Chinese government or state-owned enterprise. Remand Results at 6. GIIG then owns 25.20 percent of GTC, and GTC owns 100 percent of GTCIE. *Id.*

and available to all shareholders, but Commerce reconsidered and further explained GTCIE's separate rate status in light of the record evidence as a whole, and based on its analysis, Commerce reasonably continued to find that record evidence demonstrates that GTCIE did not operate independent of government control.  Remand Results at 8-24.

Commerce also explained that the four *de facto* criteria and the related questions in the separate rate application constitute Commerce's analysis of "export functions," and that it uses the terms export functions and export activities interchangeably to denote the tasks undertaken by a company in selling its merchandise outside its own country.  *Id.* at 9-10.  Moreover, Commerce explained that when discussing a company's operations, Commerce generally refers to the general operations of a company, which encompass a broad range of business activities, including export functions/activities, as well as management, board meetings, manufacturing, sales, advertising, and marketing.  *Id.* at 10.  In considering the record evidence, Commerce determined that GIIG has the ability to control the operations of GTC using its status as GTC's single largest, and controlling, shareholder.  *Id.* at 10-11.

To wit, Commerce explained in the remand results that it would "expect any large shareholder, including a government entity, to control the operations of the company in which it holds the largest number of shares, if its shareholder rights afford it that ability," such as in this case, where "GIIG can control, and has an interest in controlling, the operations of GTC, and ultimately GTCIE, including the selection of management and the profitability of the companies."  *Id.* at 10.  And although Commerce noted that GTC had shareholders' safeguards in place via its articles of association, Commerce explained that GIIG "is the only shareholder with the requisite shares to individually put forward proposals for consideration at shareholders' meetings," and to allow "GIIG to remain in a supervisory position over GTC despite its less-

than-majority ownership." *Id.* at 11-12.  And in this case, the supposed safeguards were ineffective because "[███████████████████████████████████

████████████████████████]" and "records for the July 2015 shareholders' meeting

[███████████████████████████████████████████████████████████████

███████████████████████████████████]." *Id.* at 12-13.

Commerce also explained that GIIG's role in GTC's board selection process also impacted profit

distribution because GTC's Chairman is [███████████████████████████

███████████████████████████] and the Chairman was voted [██████

████████████████████████████████████████████████████

██████████]." *Id.* at 13.

Further, Commerce addressed the role of minority shareholders and explained that it

"never found that minority shareholders were silenced, or that GTC failed to abide by relevant

laws." *Id.* at 14.  Rather, the articles of association and the relevant Chinese laws were

"ineffective at preventing GIIG's control" over such things as the selection of board members

and distribution of profits. *Id.* at 14-15.

Commerce also clarified that it is not equating lack of autonomy in selection of

management to a *direct* finding of government control of export activities. *Id.* at 18-19.  As

Commerce explained:

> under the presumption of government control (which has been upheld
> repeatedly by the courts) Commerce does not affirmatively establish in each
> instance that the government is controlling the respondent's export
> activities, including pricing decisions.  Rather, it is the *burden of the
> respondent to rebut the presumption* by providing sufficient evidence to
> establish that it operates autonomously from the government in certain key
> aspects (*i.e.*, those enumerated in the *de facto* criteria).

*Id.* at 18 (emphasis in original); *see also China Manufacturers Alliance, LLC*, 1 F.4th at 1030 ("Our court has previously approved Commerce's application of a presumption of government control over exporters in {non-market economy} countries{.}").

Notably, this Court recently explained that, "{a}s the four-part test for *de facto* control requires the exporter to satisfy all four elements to demonstrate independence, Commerce was entitled to stop there: 'Because Plaintiffs failed to satisfy one de facto criterion, Commerce had no further obligation to continue with the analysis.'" *I.D.I. Int'l Dev. and Inv. Corp. v. United States*, Court No. 20-00107, Slip Op. 21-82, 2021 WL 3082807, at *6 (Ct. Int'l Trade July 6, 2021) (quoting *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1321 (Ct. Int'l Trade 2018) (cleaned up)).  It is not contrary to law when Commerce "declin{es} to consider evidence pertaining to the remaining elements that were unnecessary to address." *Id.*

Commerce further explained that, although there is no evidence of government owners directly exercising control over export activities, under the presumption of government control and Commerce's separate rate test, it considers "the *de facto* criteria as indicative of whether the government controls or has the potential to control, export functions."  Remand Results at 19. Therefore, Commerce's "finding that GTC does not have autonomy in the selection of management allows for the reasonable inference, considering the presumption of government control in {non-market economy} country proceedings, that their respective government shareholders maintain the potential to control the export operations of GTC and its wholly owned subsidiary, GTCIE, because the management of a firm controls its operations—including its export functions." *Id.*

Moreover, Commerce is permitted to "make reasonable inferences from the record" when examining the totality of circumstances in determining whether a respondent has demonstrated *de jure* and *de facto* control over its export activities. *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1339 (Ct. Int'l Trade 2014) (citations omitted). This Court has previously held that Commerce's "determination that an exporter is *potentially* controlled by the government—in the sense that the government has the 'ability to exercise control (even without exercising it)'—suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control." *I.D.I.*, 2021 WL 3082807, at *7 (Ct. Int'l Trade July 6, 2021) (quoting *An Giang Fisheries Imp. & Exp. Joint Stock Co., v. United States*, 284 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2018)). As the Court explained, "{a} puppet master is no less in control when the strings are slack." *Id.*

Commerce's explanation is reasonable because of the nature of its separate rate test. Specifically, the *de facto* separate rate test enumerates four distinct factors that Commerce considers, and Commerce's practice is to deny a separate rate if a company fails to rebut the presumption of government control for any one of the factors. Remand Results at 14-15; *id.* at 19 ("Although Commerce considers the entirety of the record when evaluating a respondent's separate rate eligibility, Commerce frequently does not detail its evaluation of the record evidence with respect to all four factors in cases such as this."); *id.* at 21 ("This reflects Commerce's practice that it is the *respondent's burden* to satisfy all four factors to rebut the presumption of government control that applies in {non-market economy} country proceedings and, thus, further discussion of other factors is moot when a respondent is unable to satisfy any single criterion.") (emphasis in original). If it were the case that a company need only rebut the first factor—whether the export prices are set by or are subject to the approval of a government

authority—to receive a separate rate, it would render the remaining factors unnecessary. Commerce also emphasized the totality of the record evidence analyzed in reaching its conclusion, and the additional indicia of control, stating that it considered the percentage of ownership by the state-owned enterprise as the largest individual shareholder, relevant documents, meeting notes, articles of association, and voting actions suggestive of potential for control, generally, as well as information regarding the influence of the state-owned enterprise-appointed board in GTC's decisions regarding the disposition of profits. *Id.* at 20-21; *see id.* at 20 ("Commerce's discussion in the underlying investigation focused on the criterion where the proffered record information contradicted GTC's assertions that it operated autonomously with respect to the third factor and, thus, {its} finding that GTC and GTCIE were unable to rebut the presumption of government control."). Therefore, Commerce complied with the remand order by remedying the aspects of its determinations found to be unsupported by substantial evidence.

Finally, Commerce also addressed the question of majority or minority government ownership and how this factors into an applicant's failure to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria. *See id.* at 16. As Commerce explained, its framework for analyzing *de facto* government control, and the cases establishing that a respondent must rebut the presumption of government control for all factors, do not rely on any threshold percentage of government ownership. *Id.* That is, Commerce explained that the level of government ownership "entered into Commerce's overall separate rate analysis following the determination in the *Advanced Tech{nology}* litigation, where the Court held that majority ownership by a government entity, either directly or indirectly, rules out a respondent's ability to demonstrate an absence of *de facto* control." *Id.* at 16-17; *see also Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 121 F. Supp. 3d 1263,

1267 (Ct. Int'l Trade 2015) ("This revised practice, which was sustained by this Court and subsequently affirmed by the Court of Appeals, holds that 'where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter or producer,' such majority ownership holding 'in and of itself' precludes a finding of *de facto* autonomy."). Commerce further explained that, in various other cases involving non-majority government-owned respondents, Commerce has "denied a separate rate based on the respondent's inability to rebut the presumption of government control with respect to only one factor of the *de facto* criteria." Remand Results at 17 (citing *53-Foot Domestic Dry Containers from the People's Republic of China*, 80 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) (final determ.), and accompanying IDM at Comment 10; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) (final results), and accompanying IDM at Comment 6)).

And here, with respect to whether Commerce's finding extended to export activities during the period of investigation, Commerce clarified that it "did not find that a lack of autonomy in management selection equates to a direct finding of government control of export activities{, r}ather, Commerce found that record evidence indicating a lack of autonomy in management selection did not satisfy the third prong of the *de facto* analysis and, thus, that GTC was unable to rebut the presumption of government control." Remand Results at 18. Rather than "affirmatively establish in each instance that the government is controlling the respondent's export activities, including pricing decisions," Commerce explained that "it is the *burden of the respondent* to rebut the presumption by providing sufficient evidence to establish that it operates autonomously from the government in certain key aspects (*i.e.*, those enumerated in the *de facto* criteria)." *Id.* (emphasis in original). That is, in the instant case, Commerce determined that

"{w}hile there is no evidence that the {state-owned enterprise} owner directly exercised its control on GTC's or GTCIE's export activities, {Commerce} consider{ed} the *de facto* criteria as indicative of whether the government controls, or has the potential to control, export functions." *Id.* at 19.  And after examining the totality of evidence, Commerce explained that "{a}lthough GTCIE reported that its export prices are not set by, subject to the approval of, or in any way controlled by a government entity at any level, because failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption of government control," Commerce's findings "related to the first factor do not otherwise overcome {its} findings that Guizhou Tyre failed to establish autonomy from government control in making decisions regarding the selection of management, which are corroborated by the totality of evidence indicative of potential for control." *Id.* at 22; *see also id.* at 23 ("It is for precisely this reason that Commerce evaluates the four factors, as well as any other information on the record that supports sustaining the presumption of government control and may determine that failure to establish independence from the government in any one such factor is sufficient to demonstrate failure to rebut the presumption of control.").

Thus, Commerce's determination that GTCIE was not eligible for a separate rate is supported by substantial evidence and is in accordance with law.  *Id.*

### B.   Guizhou Tyre's Arguments Are Unavailing

In its opposition, Guizhou Tyre objects to Commerce's findings regarding:  (1) the presumption of government control in minority ownership situations; (2) autonomy in the selection of management; and (3) the separate rate analysis applied by Commerce.  *See* Guizhou Tyre Cmts.  As we explain below, Guizhou Tyre's comments lack merit.

    **1.**     **Substantial Evidence Supports Commerce's Determination That, Despite Minority Ownership, GTCIE Failed To Rebut The Presumption Of Government Control**

Guizhou Tyre argues that precedent involving majority government ownership is inapposite.  Specifically, Guizhou Tyre argues that in minority ownership situations, Commerce cannot rely on a company's failure to rebut only one factor of the *de facto* analysis, emphasizing a statement in the Court's opinion, in which it quotes Guizhou Tyre's argument that Commerce is "required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria."  Guizhou Tyre Cmts. at 6.  Guizhou Tyre's arguments with respect to the presumption of government control fail for several reasons.

First, Guizhou Tyre's characterization of Commerce's separate rate evaluation ignores that Commerce considered all the *de facto* separate rate factors, in compliance with the remand order.  Although Commerce, after it analyzed all the factors, continued to deny separate rate eligibility based on the third and fourth factors, this does not mean that Commerce failed to conduct a full evaluation, consistent with its separate rate practice.  *See* Remand Results at 20-21.  Guizhou Tyre's assertions would amount to a separate rate test whereby a respondent need only rebut one separate rate factor to be granted a separate rate, because Commerce would not be able to find government control for each factor.  Because Commerce's separate rate test requires companies to rebut the presumption of government control for *each* factor, Guizhou Tyre has it backwards.

Relatedly, Guizhou Tyre argues that Commerce ignored that "minority-owned {state-owned enterprise} respondents can only be denied separate rates after considering all factors."  Guizhou Tyre Cmts. at 7.  Guizhou Tyre acknowledges, however, that majority government-owned companies "cannot demonstrate that they operate autonomously from the government,"

*id.*, unless, as Commerce explained, such companies successfully rebut the presumption of control. Remand Results at 43 ("Thus, majority ownership by a government entity is a consideration only in the sense that such level of ownership establishes that a government entity controls, or has the potential to control, a respondent's operations, including export activities, and given that control or potential for control, a respondent cannot demonstrate that it operates autonomously from the government under the four factors, unless it successfully rebuts the presumption of control."). Here, Commerce examined the evidence for all the factors and found that Guizhou Tyre failed to rebut the presumption for the third and fourth factors. Commerce explained that its "analysis with respect to the third and fourth *de facto* factors and additional indicia establishing the potential to control is sufficient to sustain the denial of the separate rates for GTCIE in the instant case." *Id.* at 47.

Guizhou Tyre further asserts that, upon providing the "'minimum quantum of evidence' creating 'genuine dispute' as to whether it was state-controlled during the {period of investigation}, the presumption vanished and Commerce became obligated to affirmatively establish such control by the Chinese government." Guizhou Tyre Cmts. at 11-12. This argument flips Commerce's separate rate test on its head. Guizhou Tyre suggests that rebutting any of the factors of Commerce's *de facto* separate rate test amounts to providing the "minimum quantum of evidence" sufficient to place the burden on Commerce. *Id.* This is inconsistent with Commerce's presumption of government control, which places the burden on the respondent to rebut the presumption, and is inconsistent with binding Federal Circuit precedent. *See, e.g.*, *Sigma Corp.*, 117 F.3d at 1405 ("it {is} within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy country, and to place the burden on the exporters to demonstrate an absence of central government control"); *Diamond Sawblades,* 886

F.3d at 1311 ("we consistently have sustained Commerce's application of a rebuttable presumption of government control to exporters and producers in {nonmarket economy} countries, such as {China}"). The standard Guizhou Tyre suggests would require Commerce to affirmatively establish Chinese government control in most cases, rendering Commerce's presumption of government control irrelevant.

Moreover, Guizhou Tyre does not elaborate on what would amount to evidence that "affirmatively establish{es}" state control. Guizhou Tyre Cmts. at 11-12. As Commerce explained, such a standard would require it to find a "smoking gun," because, "{e}ven in a hypothetical situation where government involvement in price-setting is direct and unambiguous, actual affirmative documentation of such activity is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited." Remand Results at 23. To also "require that Commerce identify record evidence that the Chinese government actually engaged in export price-setting before denying a separate rate would impose an unreasonable threshold on the *de facto* analysis and potentially result in companies improperly receiving a separate rate even when the Chinese government retains the potential to control export functions." *Id.* at 46. In other words, "{u}nder such a standard, Commerce would need to rely on direct evidence unambiguously demonstrating government involvement in price-setting as the pre-eminent consideration in whether the presumption remains," which would "result in granting a separate rate in situations, for example, where the government maintains direct and unambiguous control over a firms' export activities, and that control is exerted and even reflected in an extant agreement document, but not apparent in sales documentation and correspondence kept in the normal course of business (*i.e.*, the documentation Commerce requests that respondents provide with respect to this prong of the

analysis).” *Id.*  Commerce uses its separate rate test to evaluate autonomy from government control to address exactly these issues. *Id.* at 46-47; *see also id.* at 47 (“Commerce’s concerns are legitimate because Commerce is limited in the type of information it can reasonably obtain from respondents and that information may not explicitly demonstrate that the government actually controlled export functions or pricing.”).

Guizhou Tyre relatedly argues that this Court required evidence of government price-setting, and that Commerce misconstrued this Court’s findings, which were focused on the “overarching purpose of the separate rate analysis.”  Guizhou Tyre Cmts. at 15-19.  However, it is apparent that Guizhou Tyre misconstrued the remand order, wherein the Court stated that it could not conclude that the government of China exercised control of export functions or, specifically, the prices at which subject merchandise exported by GTCIE was sold during the period of investigation. *See Guizhou Tyre*, 557 F. Supp. 3d at 1320 (stating that because “the pricing decisions were already made by the time Commerce made its separate rate decision for GTCIE, a vague presumption that the government had the potential to control GTCIE’s export activities and prices during the investigation is unconvincing…”).

To address this issue, Commerce explained that it did not have evidence to contradict Guizhou Tyre’s claims regarding the first factor.  Remand Results at 21.  That is, “the record evidence provided by GTC demonstrated that sales manager(s) set export prices for GTCIE, and there was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor).” *Id.*  As explained above, however, a standard requiring direct evidence of government price-setting would defeat the purpose of the *de facto* separate rate test.  For this reason, Commerce explained that it is the *de facto* separate rate test—and the four factors enumerated therein—that “together, relate to the determination of whether a

respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm." *Id.* at 22.

Moreover, Commerce has established the basis for its finding of government control over export functions, stating that the finding of lack of autonomy in the selection of management means that "their respective government shareholders maintain the potential to control the export operations of GTC and its wholly owned subsidiary, GTCIE, because the management of a firm controls its operations—including its export functions." *Id.* at 19. Indeed, Commerce explained that it found "it inappropriate to presume like Guizhou Tyre does, that Commerce may not rely on such information in finding that GTCIE has not rebutted the presumption of government control" when Commerce's analysis of the third and fourth factors, as well as "additional indicia establishing the potential to control is sufficient to sustain the denial of the separate rates for GTCIE in the instant case." *Id.* at 47-48. Therefore, Guizhou Tyre's arguments that Commerce failed to comply with the remand order are meritless.

> **2.      Substantial Evidence Supports Commerce's Determination That GTCIE Failed To Rebut The Presumption Of Government Control Regarding Autonomy In The Selection Of Management**

Commerce reconsidered and further explained GTCIE's separate rate status in light of the record evidence as a whole, and provided a reasonable analysis supported by substantial evidence, finding that GTCIE failed to rebut the presumption of government control over the selection of management. *See* Remand Results at 10-24. Specifically, Commerce examined the record evidence that a state-owned enterprise, GIIG, owns 25.20 percent of GTC and is its largest shareholder, *i.e.*, GIIG is the only shareholder to own more than one percent of GTC's voting shares. *Id.* at 10. GTC correspondingly owns 100 percent of GTCIE. *Id.* at 6. Thus, Commerce found that GIIG is wholly owned and supervised by Guiyang SASAC, which gives it

the ability to control the selection of GTC's management and its distribution of profits and to exert influence over GTC and GTCIE. *Id.* at 6, 10-11.

Moreover, Commerce determined that shareholders' safeguards in GTC's articles of association and Chinese law during the period of investigation were ineffective at preventing influence by GIIG. *Id.* at 10-11.   With respect to GTC's specific articles of association, the only shareholders who can nominate "non-independent" directors are those with 10 percent or more of voting shares held individually or jointly. *Id.* at 11-12.  GTC's articles of association also allow shareholders, individually or jointly holding at least 10 percent of the shares of the company, to convene interim shareholders' meetings. *Id.*  Commerce determined that GIIG was the only individual shareholder to hold more than 10 percent, or even more than one percent, of voting shares. *Id.* at 12.  Commerce also considered that GTC's articles of association allow shareholders the ability to supervise GTC's operations, put forward suggestions, and raise inquiries. *Id.*

Commerce acknowledged that certain articles of association ostensibly placed safeguards against undue influence by large shareholders in the selection of senior management, but ultimately found that the board of directors appoints the general manager and four deputy general managers and that GIIG controls the board selection process. *Id.* at 12-13.  Commerce explained that the record demonstrates that the safeguards were unsuccessful because GIIG was ultimately able to dominate GTC's decision-making process and appoint its preferred members to GTC's board. *Id.*  This is apparent from the fact that [████████████████████████████████ ████████████████████████████████], and that in the July 2015 shareholders' meeting, [████████████████████████████████████ ████████████████████████████████]. *Id.*  Therefore,

Commerce concluded that GTC and GTCIE do not have autonomy in the selection of management.  *Id.*

Similarly, because the board of directors puts forward an annual profit distribution proposal, Commerce concluded that GIIG could also ultimately control profit distributions through its influence on the board selection process.  *Id.*  Commerce also reexamined the relationship between GTC's chairman and GIIG, finding that [███████████████████ ███████████████████████████████] *Id.*

Guizhou Tyre argues that the 2012 board meeting at which GTC's board was elected, does not evidence government control, despite being the same board during the period of review.  *See* Guizhou Tyre Cmts. at 23-25.  However, as Commerce explained, Guizhou Tyre's argument that GIIG did not have any involvement at the nomination stage of board election does not undermine Commerce's finding that "GIIG was the dominant voter at the meeting electing the board in place during the {period of investigation}."  Remand Results at 57.  Commerce explained that, under Article 83 of GTC's articles of association, the only shareholders who can nominate directors are those with ten percent or more of shares held individually or jointly.  Guizhou Tyre's argument assumes that Commerce inferred that GIIG was itself involved as a shareholder in nominating directors; to the contrary, Commerce specifically clarified that the board members elected at the December 2012 meeting [███████████████████ ███████████████████████████████████████████████████ ██].  *Id.* at 51.  Thus, Commerce considered that the "board members [████████████] and that [█████████████████████████]."  *Id.*

Nevertheless, Commerce emphasized that, once nominated, the candidates were elected by shareholder vote, "with [███████████████████████████████]".

*Id.*  Again, Guizhou Tyre's argument ignores that Commerce based its finding on the fact that the board [███████████] and was then elected at a meeting where GIIG comprised [███████ ███████████].  *Id.*  In other words, Guizhou Tyre's focus on nomination, rather than the full process of board election, ignores that [███████████████████████████████ ███████████] at the meeting electing the nominated candidates.  *Id.*

Relatedly, Guizhou Tyre's argument that the 2012 meeting complied with all legal requirements, including protections against domination by any one shareholder, also lacks merit. Guizhou Tyre Cmts. at 24-25.  Commerce did not find that GTC acted illegally or contrary to its articles of association.  Instead, Commerce found that "GIIG effectively selected GTC's board." Remand Results at 52.  And, as Commerce explained, "{s}uch a finding need not be inconsistent with relevant Chinese law to demonstrate a lack of independence from the Chinese government." *Id.*

Guizhou Tyre argues that Commerce's reliance on the 2012 meeting "presumes perpetual government control over GTCIE by virtue of a vote by GIIG years before the {period of investigation}."  Guizhou Tyre Cmts. at 25.  "To follow Guizhou Tyre's logic, however, would leave Commerce unable to consider government involvement in selecting a board if that involvement pre-dated the period of investigation at issue, even if the board remains the same during the period at issue, as it did here."  Remand Results at 52.  Commerce explained that "{s}uch a result would curtail {its} ability to consider the level of government control in a company—even significant government involvement in the selection of a company's board could not be considered as long as that involvement took place before the period of investigation or review."  *Id.* at 52-53.  And here, the election that took place before the period of investigation is relevant to Commerce's analysis because it relates to the level of government involvement in

the selection of the board members that remained in place during the current period of investigation.  *See id.*  Commerce, therefore, appropriately considered the level of government involvement in the selection of that board.

Next, Guizhou Tyre argues that it is disingenuous for Commerce to deny GTCIE a separate rate in this investigation based on a December 2012 meeting when Commerce granted GTC a separate rate in 2015 in another case.  Guizhou Tyre Cmts. at 25 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015)).  Contrary to Guizhou Tyre's argument that this is a "new" separate rate test, Commerce explained that while GTC may have been eligible for a separate rate during an earlier period in another proceeding, that is not dispositive here.  Remand Results at 53.  Guizhou Tyre's argument also overlooks that Commerce subsequently found GTC is not eligible for a separate rate based on a factual situation that is very similar to this investigation. *Id.* (citing C*ertain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 18,733 (Dep't of Commerce Apr. 21, 2017)[4]).

Moreover, Guizhou Tyre's arguments ignore the evolution of Commerce's separate rate analysis.  Commerce explained that, following litigation in this Court and the Court of Appeals for the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios."  *Id*. at 60 (emphasis in original).  Thus, Commerce's differing conclusions in another administrative proceeding in 2015 and the underlying investigation here are not unexplained, and instead, reflect the reasonable

---

[4] Commerce's separate rate determination in this case is also in litigation before this Court.  *See Guizhou Tyre Co., Ltd. v. United States*, Consol. Court No. 17-100.

evolution of Commerce's analysis in response to court decisions. *Id*. Rather than reflect a "new" separate rate methodology, Commerce was consistent in its separate rate methodology here. *See id.* at 53; *see also I.D.I.*, 2021 WL 3082807, at *6 ("That the *Rongxin III* court took this additional work upon itself hardly obligated Commerce here to review evidence pertaining to the remaining elements that were no longer material after the Department concluded that IDI failed to establish the third element . . . To require Commerce to needlessly address evidence that is no longer material to the task at hand would be at best nonsensical. 'The law does not require a vain and useless thing . . . .' *McMicking v. Schields*, 238 U.S. 99, 103 (1915).").

Guizhou Tyre's arguments regarding GTC's 2015 meetings similarly do not undermine Commerce's analysis. *See* Guizhou Tyre Cmts. at 25-27. Although Guizhou Tyre focuses on the fact that certain GIIG proposals were rejected at a May 2015 meeting, Commerce explained that, "even though GIIG's proposals initially failed, GIIG was able to convene an interim shareholder meeting only two months later where, representing the vast majority of votes present, GIIG passed the very proposals that failed previously." Remand Results at 54. Moreover, while Commerce recognized that GIIG "was only able to enact its preferred proposals through the normal courses available to all shareholders," and that "GIIG did not violate the law or GTC's articles of association, no other shareholder has the requisite shares to individually call an interim meeting—only GIIG." *Id.* at 54-55. Accordingly, although Guizhou Tyre argues that there is no instance of control by GIIG, "Commerce concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management." *Id.* at 55.

And although Guizhou Tyre argues that GIIG garnered sufficient votes through normal corporate procedures in a subsequent meeting, such that GIIG did not control the voting process, Guizhou Tyre Cmts. at 25-27, Commerce explained that GIIG prevailed at the subsequent meeting because it [████████████████████████████], not because other shareholders who previously opposed GIIG's proposals changed their positions.  Remand Results at 55.  Relatedly, while Commerce had stated in the final results that GIIG had a "sole ability to convene meetings," Commerce clarified in the remand results that it had "accurately concluded that GIIG's status as the only individual shareholder with enough shares to convene interim meetings provided additional evidence of the potential for GIIG to control GTC's board." *Id.* at 55-56.  Instead, Commerce accurately concluded that GIIG's status as the *only* individual shareholder with enough shares to convene interim meetings provided additional evidence of the potential for GIIG to control GTC's board.  *Id.*

III.   **Commerce's Determination That Double Coin Is Ineligible For A Separate Rate Complies With The Remand Order**

Commerce's determination that Double Coin is ineligible for a separate rate complies with the remand order and is supported by substantial evidence.  First, in response to the Court's comments that it was unclear whether Commerce's separate rate analysis was focused on Double Coin's *export* activities, as opposed to control of the selection of board members and management, *Guizhou Tyre*, 557 F. Supp. 3d at 1324-26, in the remand results, Commerce clarified that it did not find that a lack of autonomy in management selection equates to a direct finding of government control of export activities.  Remand Results at 25-26.  Rather, Commerce found that evidence indicating a lack of autonomy in management selection did not satisfy the third prong of the *de facto* analysis, and thus, that Double Coin was unable to rebut the presumption of government control.  *Id.*

Commerce explained that in evaluating the *de facto* factors, it previously has found that where a government entity holds a majority ownership share in the respondent, either directly or indirectly, the majority ownership in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations.  *Id.*  Commerce acknowledged that in majority government ownership situations, it may be uncommon for a company to demonstrate that it has autonomy from government control, such that it would be able to rebut the presumption of control.  *Id.* at 30-31.  In finding that majority ownership means that the government potentially exercises control over a company's operations, Commerce determined that this, in turn, includes control over the selection of management, which is a key factor in determining whether a company has sufficient independence in its export activities.  *Id.* at 25-26.

In this case, the record demonstrates that Double Coin was 72.15 percent owned by Shanghai Huayi, which is 100 percent owned by Shanghai SASAC.  *Id.* at 26.  Commerce explained that as the majority shareholder, Shanghai Huayi has "rights to elect directors at the shareholders' general meetings," that the board appoints Double Coin's "general manager, and the general manager appoints other managers, including deputy general managers".  *Id.*  In fact, three out of four directors are general managers and deputy general managers.  *Id.*  Thus, Commerce found that Shanghai SASAC "controls, or has the potential to control, Double Coin's selection of management and its company operations, including export activities and functions, and that Double Coin has not rebutted the presumption of government control."  *Id.*

Double Coin argues, however, that the remand results fail to provide a compelling basis for linking potential influence over the selection of management to actual control of export activities.  *See* Double Coin Cmts. at 7-10.  However, as discussed above, Commerce clarified that it did not find that a lack of autonomy in management selection equates to a *direct* finding of

government control of export activities.  *See* Remand Results at 25-26.  Instead, Commerce

found that record evidence indicating a lack of autonomy in management selection did not satisfy

the third prong of the *de facto* analysis.  *Id.*  As Commerce explained, because Shanghai Huayi

controls, or has the potential to control, Double Coin's selection of management and its company

operations, which includes export activities and functions, Double Coin failed to rebut the

presumption of government control.  *Id.*

Double Coin also argues that the potential for control cannot substitute for an analysis of

the presence or absence of actual control.  *See* Double Coin Cmts. at 10.  However, under

Commerce's presumption of government control, which has been repeatedly affirmed by the

courts, Commerce does not affirmatively establish in each instance that the government controls

the respondent's export activities and pricing decisions.  *See, e.g.*, Remand Results at 18 (citing

*China Manufacturers Alliance, LLC*, 1 F.4th at 1030).  Rather, it is the respondent's burden to

rebut the presumption by providing sufficient evidence to establish that it operates autonomously

from the government with respect to the *de facto* criteria.  *Id.*  As this Court has stated, "{w}here

a majority shareholder has potential control that control is, for all intents and purposes, actual

control.  In such a situation actual control is inherent in the fact that the majority shareholder can

typically control the operations of a company without actually removing directors or

management since it is clear that directors or management could be removed."  *An Giang*, 284 F.

Supp. 3d at 1359 (citations omitted).

Next, consistent with the remand order, Commerce reconsidered certain information on

the record suggesting there are restrictions on the authority of controlling shareholders.  *See*

*Guizhou Tyre*, 557 F. Supp. 3d at 1325.  In the remand results, Commerce reviewed the

information on the record and expanded on its separate rate analysis.  For example, Commerce

found that the record does not support a finding that the China Code of Corporate Governance prevents the Chinese government or its subsidiaries from controlling a company. Remand Results at 27. Similar to its finding that the China Code of Corporate Governance did not prevent GIIG from exerting control over GTC, Commerce also determined there was no reason to find that Shanghai Huayi, Double Coin's majority shareholder, cannot exert control over Double Coin. *Id.* Commerce also explained that the Company Law of China indicates that the government has the ability to control the business activities of a company when the government is a controlling shareholder – the precise situation here where Shanghai Huayi is the controlling shareholder of Double Coin. *Id.* at 27-28.

In addition, Commerce found that the record does not support a finding that Double Coin's articles of association prevented Shanghai Huayi from controlling Double Coin. *Id.* at 28-29. Again, Commerce found that Double Coin's articles of association are very similar to GTC's articles of association and "appear to be standard rules applicable to any company." *Id.* at 28. Similar to GTC, Commerce explained that there is "no reason to conclude" that the articles of association "would prevent Shanghai Huayi, as a majority shareholder, from controlling Double Coin when they do not prevent GIIG from controlling GTC and GTCIE" in a minority shareholder situation. *Id.*

Further, Double Coin argues that Commerce fails to account for "affirmative evidence" it submitted, which it argues demonstrates that the Company Law of China, China Code of Corporate Governance, and Double Coin's articles of association were effective. *See* Double Coin Cmts. at 13-14. However, Commerce directly addressed the affidavit of Sun Yong, the "affirmative evidence" Double Coin cites. *See* Remand Results at 66. Commerce found unavailing Mr. Yong's statement that "Double Coin must adhere to the relevant laws,

regulations, and articles of association," because, as Commerce explained, Commerce did not

determine that Double Coin's managers violated those laws, regulations or articles of

association.  *Id.*  Rather, its determination was that "Double Coin does not have autonomy from

the government in making decisions regarding the selection of management because Shanghai

Huayi has rights to elect directors at the shareholders' general meetings in accordance with the

number of shares it owns, *i.e.*, 72.15 percent, and the directors in turn appoint Double Coin's

managers."  *Id.*; *see, e.g.*, *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.

Supp. 3d 1308, 1319 (Ct. Int'l Trade 2018) ("None of these provisions, however, constrain Juhua

Group's ability to elect Zhejiang Juhua's directors in accordance with its majority

shareholding.").

Commerce also elaborated on its analysis of price negotiations that Double Coin's U.S.

subsidiary, CMA, conducts with unaffiliated U.S. customers.  Remand Results at 29-30.  The

record demonstrates that Double Coin owned [ ███ ] percent of CMA, who negotiated [ ██ ]

percent of Double Coin's U.S. sales.  *Id.* at 29.  As discussed above, Commerce found that

Shanghai Huayi, by virtue of being the majority shareholder, can effectively appoint Double

Coin's directors and managers, who control the operations and export activities of Double Coin.

*Id.*  As Commerce explained, it presumes that "Double Coin's managers are 'beholden to the

board that controls their pay, in particular to the chairman of the board as the *de facto* company

head under the {Chinese} model,' until proven otherwise."  *Id.* (citing IDM at 24).

Similarly, Commerce found that Double Coin, in turn, can effectively appoint CMA's

directors and managers, who control the operations and export activities of CMA, by virtue of

being the majority shareholder of CMA.  *See id.* at 29.  It is reasonable for Commerce to

similarly presume that CMA's managers are beholden to the directors appointed by Double Coin

given its [█████] percent ownership of CMA.  *Id.*  Thus, even if CMA negotiates prices with

unaffiliated U.S. customers, Commerce reasonably found that this does not rebut the

presumption of government control.

Nonetheless, Double Coin argues that the rules governing Double Coin's corporate

activities protected it and CMA from interference from Shanghai Huayi.  Double Coin Cmts. at

11-14.  It also argues that Commerce ignores evidence demonstrating that CMA negotiated

export prices independently, and according to Double Coin, conducted export activities free of

government control.  *Id.* at 14-16.  As discussed above, however, Commerce analyzed the

evidence on the record, including Chinese law, Double Coin's articles of association, and

Mr. Yong's affidavit, and found that Shanghai Huayi, as a majority owner of Double Coin,

controls, or has the potential to control, Double Coin's selection of management and company

operations, including export activities and functions.  Remand Results at 26.  Similar to its

finding with regard to GTCIE in a minority ownership situation, Commerce reasonably

determined that there was no reason to conclude that Shanghai Huayi, as a *majority* owner,

would be prevented from controlling Double Coin.  *Id.* at 26-30; *see also id.* at 66.

Regarding CMA's ability to negotiate export prices, Commerce determined that Shanghai

Huayi can effectively appoint Double Coin's directors and managers, and that Double Coin, as a

majority shareholder of CMA, can effectively appoint CMA's directors and managers, who

control the operations, including export activities of CMA.  *Id.* at 66-67.  While Double Coin

claims that CMA conducts independent price negotiations with U.S. customers, Commerce

observed that Double Coin also reported that CMA utilized established price lists for all its sales

of subject merchandise.  *Id.* at 67.  Commerce reasonably found that the price lists were

presumably "approved, if not generated, by CMA's managers," who "are presumably beholden

to the directors appointed by Double Coin, who are similarly beholden to Shanghai Huayi." *Id.*

Given that Double Coin owned [███] percent of CMA, Commerce reasonably considered that

Double Coin is "legally {} in a position to exercise restraint or direction over" CMA and found

that Double Coin's evidence does not demonstrate otherwise. *Id.* Commerce is permitted to

"make reasonable inferences from the record" and did so here. *See Jiangsu Jiasheng*, 28 F.

Supp. 3d at 1339.

Finally, Commerce addressed the Court's statements that it found it unclear "whether

government control of selection of board and management is either a rebuttable or irrebuttable

presumption of government control over export activities" and, if irrebuttable, the basis for

adoption of such a rule or policy. *Guizhou Tyre*, 557 F. Supp. 3d at 1326; *see also* Double Coin

Cmts. at 3-6 (arguing that Commerce is applying an irrebuttable presumption of government

control). In the remand results, Commerce further explained its presumption of government

control and clarified that it is a *rebuttable* presumption. *See* Remand Results at 8-10, 30-31, 64-

65. Specifically, Commerce discussed that it is well established that the burden is on the

respondent, not on Commerce, to demonstrate that the respondent is free of government control.

*Id.* Commerce explained that instances where a non-market economy respondent that is

majority-owned by the foreign government will be able to demonstrate that it has autonomy from

government control may be uncommon; however, this does not mean that the presumption of

government control is irrebuttable. *Id.* at 64-65 (explaining that there is no "bright line test for

which there is no evidentiary escape" for majority ownership because while Commerce

acknowledges that it "would expect such instances to be rare, if a respondent were to show that

the SASAC entity could not make decisions regarding the selection of management of the

respondent despite owning a majority share of the respondent, then the respondent may satisfy

the third factor and, assuming it satisfied all of the other *de facto* and all of the *de jure* factors, it would be eligible for a separate rate.").

Indeed, this Court has on numerous occasions recognized that Commerce's presumption of government control is rebuttable.  In *Yantai CMC Bearing*, the Court held, "{t}hat particular facts (majority ownership) may be sufficient to support an agency determination of control . . . does not alter the test into an irrebuttable presumption; instead, it means that, on the basis of these facts, {the respondent} failed to rebut the presumption."  *Yantai CMC Bearing*, 203 F. Supp. 3d at 1325-26.  In *Zhejiang Quzhou*, the Court disagreed with arguments that Commerce converted "the presumption into an irrebuttable finding of government control," noting that "{t}he presence of direct or indirect majority ownership may require exporters to *surmount a high bar* to demonstrate the absence of *de facto* control, *but it does not necessarily preclude exporters from obtaining a separate rate*."  *Zhejiang Quzhou*, 350 F. Supp. 3d at 1323 (emphasis added).  Similarly, in *ZMC*, the Court rejected the respondent's argument that Commerce's remand results attempted to transform its presumption of government control into an irrebuttable presumption that could never be overcome.  *Zhejiang Machinery Imp. & Exp. Corp. v. United States*, 521 F. Supp. 3d 1345, 1352 (Ct. Int'l Trade 2021) (*ZMC*), *appeal docketed* No. 21-2257 (Fed. Cir. Aug. 27, 2021).  The Court recognized that "ZMC's arguments *erroneously reverse the burden* of rebutting the presumption of government control by arguing that Commerce needed to have shown more direct evidence of actual control above the evidence relied upon."  *Id.* at 1352 (emphasis added).

Here, Commerce acknowledged that it might be rare for a majority government owned company to be able to demonstrate absence of *de facto* control.  Remand Results at 64-65. However, Commerce explained that "if a respondent were to show that the SASAC entity could

not make decisions regarding the selection of management of the respondent despite owning a majority share of the respondent, then the respondent may satisfy the third factor and, assuming it satisfied all of the other *de facto* and all of the *de jure* factors, it would be eligible for a separate rate." *Id.*  Thus, contrary to Double Coin's argument, Commerce's presumption of government control is rebuttable.  Moreover, this Court has recognized that while companies may have to overcome a high bar to demonstrate absence of government control, this does not convert Commerce's presumption into an irrebuttable presumption.

Therefore, Commerce's determination that Double Coin failed to establish its eligibility for a separate rate is supported by substantial evidence and in accordance with law.

## IV.   Commerce's Comments Regarding The Premature Issuance Of The Antidumping Duty Order

In the remand order, the Court held that Commerce prematurely issued the order on February 15, 2019, following the ITC's notification of its affirmative remand redetermination, but before this Court sustained the ITC's remand redetermination.  *Guizhou Tyre*, 557 F. Supp. 3d at 1307-16.  The Court held that Commerce instead, should have taken steps to publish the order after the Court sustained the ITC's affirmative remand on February 18, 2020, and estimated that the earliest date Commerce could have published an order in the Federal Register was February 21, 2020.  *Id.* at 1316.  The Court invited Commerce to comment on the Court's selection of February 21, 2020, as the earliest possible date the order could have been entered, as well as its stated intention of ordering Commerce to direct CBP to liquidate entries made prior to February 21, 2020, without regard to antidumping duties and to refund all cash deposits collected on those entries, with interest as provided by law, when it enters a judgment to conclude this judicial proceeding.  *Id.*

In the remand results, Commerce stated that "{s}hould the Court proceed with its intended remedy and it is necessary to identify the earliest date that Commerce hypothetically could have published the {antidumping duty order} following the {Court's} February 18, 2020 decision sustaining the ITC's affirmative redetermination, Commerce believes the Court's choice of February 21, 2020, is reasonable." Remand Results at 4, 32. Commerce also observed that the Court's intention to liquidate entries made prior to February 21, 2020, without regard to antidumping duties, and to refund all cash deposits collected on these entries, will necessarily only apply to entries of subject merchandise exported by GTCIE. *Id.* at 5. This is because the reviews covering the period from the date of the antidumping duty order through February 21, 2020, have both been rescinded, and only GTCIE's entries during this period are enjoined from liquidation and remain unliquidated. *Id.* Thus, Commerce indicated that should the Court order Commerce to direct CBP to liquidate entries prior to February 21, 2020, without regard to antidumping duties, Commerce intends to do so for GTCIE's entries that remain suspended pursuant to statutory injunction upon a final and conclusive decision. *Id.* Finally, Commerce also stated that, based on the Court's holding that Commerce's issuance of the antidumping duty order was premature, Commerce understands the Court's intention to be that Commerce refund, with interest, cash deposits for merchandise that entered between February 15, 2019, and February 21, 2020. *Id.* at 5-6, 32-33. We note that Guizhou Tyre concurs with Commerce's position. *See* Guizhou Tyre Cmts. at 31.

## **CONCLUSION**

For the above reasons, we respectfully request that the Court sustain Commerce's remand results and enter final judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                        /s/ Kara M. Westercamp
ELIO GONZALEZ                      KARA M. WESTERCAMP
Senior Attorney                    Trial Attorney
Office of the Chief Counsel        U.S. Department of Justice
    For Trade Enforcement and Compliance    Civil Division
U.S. Department of Commerce        Commercial Litigation Branch
Washington, D.C. 20230             P.O. Box 480
                                   Ben Franklin Station
                                   Washington, D.C. 20044
                                   Tel:  (202) 305-7571
                                   Fax:  (202) 514-8640
                                   Email:  kara.m.westercamp@usdoj.gov

June 14, 2022                      Attorneys for Defendant

BEFORE:  **THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| GUIZHOU TYRE CO. LTD. and GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., )<br><br>Plaintiffs, )<br><br>CHINA MANUFACTURERS ALLIANCE LLC, AND SHANGHAI HUAYI GROUP CORPORATION LIMITED, )<br><br>Consolidated Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant. ) | Consol. Court No. 19-00031 |

GUIZHOU TYRE CO. LTD. and GUIZHOU
TYRE IMPORT AND EXPORT CO., LTD.,           )

              Plaintiffs,                )

CHINA MANUFACTURERS ALLIANCE
LLC, AND SHANGHAI HUAYI GROUP              )     Consol. Court No. 19-00031
CORPORATION LIMITED,

        Consolidated Plaintiffs,     )

     v.                           )

UNITED STATES,                                )

           Defendant.               )

## ORDER

    Upon consideration of plaintiffs' and consolidated-plaintiffs' comments regarding the

United States Department of Commerce's (Commerce) remand redetermination, defendant's

response thereto, and all other pertinent papers, it is hereby

    ORDERED that Commerce's remand results are sustained.


Dated: _____          _____

      New York, New York                              Judge

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief contains 11,956 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>

KARA M. WESTERCAMP

Trial Attorney

Department of Justice

Civil Division