Slip Op. No. 23-81

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.**, et al., | |
| Plaintiffs, | **Before: Timothy C. Stanceu, Judge** |
| v. | **Consol. Court No. 19-00031** |
| **UNITED STATES,** | |
| Defendant. | |

## OPINION

[Sustaining a decision issued in response to court order in an action contesting final agency determination in an antidumping duty investigation of imports of certain truck and bus tires from the People's Republic of China.]

Dated: May 22, 2023

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, N.Y. and Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the briefs were *Jordan C. Kahn*, *Elaine F. Wang*, and *Brandon M. Petelin*.

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for consolidated plaintiffs Shanghai Huayi Grp. Corp. Ltd., formerly known as Double Coin Holdings Ltd., and China Manufacturers Alliance LLC.  With him on the brief were *James P. Durling*, *James C. Beaty*, and *Kimberly Reynolds*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *L. Misha Preheim*, Assistant Director.  Of counsel on the

briefs was *Elio Gonzalez*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge: In this action, plaintiffs contested a final affirmative less-than-fair-value determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in an antidumping duty investigation of certain truck and bus tires from the People's Republic of China ("China" or the "PRC") and the resulting antidumping duty order.  Before the court is the decision (the "Remand Redetermination") Commerce submitted in response to the court's opinion and order in *Guizhou Tyre Co. v. United States*, 46 CIT __, 557 F. Supp. 3d 1302 (2022) ("*Guizhou Tyre I*").  *Final Results of Redetermination Pursuant to Ct. Remand* (April 25, 2022), ECF Nos. 66-1 (Conf.), 67-1 (Public) ("*Remand Redetermination*").  The court sustains the Remand Redetermination.

## I. Background

Background on this case is presented in the court's previous opinion, *Guizhou Tyre I*, 46 CIT at __, 557 F. Supp. 3d at 1304–06, and is supplemented herein.

### A.  The Parties to this Consolidated Action

There are two groups of plaintiffs in this consolidated action.  One group ("Guizhou Tyre") consists of Guizhou Tyre Co., Ltd. ("GTC"), a Chinese producer of truck and bus tires, and its affiliated exporter, Guizhou Tyre Import and Export Co., Ltd. ("GTCIE"), a Chinese exporter of this merchandise.  Compl. ¶ 3 (Apr. 15, 2019),

ECF No. 7.  The other group of plaintiffs consists of a Chinese producer and exporter of

truck and bus tires, Shanghai Huayi Group Corporation Ltd., to which its counsel

referred by its former name, Double Coin Holdings Ltd., and its affiliated U.S. importer,

China Manufacturers Alliance LLC ("CMA").  Compl. ¶ 3 (Mar. 18, 2019), Ct. No.

19-00034, ECF No. 7.  The court refers to these two plaintiffs collectively as "Double

Coin."  Double Coin Holdings Ltd. was one of the two "mandatory" respondents in the

investigation, i.e., respondents for which Commerce intended to conduct an individual

investigation.  *Truck and Bus Tires From the People's Republic of China: Final Affirmative*

*Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 82 Fed. Reg.

8,599, 8,604 (Int'l Trade Admin. Jan. 27, 2017) (the "*Final LTFV Determination*").

Defendant is the United States.

## B.  The Antidumping Duty Investigation and the Contested Determinations

Two related agency decisions stemming from an antidumping duty investigation

are contested in this consolidated action.[1]  They are a "Final Less-Than-Fair Value

('LTFV') Determination," *Final LTFV Determination*, and the subsequently-issued

antidumping duty order ("Order"), *Truck and Bus Tires From the People's Republic of*

*China: Antidumping Duty Order*, 84 Fed. Reg. 4,436 (Int'l Trade Admin. Feb. 15, 2019) (the

---

[1] Consolidated with the lead case, *Guizhou Tyre Co., Ltd. et al. v. United States*,
Court No. 19-00031, is *China Mfrs. All. LLC et al. v. United States*, Court No. 19-00034.  *See*
Order (June 7, 2019), ECF No. 24.

"*Order*").  Incorporated by reference in the Final LTFV Determination is an "Issues and

Decision Memorandum" containing specific findings and explanatory discussion.  *Truck*

*and Bus Tires from the People's Republic of China: Issues and Decision Memorandum for the*

*Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*

(Int'l Trade Admin. Jan. 19, 2017) (P.R. Doc. 855) ("*Final I&D Mem.*").[2]

 Commerce initiated the antidumping duty investigation of certain truck and bus

tires from the PRC (the "subject merchandise") in early 2016, *Truck and Bus Tires From*

*the People's Republic of China: Initiation of Antidumping Duty Investigation*, 81 Fed. Reg.

9,434 (Int'l Trade Admin. Feb. 25, 2016), with a period of investigation ("POI") of July 1,

2015 through December 31, 2015, *id*. at 9,435.

 Commerce published a Preliminary Affirmative LTFV Determination later in

2016, *Truck and Bus Tires From the People's Republic of China: Preliminary Affirmative*

*Determinations of Sales at Less Than Fair Value and Critical Circumstances, and Postponement*

*of Final Determination*, 81 Fed. Reg. 61,186 (Int'l Trade Admin. Sept. 6, 2016), which

incorporated by reference the "Preliminary Decision Memorandum."  *Truck and Bus*

*Tires from the People's Republic of China: Decision Memorandum for the Preliminary*

---

[2] All citations to documents from the Joint Appendix (Mar. 30, 2020), ECF Nos. 55 (Conf.), 56 (Public) are to public documents and are cited as "P.R. Doc. __."  All citations to documents from the Joint Appendix to Remand Comments and Reply (June 28, 2022), ECF Nos. 76 (Conf.), 77 (Public) are cited as "P.R.R. Doc. __."

*Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, and Postponement of Final Determination* (Int'l Trade Admin. Aug. 26, 2016) (P.R. Doc. 716) (*"Prelim. Decision Mem."*).  Commerce also published an Amended Preliminary LTFV Determination.  *Truck and Bus Tires From the People's Republic of China: Amended Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 71,051 (Int'l Trade Admin. Oct. 14, 2016).

   In the Final LTFV Determination, Commerce calculated an estimated weighted average dumping margin of 22.57% for what it considered to be a nationwide entity (the "PRC-wide" or "China-wide" entity) consisting of all exporters of the subject merchandise that it determined not to have rebutted its presumption of control by the PRC government.  *Final LTFV Determination*, 82 Fed. Reg. at 8,604.  Commerce included in the China-wide entity 102 companies that did not respond to the Department's requests for information during the preliminary phase of the antidumping duty investigation, *Prelim. Decision Mem.* at 4, and ten other companies that responded but were determined by Commerce to have failed to rebut its presumption of government control, *Prelim Decision Mem.* at 16–17; *Final I&D Mem.* at 6–8.  Among the ten companies were Double Coin, *Prelim. Decision Mem.* at 16; *Final I&D Mem.* at 11–13, and GTCIE, *Prelim Decision Mem.* at 16; *Final I&D Mem.* at 24–28.

   Commerce calculated an individually determined estimated weighted average dumping margin of 9.00% for Prinx Chengshan (Shandong) Tire Co., Ltd., the other

mandatory respondent in the investigation, which Commerce considered to have

rebutted its presumption of government control and thus was a "separate rate"

respondent, i.e., a respondent entitled to receive a margin separate from the rate

assigned to the PRC-wide entity. *Final I&D Mem.* at 6–7. Commerce assigned the 9.00%

rate to the numerous other companies that Commerce also determined to have rebutted

the presumption of government control and therefore qualified for a separate rate but,

not having been individually investigated, did not receive an individually determined

margin. *Final LTFV Determination*, 82 Fed. Reg. at 8,600–04; *Final I&D Mem.* at 6–7.

## C. Proceedings Before the Court

Following the court's issuing its opinion and order in *Guizhou Tyre I*, Commerce

submitted the Remand Redetermination for the court's consideration on April 25, 2022.

Guizhou Tyre and Double Coin submitted comments on the Remand Redetermination.

Pls.' Comments on Remand Redetermination (May 25, 2022), ECF Nos. 69 (Conf.), 70

(Public) ("Guizhou Tyre's Comments"); Consol. Pls. Comments on Remand

Redetermination (May 25, 2022), ECF No. 71 ("Double Coin's Comments"). Defendant

responded to the comment submissions. Def.'s Response to Comments on Remand

Redetermination (June 14, 2022), ECF Nos. 74 (Public), 75 (Conf.) ("Def.'s Response").

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a, including an action contesting a final determination that Commerce issues to conclude an antidumping duty investigation.[3]

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)).

### B. The Court's Opinion and Order in *Guizhou Tyre I*

In *Guizhou Tyre I*, the court found merit in a claim by Guizhou Tyre that Commerce invalidly issued the Order prior to the effective date of an affirmative injury determination of the U.S. International Trade Commission ("ITC"). *Guizhou Tyre I*,

---

[3] All citations to the United States Code herein are to the 2012 edition, except where otherwise indicated.

46 CIT at __, 557 F. Supp. 3d at 1307–16.  The court concluded that the earliest date

Commerce validly could have published an antidumping duty order following a

decision of the Court of International Trade ("CIT") sustaining an affirmative remand

redetermination of the ITC was February 21, 2020.  *Id.*, 46 CIT at __, 557 F. Supp. 3d at

1315.  The court concluded, further, that "the Tariff Act requires that entries made prior

to that date not be assessed antidumping duties" and stated its intention "to order

Commerce to direct Customs [i.e., U.S. Customs and Border Protection] to liquidate

these entries without regard to antidumping duties and to refund all cash deposits

collected on these entries, with interest as provided by law."  *Id.*, 46 CIT at __, 557

F. Supp. 3d at 1315–16.  The court invited the parties to comment on the remedy the

court identified, including the date the court identified as the earliest date the Order

lawfully could have issued.  *Id.*

        In response to Guizhou Tyre's claim that Commerce should have ruled that

GTCIE was a separate rate respondent, the court concluded that Commerce invalidly

based its decision, in part, on a finding that GTC's meeting to elect board members was

not open to all shareholders.  *Id.*, 46 CIT at __, 557 F. Supp. 3d at 1318.  The court

concluded, additionally, that "the Department's reasoning is flawed, being vague and

ambiguous as to whether its inquiry is focused on government control of export

activities."  *Id.*  The court reached this same conclusion with respect to the analysis

Commerce applied to the issue of whether Commerce should have granted separate

rate status to Double Coin.  *Id.*, 46 CIT at __, 557 F. Supp. 3d at 1324–26.

　　Based on the holdings in *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028

(Fed. Cir. 2021) ("*CMA*"), the court rejected a claim by Double Coin that Commerce

lacked statutory authority to establish an estimated dumping duty rate for the PRC-

wide entity.  *Id.*, 46 CIT at __, 557 F. Supp. 3d at 1323–24.

　　Finally, the court deferred any ruling on Double Coin's claim that Commerce

impermissibly declined to conduct a verification of the factual information on which

Commerce based its decision to deny Double Coin separate rate status.  *Id.*, 46 CIT at __,

557 F. Supp. 3d at 1326–27.

### C.  The Department's Decisions in the Remand Redetermination

### 1.  The Issuance of the Antidumping Duty Order Prior to an Affirmative ITC Determination

　　In the Remand Redetermination, Commerce stated that "[s]hould the Court

proceed with its intended remedy and it is necessary to identify the earliest date that

Commerce hypothetically could have published the *Order* following the CIT's

February 18, 2020 decision sustaining the ITC's affirmative redetermination, Commerce

believes the Court's choice of February 21, 2020, is reasonable."  *Remand*

*Redetermination* at 4.  Commerce also stated that the remedy "will necessarily only apply

to entries of subject merchandise exported by GTCIE," noting that "all other entries of

subject merchandise from the date of the *Order* through February 21, 2020 have been

liquidated."[4]  *Id*. at 5.

Guizhou Tyre agrees with the court's determining that entries prior to

February 21, 2020 should be addressed in any remedy the court would order on its

claim and "requests affirmation of this aspect of the Remand so that [antidumping duty]

cash deposits collected on such entries are refunded with interest per 19 U.S.C.

§ 1677g."  Guizhou Tyre's Comments 31.  The Remand Redetermination also refers to

19 U.S.C. § 1677g in citing "section 778 of the Act" as governing the payment of interest

on overpayments of antidumping duty deposits.[5]  *Remand Redetermination* at 5.  The

provision directs that interest shall be payable on antidumping duty cash deposits

made on and after "the date of publication of a countervailing or antidumping duty

order under this subtitle."  19 U.S.C. § 1677g(a)(1).  Commerce stated, further, that

"[s]hould the Court hold that the [antidumping duty] Order was prematurely issued

and order its intended remedy when it enters a final judgment in this case, Commerce

---

[4] Double Coin did not make a claim pertaining to the timing of the issuance of the antidumping duty order and, in its comments on the Remand Redetermination, did not address any issue pertaining to Guizhou Tyre's claim or any remedy thereon.

[5] Section 778 of the Tariff Act of 1930, as amended ("Interest on Certain Overpayments and Underpayments") provides, in pertinent part, that "Interest shall be payable on overpayments and underpayments of amounts deposited on merchandise entered, or withdrawn from warehouse, for consumption on and after . . . the date of publication of a countervailing or antidumping duty order under this title . . . ." 19 U.S.C. § 1677g.

intends to publish a notice of amended order in the *Federal Register* and issue

appropriate customs instructions to [U.S. Customs and Border Protection]." *Remand*

*Redetermination* at 68.

Even though the Department's publication of the Order on February 15, 2019

occurred in the absence of an affirmative ITC determination, it nevertheless was a

publication of an antidumping duty order for purposes of the court's ordering an

adequate remedy on Guizhou Tyre's claim. Therefore, the court will order Commerce

to publish an amended antidumping duty order and to direct U.S. Customs and Border

Protection to liquidate without regard to antidumping duties, and refund all estimated

antidumping duties deposited on, entries of truck and bus tires exported by GTCIE that

were made prior to February 21, 2020 and to pay interest, pursuant to 19 U.S.C. § 1677g,

on any such antidumping duty cash deposits that were made on or after February 15,

2019 and prior to February 21, 2020.

### 2. The Department's Decision that GTCIE Did Not Rebut the Presumption of Government Control

The Remand Redetermination concluded, once again, that GTCIE was not

independent of government control with respect to its export activities and, therefore,

did not qualify for a separate rate. In response to the court's questioning the

Department's finding that GTC's board members were elected in a meeting not open to

all shareholders, Commerce stated in the Remand Redetermination that "[w]e

acknowledge that details of the May 2015 and July 2015 meetings indicate that public

notices were available to all shareholders.  However, as we explain below, other record

evidence demonstrates that GTCIE did not operate independent [*sic*] of government

control."  *Id*. at 8.

      Commerce relied on record evidence that a state-owned enterprise, the Guiyang

Industry Investment Group Co., Ltd., ("GIIG") "is GTC's single largest, and thus

controlling, shareholder with 25.20 percent ownership," *id*. at 10 (footnote omitted) and

that "GTC owned 100 percent" of GTCIE, *id*. at 6.  In addition to the latter finding,

Commerce cited record evidence (designated as confidential by Guizhou Tyre) bearing

on the issue of an operational relationship between GTC and GTCIE.  *Id.* at 23.

Commerce also found that GIIG is 100% owned by a government entity, the Guiyang

State-owned Assets Supervision and Administration Commission ("Guiyang SASAC").

*Id*. at 6.  Commerce concluded that this evidence, as well as record evidence gleaned

from GTC's Articles of Association ("AoAs"), *GTC and GTCIE Rebuttal Factual*

*Information Submission* at Ex. 4 (May 6, 2016) (P.R. Docs. 438–440), demonstrated GTC's

lack of independence from GIIG's ability to control or influence: (1) the composition of

GTC's board of directors, including the selection of the chair and vice chair; (2) the

putting forth of proposals for consideration at the company's shareholders' meetings;

(3) the calling of interim shareholders' meetings; and (4) the appointment and removal

of the company's general manager and four deputy general managers.  *Remand*

*Redetermination* at 11–13.  Commerce listed a number of provisions of GTC's AoAs that

supported its conclusion.

Commerce noted, for example, that Article 83 of the AoAs provided that "non-

independent directors are nominated by the board of directors or shareholders holding

individually or jointly more than ten percent of the company's shares" and that

"independent directors are nominated by the board of directors, board of supervisors,

or shareholders individually or jointly holding more than one percent of company

shares."  *Id*. at 11 (footnotes omitted).  Commerce also noted that "Article 117 states that

the chairperson and vice chairperson shall be elected and dismissed by the votes of

more than half of all directors."  *Id*. at 11–12 (footnote omitted).  Commerce considered

it significant that "[w]ith its 25.20 percent ownership share, GIIG is the only individual

shareholder with more than ten percent or even one percent of shares" and that

"because GIIG is the only shareholder with more than three percent of shares, GIIG is

the only shareholder with the requisite shares to individually put forward proposals for

consideration at shareholders' meetings, pursuant to Article 54 of GTC's AoAs."  *Id*. at

12 (footnotes omitted).  On the issue of the board's ability to control GTC's

management, Commerce pointed to Article 130 of the AoAs, which "states that the

board of directors shall appoint or remove GTC's general manager and four deputy

managers."  *Id*. at 13 (footnote omitted).

In response to *Guizhou Tyre I*, the Remand Redetermination provided a revised explanation for its methodology.  Commerce restated the four factors that it "typically considers" in determining "whether a respondent is subject to *de facto* control of its export functions:"

> (1) whether the export prices are set by, or are subject to the approval of, a government agency;
>
> (2) whether the respondent has authority to negotiate and sign contracts and other agreements;
>
> (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and,
>
> (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.

*Id*. at 9 (footnote omitted).  Commerce explained that its "practice is to deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the factors (the aforementioned *de facto* factors) and that if an applicant fails to establish any one of the criteria, Commerce is not required to continue its analysis with respect to the remainder of the criteria."  *Id*. (footnote omitted).

Based on the record evidence summarized above, Commerce concluded "that GTCIE is not free from government control in making decisions regarding the selection of its management," *id*. at 10, and, under its practice, considered that finding sufficient to support a denial of separate rate status, *id*. at 15.  Commerce acknowledged that

GTCIE satisfied the first factor in its four-part test, stating that "sales manager(s) set export prices for GTCIE" and that "there was no indication of direct involvement or approval on behalf of any government authority regarding price-setting." *Id*. at 21. Commerce also found that GTCIE satisfied the second factor because it demonstrated "authority to negotiate and sign contracts and other agreements on its own behalf." *Id*. (citation omitted).  Commerce cited evidence that GTCIE was not independent from GIIG's exercising control over distribution of profits, and, thus, that GTCIE did not satisfy the fourth factor.  *Id*. at 15, 21.

On the question of government control of "export functions," Commerce further explained that its finding as to the second factor, autonomy from the government in making decisions regarding the selection of management, "allows for the reasonable inference, considering the presumption of government control in NME [nonmarket economy] country proceedings, that their respective government shareholders maintain the potential to control the export operations of GTC and its wholly owned subsidiary, GTCIE, because the management of a firm controls its operations, including its export functions." *Id.* at 19.

Commerce also explained why it considered independence in setting export prices insufficient to show independence from control of export functions.  In addition to explaining that control over selection of management supports an inference of control over operations generally, including export operations, Commerce explained that

independence from government control over setting of export prices does not

necessarily mean independence from government control of other individual company

activities affecting export functions.  *Id.* at 22–23.

Guizhou Tyre challenges the Remand Redetermination on three grounds.  It

argues, first, that the decision does not comply with *Guizhou Tyre I.*  Guizhou Tyre's

Comments 4–19.  Second, it argues that substantial evidence on the record does not

support the denial of separate rate status to GTCIE.  *Id*. at 23–28.  Third, it argues that

Commerce unlawfully implemented a new analysis that is inconsistent with its past

practice.  *Id*. at 28–31.  The court addresses each of these arguments below.

In support of its first argument, Guizhou Tyre maintains that the court in

*Guizhou Tyre I* "rejected Commerce's effort to avoid the first and second *de facto* factors"

and that Commerce "claims authority to deny GTCIE's separate rate based on

management selection and profit distribution—without considering other factors."  *Id*.

at 6 (citing *Guizhou Tyre I,* 557 F. Supp. 3d at 1318–20 and *Remand Redetermination* at

15–16, 18–21, 23, 40–42).  In the view of these plaintiffs, Commerce must consider all

four factors in light of the evidence on the whole and, specifically, demonstrate

government control of prices of truck and bus tire exports before denying separate rate

status.  *Id*. at 13–17.  These arguments are not convincing for two reasons: they read too

much into the court's decision in *Guizhou Tyre I,* and they incorrectly presume that

Commerce lacked any discretion to apply its four-part test so as to require

independence from government control as to each of the four factors.

      *Guizhou Tyre I* did not hold that the Department's practice of requiring a separate

rate respondent to demonstrate independence as to all four factors was unlawful *per se*.

Although questioning the Department's rationale as to the first factor, the court's

decision did not go so far as to require Commerce to recognize separate rate status

absent evidence of government control of export prices.  Instead, the court viewed the

reasoning Commerce put forth in support of its less-than-fair-value determination as

"flawed, being vague and ambiguous as to whether its inquiry is focused on

government control of export activities."  *Guizhou Tyre I*, 557 F. Supp. 3d at 1318.  In

response, the Remand Redetermination offers new reasoning for the court's

consideration, and the issue presented is whether that reasoning suffices to support the

Department's ultimate conclusion to deny separate rate status to GTCIE.

      Commerce must be afforded broad discretion in crafting a methodology for

making its *de facto* determination.  As this Court has recognized, neither the adoption of

the rebuttable presumption of government control, nor the methodology by which

Commerce effectuates it, implements any specific provision of the Tariff Act or a

procedure set forth in the Department's regulations.  *See*, *e.g.*, *Jilin Forest Indus. Jinqiao*

*Flooring Grp. Co. v. United States*, 47 CIT __, __, 617 F. Supp. 3d 1343, 1356 (2023).  As a

result, the court is guided by no statutory language, legislative history, or regulatory

language or preamble in judging whether the Department's methodology is *ultra vires*

or unreasonable *per se*.  At the same time, binding precedent of the Court of Appeals for

the Federal Circuit ("Court of Appeals") repeatedly has affirmed the Department's

authority to apply a rebuttable presumption of government control.  *CMA*, 1 F.4th at

1039; *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017).

A court, therefore, must afford Commerce the discretion to select the methodology by

which it interprets and effectuates its presumption of government control over export

functions and thereby will decide which exporters are included within the PRC-wide

entity, so long as that methodology is reasonable.  The breadth of this discretion

requires the court to reject Guizhou Tyre's general objection to the methodology

Commerce applied in the Remand Redetermination, which placed weight on the ability

of a single, government-owned shareholder to control the selection of board members

and to control indirectly the selection of the senior managers who operated the

company.  From record evidence demonstrating that ability, Commerce reasonably

could find or infer that GIIG had the power to exert significant control or influence over

the business operations of GTC and its wholly-owned affiliate, GTCIE, including

operations involving exports.  An agency has the discretion to draw reasonable

inferences from the record evidence.  *SeAH Steel VINA Corp. v. United States*, 950 F.3d

833, 845 (Fed. Cir. 2020) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927,

933 (Fed. Cir. 1984) for the principle that "substantial evidence includes 'reasonable

inferences from the record'")  While Guizhou Tyre objects on the ground that GIIG was not a majority shareholder, that fact alone is not sufficient to refute the Department's findings as to the third and fourth factors of its *de facto* test.

Guizhou Tyre argues that after it placed on the record evidence sufficient to rebut the presumption of government control, it then became the Department's burden to establish government control of GTCIE's export functions, Guizhou Tyre's Comments 11–15, a burden Commerce did not meet, *id*. at 23–27.  In addition, it argues, Commerce could not lawfully deny separate rate status absent evidence of "actual state control" as opposed to "potential to control."  *Id*. at 19–23.  These arguments are also unconvincing.

The Department's third criterion requires a respondent to rebut the presumption by demonstrating "autonomy" from the government in making decisions regarding the selection of management and "independent" decisions regarding the disposition of profits.  Guizhou Tyre is, essentially, taking issue with the criteria the Department chose to apply, which focus on the government's *ability* to exert influence or control.  Guizhou Tyre argues, further, that Commerce ignored evidence that a Nomination Committee under GTC's board of directors, and not GIIG, was responsible for the nominations of board members and that the election of board members was in compliance with the AoAs and all applicable legal requirements.  *Id*. at 24.  It argues, in addition, that "[w]hile managers are selected by the board, they must work for the best interests of

GTC; board members and management owe fiduciary duties to GTC and **all** of its shareholders." *Id*. at 25 (citation omitted). The evidence concerning the formalities of the nomination process does not refute evidence, including evidence on ownership, the AoAs, and proprietary information on voting records, *see Remand Redetermination* at 12–13, that together demonstrate GIIG's ability to control or influence the general business operations of GTC and GTCIE and, specifically, profit distribution. Also, Commerce did not base its determination on a finding that GIIG or GTC's board of directors did anything improper, inimical to the company's interests, or in derogation of a fiduciary duty.

Guizhou Tyre's third argument is based on the notion that Commerce departed from "longstanding" practice in adopting a new methodology that "myopically fixates on management selection and to a lesser extent profit distribution." Guizhou Tyre's Comments 28. In a related argument, it points out that Commerce conferred separate rate status on GTC for the fifth review of the antidumping duty order on off-the road tires from the PRC in 2015, when GIIG's ownership share was 33.6% and the Guiyang SASAC was conducting performance reviews, which it no longer was doing during the POI. *Id*. at 25 (citing *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012–2013*, 80 Fed. Reg. 20,197 (Apr. 15, 2015)).

An agency may change its practice if it provides an adequate explanation.  *See, e.g.*, *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (citing *Atchison*, 412 U.S. at 808) ("Commerce is permitted to deviate from this past practice, at least where it explains the reason for its departure," where the "past practice" was "not a burden imposed by statute or regulation" but was merely "a general practice of Commerce.").  Commerce explained that its practice has evolved upon its considering decisions of this Court, including *Advanced Technology & Materials Co. v. United States*, 37 CIT 1487, 938 F. Supp. 2d 1342 (2013), which, although differing from this case in involving majority government ownership, sustained a denial of separate rate status based on a government shareholder's ability to control the composition of the board of directors and the selection of management.  *Remand Redetermination* at 15–17.

In summary, Commerce employed a methodology that is not *per se* unreasonable, is adequately explained, and is reasonable in light of the wide discretion the agency is afforded under applicable precedent of the Court of Appeals.[6]  Applying that

---

[6] In this proceeding, neither group of plaintiffs argued that the *de facto* test for separate rate status was invalid for the failure to adhere to notice-and-comment rulemaking.  *See Guizhou Tyre Co., Ltd. v. United States*, 46 CIT __, __, 557 F. Supp. 3d 1302, 1326 n.18 (2022).  In its comment submission, Double Coin observed that "[t]his test is a matter of agency practice untouched by the legislature or even notice and comment," Consol. Pls. Comments on Remand Redetermination 17 (May 25, 2022), ECF (continued . . .)

methodology, Commerce acted upon a sufficient basis in the record evidence when it

denied separate rate status to GTCIE.

### 3.  The Department's Decision that Double Coin Did Not Rebut the Presumption of Government Control

Commerce found that Shanghai Huayi (Group) Company ("Shanghai Huayi")

held a 72.15 percent ownership share in Double Coin during the POI and, in turn, was

100 percent owned by the Shanghai State-owned Assets Supervision and

Administration Commission ("Shanghai SASAC"), a government entity.  *Remand*

*Redetermination* at 24.  Commerce found, further, that Shanghai Huayi, as the majority

shareholder, "has rights to elect directors at the shareholders' general meetings in

accordance with the number of shares it owns, *i.e.*, 72.15 percent" and that "Double

Coin's board appoints its general manager, and the general managers appoints other

managers, including deputy general managers."  *Id*. at 26.  Finding also that "[t]hree of

four directors are general manager and deputy general managers," Commerce

concluded from these uncontested facts that "Shanghai SASAC controls the selection of

Double Coin's management and the *de facto* control over Double Coin exists."  *Id.*

(footnote omitted).

---

(. . . continued)
No. 71, but the submission does not state a claim that the failure to engage in notice-
and-comment rulemaking invalidated the agency's decision.

Commerce also made findings pertaining to CMA, Double Coin's affiliated U.S. importer.  Commerce found that Double Coin "can effectively appoint CMA's directors and managers, who control the operations (including export activities) of CMA, by virtue of being the majority shareholder of CMA."  *Id*. at 29.  While Commerce also found that while "there was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor)," *id.* at 30, CMA's negotiating prices with unaffiliated U.S. customers does not suffice to rebut the presumption of government control over export functions in light of the ability of Double Coin's board to "effectively appoint CMA's directors and managers, who control the operations (including export activities) of CMA," *id*.at 29.

Double Coin objects to the decision in the Remand Redetermination by raising three arguments: (1) Commerce essentially is applying an "irrebuttable presumption" that majority government ownership establishes control over export functions, Double Coin's Comments 3–6; (2) Commerce failed to show a "compelling basis" for linking potential influence over the selection of management to actual control of export activities, *id*. at 7–10; and (3) "the record does not support" the Department's conclusion, *id*. at 11–16.

On the first argument, Double Coin validly can object that majority ownership by a government entity such as a SASAC will make it impossible for a respondent to obtain a separate rate.  The Department's reliance on the decision of this Court in *Advanced*

*Technology & Materials Co. v. United States*, supports such an objection.  In explaining the

decision in the Remand Redetermination, Commerce struggled to leave room for the

remote possibility that a majority-government-owned company could be organized and

governed such as to prevent the Chinese government's ability to control the company's

operations.  Commerce discussed that possibility in this way:

> To clarify, if the majority ownership by a SASAC entity entitles the
> SASAC entity to make decisions regarding the selection of management of
> a respondent, then the respondent will necessarily not be able to show
> that it has autonomy from the government in making decisions regarding
> the selection of management (the third factor) and, thus, it will necessarily
> be ineligible for a separate rate.  We disagree, however, that a finding of
> majority ownership by a SASAC entity is a bright line test for which there
> is no evidentiary escape.  While we acknowledge that we would expect
> such instances to be rare, if a respondent were to show that the SASAC
> entity could not make decisions regarding the selection of management of
> the respondent despite owning a majority share of the respondent, then
> the respondent may satisfy the third factor and, assuming it satisfied all of
> the other *de facto* and all of the *de jure* factors, it would be eligible for a
> separate rate.

*Remand Redetermination* at 64.  Double Coin objects, justifiably, that the Remand

Redetermination itself contradicts this explanation.  As Double Coin points out, Double

Coin's Comments 4, the Remand Redetermination contains the following statement:

> In evaluating the *de facto* factors, Commerce has found that where a
> government entity holds a majority ownership share, either directly or
> indirectly, in the respondent exporter, the majority ownership holding in
> and of itself means that the government exercises, or has the potential to
> exercise, control over the company's operations.

*Remand Redetermination* at 26 (citation omitted).  "This may include control over, for

example, the selection of management, which is a key factor in determining whether a

company has sufficient independence in its export activities."  *Id*.  The Remand

Redetermination includes these statements even though also stating that "[w]e clarify

that Commerce did not find that a lack of autonomy in management selection equates

to a direct finding of government control of export activities."  *Id*. at 25–26.

Commerce itself acknowledged that the possibility of a majority-government-

owned respondent's obtaining a separate rate under the Department's practice is more

theoretical than real.  Moreover, the ambivalent way the Remand Redetermination

approached this possibility was, at best, inartful.  Nevertheless, the Department's

inartful and internally-inconsistent approach does not give the court a basis to order

another remand.  This case does not present the question of whether a majority-

government-owned respondent could place on the record evidence demonstrating that

the majority shareholder could not control the selection of management.  The

evidentiary record in this proceeding, under which Commerce permissibly could find

that Double Coin was not free of government control or influence on the issue of

management selection, does not demonstrate such a possibility.  Commerce permissibly

found that the majority shareholder had the power to select the members of the board,

that the board appointed the company's general manager, and that the general

managers appointed other managers, including deputy general managers.  *Id*. at 26.

These findings were adequate to support a conclusion that Double Coin did not

demonstrate its right or ability to select management independently of the government-

owned shareholder.

Double Coin quotes *Universal Restoration, Inc. v. United States*, 798 F.2d 1400, 1406

(Fed. Cir. 1986) for the principle that "[a]n irrebutable presumption of fact violates due

process."  Double Coin's Comments 6.  This argument is unavailing.  The Court of

Appeals made that statement in reversing a decision of the Court of Claims that a

contractor had violated the Truth and Negotiations Act, 10 U.S.C. § 2306(f), when it

failed to disclose its actual overhead to the government, as required by a standard

contract term, during negotiations for a building renovation project.  *Universal*

*Restoration*, 798 F.2d at 1406 (citing *Vlandis v. Kline*, 412 U.S. 441, 453 (1973)).  The

principle the Court of Appeals identified referred to an established presumption, which

the contractor could rebut, that the contract price would have been lower but for the

nondisclosure.  *Id*.  Based on the "due process" principle identified in *Universal*

*Restoration*, Double Coin argues that "Commerce's redetermination is premised on a

prohibited analytical approach and must be remanded as unlawful."  Double Coin's

Comments 6.  In its opinion in *Universal Restoration*, the Court of Appeals ruled that the

contractor actually did rebut the presumption.  *Universal Restoration*, 798 F.2d at 1406.

Double Coin's reliance on the case is misplaced because in this instance, Commerce

permissibly relied on record evidence to conclude that Double Coin did *not* rebut the

presumption of government control over the selection of management.

Double Coin's argument that Commerce lacked a "compelling basis" for linking

potential influence over the selection of management to actual control of export

activities, Double Coin's Comments 7–10, is also unpersuasive.  This argument

essentially is a contention that Commerce lacked discretion to deny separate rate status

when a respondent failed to demonstrate independence from the government in the

selection of management, i.e., it failed to satisfy the third criterion.  But as explained

above, a court must afford Commerce the discretion to devise and apply reasonable

criteria for deciding the composition of the PRC-wide entity.

Double Coin's final argument is that the Department's denial of separate rate

status is not supported by substantial record evidence.  *Id*. at 11–16.  Double Coin

highlights evidence that "CMA negotiated its prices free of government control," *id*.

at 11, but this argument also takes issue with the *de facto* criteria *per se* and the

Department's practice of requiring a separate rate respondent to satisfy each of them.

Double Coin objects that the decision "fail[s] to account for affirmative evidence

submitted by Double Coin that shows that, with respect to Double Coin, the Company

Law, the Code of Corporate Governance, and Double Coin's articles of association were

effective during the investigation and actually prevented the type of influence that

Commerce has inferred."  *Id.* at 13.  It points to an affidavit from Double Coin's Legal

Director certifying that "[t]he Corporate Governance Code, much like the Company

Law, provides that a publicly traded company should act independently from the

controlling shareholder for all issues of substantial relevance for the company and that

directors and management must act in the interests of the company." *Id.* (quoting

*Double Coin's Separate Rate Application* at Ex. 17 (May 23, 2016) (P.R.R. Doc. 297)).

     The Legal Director's opinion, although record evidence, is not the only evidence

relevant to whether Double Coin demonstrated that its management was *de facto*

independent of a majority shareholder entirely owned by a government entity.  Other

evidence established that shareholder's ability to control, directly or indirectly, the

selection of the company's senior management.  Commerce could infer that the Legal

Director, unlike Commerce itself, did not consider this ability to be among the "issues of

substantial relevance to the company."  The broad, indefinite language of the Legal

Director's opinion begs the question of what, if any, influence the Legal Director would

consider the government-owned majority shareholder to have.  Also, Commerce was

aware of evidence that could support a conclusion that Chinese laws, in some respects,

treated companies in which the government held a majority interest in the same way it

treated other public companies, but that evidence did not require Commerce to base a

denial of separate rate status on a company's having violated those laws or having

acted contrary to the company's business interests.

### 4. Double Coin's Claim that Commerce Failed to Verify Double Coin's Information on Separate Rate Status

In *Guizhou Tyre I*, the court deferred a decision on Double Coin's claim that Commerce was required to, but did not, verify the information Double Coin submitted in seeking separate rate status, reasoning that "it is not known at this time what record information will form the basis for the Department's new decision, as set forth in a redetermination submitted upon remand, and whether any factual determinations underlying that redetermination will be in dispute." *Guizhou Tyre I*, 46 CIT at __, 557 F. Supp. 3d at 1326–27. The Remand Redetermination did not address this claim. Double Coin, while commenting that the Remand Redetermination was unsupported by record evidence, did not renew or otherwise preserve its claim that verification was required for the record information it submitted. *See* Double Coin's Comments 3–17. The claim, therefore, is waived.

### III. CONCLUSION

The Remand Redetermination permissibly determined that GTCIE and Double Coin failed to rebut the presumption of *de facto* control of their respective export functions and, as a result, did not qualify for separate rate status. The Remand Redetermination also achieves a satisfactory resolution of the issue posed by the Department's premature issuance of the Order, to which resolution plaintiff does not object.

**Consol. Court No. 19-00031**                                                      **Page 30**

The court will enter judgment in accordance with this Opinion.

<u>/s/ Timothy C. Stanceu</u>
Timothy C. Stanceu
Judge

Dated: May 22, 2023
        New York, New York